UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 0 3 2016 ★

BROOKLYN OFFICE

-------------------------------------------------------------- X

THREELINE IMPORTS, INC.,

        Plaintiff,

    - against -

GRIGORIY VERNIKOV a/k/a GREGORY
VERNIKOV, INTERPAGE INTERNATIONAL
INC. d/b/a INTERPAGE CO.

        Defendants.

-------------------------------------------------------------- X

**MEMORANDUM & ORDER**

15 Civ. 02333 (AMD) (RML)

**ANN DONNELLY,** District Judge.

    The plaintiff, Threeline Imports, Inc., initiated this action against defendants Grigoriy

Vernikov and Interpage International Inc. d/b/a Interpage Co. for trademark infringement and

counterfeiting pursuant to 15. U.S.C. §1114 on April 23, 2015. The defendants then asserted

federal and state law counterclaims against the plaintiff, including for trademark infringement.

The core of this action is the parties' dispute as to ownership of a trademarked chicken-and-egg

logo that is used on certain imported pasta products.

    I held a bench trial as to liability on the parties' claims in January 2017. For the reasons

set forth below, I find that the plaintiff did not prove at trial that it had valid rights to the

chicken-and-egg logo, and therefore has not proved its Lanham Act infringement and

counterfeiting claims against the defendants. On the other hand, I find that the defendants have

1

established common law rights in the chicken-and-egg logo, and have shown that the plaintiff is liable to them for Lanham Act unfair competition, infringement and false designation of origin, as well as common law unfair competition and unjust enrichment. The Court will consider damages in the next phase of this case.

## PROCEDURAL HISTORY

On the same day that it filed its complaint, the plaintiff moved for a preliminary injunction preventing the defendants from using its registered trademark, this chicken-and-egg logo:



After holding an evidentiary hearing, the Honorable Brian M. Cogan granted the injunction on May 21, 2015.[1] The parties engaged in extensive discovery, and then cross-moved for summary judgment on all claims in the case.[2]

---

[1] The defendants twice moved for reconsideration of the preliminary injunction due to "newly discovered" evidence. Judge Cogan denied both requests.

[2] The plaintiff moved for summary judgment on its trademark infringement and counterfeiting claims, and on all of the defendants' counterclaims. The defendants cross-moved for summary judgment on the plaintiff's trademark claims, their own trademark and copyright counterclaims, and opposed the plaintiff's motion as to their state law counterclaims.

I issued my decision on the parties' motions for summary judgment on October 28, 2016. In that decision, I found that there were genuine issues of material fact as to the plaintiff's trademark infringement and counterfeiting claims and as to the defendants' cross-claims for trademark infringement, unjust enrichment, and unfair competition. I dismissed the defendants' claims for copyright infringement and tortious interference with business relations, as well as their claims pursuant to New York General Business law.

A bench trial as to liability on the parties' remaining claims began on January 17, 2017.[3] The key question is whether two containers of pasta product bearing the chicken-and-egg logo that arrived at Threeline's warehouse in December of 2012 inured to the benefit of Grigory Vernikov, as owner of Interpage Co., or to Threeline.

## FINDINGS OF FACT

Threeline Imports Inc., the plaintiff in this action, is an importer and distributor of food products, including confectionary products, candy, pasta, and grain products, from Europe and the former Soviet Union. (Tr. 32:15-17.)[4] Malvina Kerzhner is its president, and her husband, Leonid Kerzhner, is its general manager. (Tr. 31:21-23; 34:13-14, 34:23-24, 203:22-24.) After importing products into the country, Threeline, which was started in 2006, sells them to retailers and distributors across the United States. (Tr. 204:17-205:3.) In 1993, the defendant, Grigory Vernikov, started a corporation called Interpage International, an import/export company that imports confectionary products from the Ukraine, Russia, and the Baltic states. (Tr. 307:18-

---

[3] The parties agreed to bifurcate this action into a liability and damages phase.

[4] Citations to "Tr." are to the transcripts of the trial that took place on January 17, 19, and 20, 2017.

3

308:2; 308:18-22; 310:15-17.)[5] He initially ran the company out of a warehouse space in Brooklyn. (Tr. 310:5-7, 311:8-16.)

At trial, witnesses for the plaintiff included Malvina Kerzhner, Leonid Kerzhner, their son, Alexander Kerznher, and Roman Katsnelson. Grigory Vernikov, along with two representatives from third-party companies, Rafail Levin and Kristaps Koskins, testified for the defendants.[6] I did not find Ms. Kerzhner's trial testimony to be credible on any issue; as I will explain in more detail below, her testimony was plagued by internal inconsistencies, and sometimes changed from minute to minute. Further, her testimony has changed throughout the course of this litigation, apparently depending on what she thought would be most favorable to the plaintiff's position at that time. Moreover, in an effort to distort the record, she tampered with a spreadsheet that undercut the plaintiff's position, by deleting references to certain entities. While Leonid Kerzhner's testimony did not suffer from the same glaring inconsistencies as Ms. Kerzhner's did, it did little to advance the plaintiff's case. By contrast, I found Vernikov a credible witness. His testimony was consistent and credible, and he was able to provide details that were missing from the testimony of both Leonid and Malvina Kerzhner. His testimony was also supported by the record evidence.[7]

Vernikov first met Leonid Kerzhner in 2002, when Kerzhner came to Interpage's warehouse to purchase food products on behalf of his employer at the time, a company called

---

[5] Vernikov testified that Interpage International was incorporated in New Jersey. (Tr. 307:24-25.)

[6] Malvina Kerzhner, Leonid Kerzhner, Vernikov, and Koskins all testified through a Russian language interpreter.

[7] This is not to say, however, that there were no inconsistencies in Vernikov's testimony at trial and throughout the course of this litigation. However, on the whole, I found his testimony credible.

4

MegaFood. (Tr. 312:13-313:11.) Kerzhner continued to purchase food products from Interpage

when he started working for a company called Trilini Imports[8] in around 2004, and in late 2004,

he offered Vernikov space in Trilini Imports' warehouse. (314:5-17; 314:19-315:3; 316:5-13.)

Although Mr. Vernikov was initially uninterested, he agreed to move Interpage to Trilini

Import's warehouse when the rent on his warehouse went up in 2005. (Tr. 315:12-21.)[9]

According to Vernikov, the terms of this arrangement were that Interpage would occupy space in

the warehouse rent-free. (Tr. 315:22-316:18.) In return, Vernikov sold goods that he imported

through Interpage to Trilini, and then Threeline, at cost. (Tr. 322:19-323:12.) Vernikov also

sold goods to other customers during this time period. (Tr. 317:20-23; 323:13-19; *see also* Def.

Ex. W (reflecting sales by Interpage Co.).) It is undisputed that when Vernikov moved into

Threeline's warehouse, Threeline was aware that Vernikov was running his own business under

the name "Interpage." (Stipulated Statements of Fact ("Stip."), ECF 104, ¶ 7.)[10]

---

[8] Trilini International is a company established in 1992 by Yury Leschinsky, Arkady Volovik, and Roman Katsnelson, and that is involved in the purchase and sale of ingredients for confectionary products. (Tr. 205:11-25; 264:1-6.)

[9] In 2006, Mr. Kerzhner became involved with Threeline Imports. (Tr. 316:14-18.)

[10] At trial, Ms. Kerzhner initially testified that Vernikov was not running his own business out of Threeline's warehouse. (Tr. 39:24-40:3.) About one minute later, however, she conceded that she knew that he had his own business, and that he was running it from Threeline's warehouse. (Tr. 40:15-41:14; Tr. 42:18-24.) Then, on cross, Ms. Kerzhner participated in this exchange:
> Q [The Court]: This company, Interpage Company, this was connected with Mr. Vernikov, correct?
> A: Yes.
> Q [The Court]: And you knew about it, correct?
> A: Yes.
> Q [The Court]: And did he run it out of your warehouse?
> A: Well, maybe. Maybe from his home. Maybe from the warehouse. I'm not sure.
> Q [Mr. Drangel]: Did Interpage Co. run its own business out of your warehouse between the years 2006 and 2009?
> A: In my understanding, no.
> Q [Mr. Drangel]: Did you give free rent to Mr. Vernikov to run his Interpage business to Mr. Vernikov between the year 2006 and 2009?

Vernikov became an employee of Threeline in late 2008 or 2009, when he was going through some financial difficulties and needed the money. (Tr. 318:2-319:15; 206:1-8.) According to Vernikov, when he spoke to Malvina and Leonid Kerzhner about working at Threeline, he "told them my terms, that I wanted to maintain my own business. I said that I agree to work for you but I want to also keep my business. They said, 'okay, no problem.'" (Tr. 319:5-20.) His title at Threeline was exporter/buyer, and his responsibilities included handling logistics, transportation of containers, making sure that labels were filled out, and working with customs and the FDA. (Tr. 320:11-12; 206:12.) When he was doing this work for Threeline, he

---

A: He did not have his own business and we did not rent out anything to him free of charge.
Q [Mr. Drangel]: And you did not buy products from the Interpage Co. company or Mr. Vernikov between 2006 and 2009; is that correct?
A: We did not buy from him.
The Court: I am so confused. You said different things each time you're asked a question, and maybe I'm just not understanding. Did Mr. Vernikov have or not have a company called Interpage in the time period that the lawyer is asking you about?
A: Yes. (Tr. 110:13-111:17; see also Tr, 117:13-21.)

Ms. Kerzhner's testimony on the subject of whether Mr. Vernikov had a separate company called Interpage Co. that he operated out of the Threeline warehouse was ever-changing and nearly impossible to pin down. The record evidence, however, shows that Vernikov was running his business out of Threeline's warehouse, and that Threeline not only knew about it, but was purchasing products from Interpage Co. For example, excerpts from Threeline's Quickbooks demonstrate that in the 2006-2009 time period, Threeline was making payments to Interpage Co. (Def. Ex. BG; Tr. 107:24-109:15.) Further, where it suited her purposes, Ms. Kerzhner admitted to third parties that she was aware that Vernikov was running his own business out of Threeline's warehouse. (See, e.g., Def. Ex. BH (August 20, 2013 email from Malvina Kerzhner to a contact at Brivais Vilnis, a Latvian company that produced canned fish products, stating, "[a]t the time, we are also fully aware that Mr. Vernikov had his own business on the side.")). But despite this record evidence, Ms. Kerzhner repeatedly changed her testimony on whether or not Vernikov was running Interpage Co. out of Threeline's warehouse, and denied purchasing products from Interpage Co. (See, e.g., Tr. 150:6-8 ("I repeat, I – we did not purchase from Interpage. He worked for us as a buyer and he did negotiations on our behalf."). Overall, I do not find Ms. Kerzhner's testimony on the subject of Mr. Vernikov's work for Interpage, or Interpage's sales to Threeline, to be at all credible.

also continued to sell goods to Threeline and his other customers through Interpage. (Tr. 319:24-320:2; 320:13-16; 323:25-324:4; Def. Ex. D (sales by Interpage Co. and Interpage International to other customers from 2008-2010).)

In July 2011, Vernikov received a call from Claus Dorner, the commercial manager of a German pasta manufacturer called ALB-Gold. (Tr. 332:17-20.) Dorner explained that he had seen a pasta product at a food exhibition that had Vernikov's contact information on it, and proposed that Vernikov purchase pasta from ALB-Gold. (Tr. 332:20-23; *see also* Def. Ex. X at IPV00335 (email from Vernikov to Dorner stating, "I would like to remind you a few points from our cooperation. It was your idea back in 2011 and you have offered me to be your distributor, despite you [k]new that I was working with 'Tress' [another pasta manufacturer]"). Dorner sent Vernikov a catalog of ALB-Gold products, and invited him to attend the Anuga food exhibition in Paris. (Tr. 333:1-7; Def. Ex. BB.)

Vernikov and Leonid Kerzhner attended the Anuga exhibition in Paris that year, where they met with ALB-Gold representatives, including Dorner. (Tr. 333:8-10.)[11] Vernikov spoke to Dorner, but Leonid "did not say a word." (Tr. 333:11-12.) Vernikov told Dorner that he would purchase from ALB-Gold certain types of pasta that the other company he worked with, Franz Tress, did not produce, and that he would be in touch. (Tr. 333:12-14.) After the meeting,

---

[11] Ms. Kerzhner testified that Threeline first learned of ALB-Gold when Leonid and Vernikov attended this trade show. (Tr. 57:25-58:6.) The plaintiff also introduced evidence that Threeline paid for at least some of Vernikov's trip to the trade show, and suggests that this shows that Vernikov must have entered the contract with ALB-Gold on behalf of Threeline. However, since Threeline also purchased products that Interpage imported, I do not find that this is dispositive of the issue of which party owned the contract.

Leonid advised Vernikov not to do business with ALB-Gold, and described Dorner as a "con artist." (Tr. 333:20-334:15.)[12]

In the summer of 2012, Leonid Kerzhner asked Vernikov for the ALB-Gold catalog. (Tr. 334:23-335:5.) Leonid said that he was interested in purchasing some ALB-Gold products, so Vernikov began negotiating with Dorner, who sent samples of the pasta. (Tr. 335:6-10.) Vernikov also began working on an exclusive contract with ALB-Gold for the distribution of its pastas in the United States, Canada, Israel, and the former USSR. (Pl. Ex. 16.) The contract was drafted by the Kerzhner's son, Alexander Kerzhner, a lawyer. (Tr. 338:10-16.)

The contract, which was effective as of January 1, 2013, was between ALB-Gold and a company called "Interpage Co. Inc.," which is described as the distributor. (Pl. Ex. 16.) The agreement was signed by Claus Dorner on behalf of ALB-Gold, and by Gregory Vernikov as "President." (*Id.*) Atop Vernikov's signature is the corporate seal for "Interpage Co. New York State 1993." (*Id.*, at 10.) In several places throughout its text, the contract refers to a brand called "Delicious Wonders." (*Id.*, at 2, 3.)

The parties dispute whether Vernikov entered the ALB-Gold contract on behalf of his own company, Interpage Co., or on behalf of a company with an almost identical name, Interpage Co., Inc ("ICI"). Roman Katsnelson, the Vice President of Trilini International, incorporated ICI in 2009 at Malvina Kerzhner's request. (Tr. 263:20-25, 267:8-268:3, 268:9-

---

[12] I credit Vernikov's account of what happened at the Anuga trade show. While Leonid Kerzhner also testified regarding this trip, Vernikov was able to provide a much more detailed account of what took place. For example, Vernikov was able to recount, in detail, the conversation he had with Dorner, along with a conversation that he had with Kerzhner as to why Kerzhner felt that Dorner was a "con artist." Kerzhner, on the other hand, recounted only that Dorner "wanted us to purchase his pasta and we sat down to talk," and provided no other details. (Tr. 214:24-215:2.)

11.) Leonid Kerzhner testified that he was aware of Vernikov's company, Interpage Co.,[13] but that he and his wife decided to name their new company "Interpage Co., International" because "cans everywhere had the name Interpage," and "we ha[d] to protect it somehow and secure" these product lines. (210:4-20.) Similarly, Ms. Kerzhner testified that she decided to give the company a name that was very similar to Mr. Vernikov's company because "our products and cans had the name 'Interpage' on them and they were already in line." (Tr. 52:20-22.) Mr. Katsnelson also testified that Ms. Kerzhner asked him to form ICI "to protect the line of products." (Tr. 268:1-3.) Mr. Katsnelson believed that Ms. Kerzhner came up with the name of the company, and explained that "[i]t's the same business as Threeline . . . It's nothing special." (Tr. 269:6-7; 269:8-10.)[14]

Malvina Kerzhner testified that in the normal course of business, the parties "did not distinguish between the Interpage Co. and Interpage Co. Inc" because "we did business as Interpage and Threeline at the same time." (Tr. 125:2-11.)[15] Similarly, Leonid Kerzhner testified that "[t]here was no difference at the time between Interpage or Interpage Co;" Vernikov would "sometimes use our company and we would sometimes use his company. And for many years, there were no issues." (Tr. 225:1-4; *see also* 209:10-210:7) Indeed, when asked

---

[13] Kerzhner also acknowledged that Vernikov's Interpage Co. was operative as a "doing business as" corporation at this time. (210:23-211:4.)

[14] Katsnelson testified that Vernikov refused his offer of shares in ICI, but that he did not object to the name of the company. (Tr. 268:15-269:2; 269:23-270:1.) Vernikov, on the other hand, testified that he was never offered shares in ICI, and that he did not learn about the company until 2010. (Tr. 385:23-386:5.) At that point, Vernikov asked Threeline's accountant about ICI, and was told that Threeline was trying to help him out due to his issues with his wife, and that that was why they opened the company. (Tr. 355:2-16.)

[15] Malvina Kerzhner testified that the ALB-Gold agreement was executed by ICI because "[i]t was our company, Interpage Co. Inc." (Tr. 88:9-11.)

why the last page of the ALB-Gold contract says "Interpage Co.," Leonid Kerzhner testified that this was because "they were all companies that worked for Threeline," and "we never paid much attention; there were no issues raised whether it was Interpage or Interpage Co., Inc. or Threeline." (Tr. 226:21-227:18; *see also* Tr. 209:14-210:3.)

By contrast, Vernikov testified that the use of "Interpage Co. Inc." on the first page of the ALB-Gold contract was a mistake that he had not noticed at the time, as Alexander Kerzhner, the Kerzhner's son, was its primary drafter. (Tr. 338:14-19; 283:7-10.)[16] Vernikov testified that he signed the contract on behalf of his own company, Interpage Co., not ICI, and said that it was Interpage Co.'s company seal that he stamped atop his signature. (Tr. 338:21-339:2.) The parties have stipulated that Vernikov was not a director, officer, shareholder, or employee of ICI (Stip. ¶ 15; *see also* 332:2-8); he was, however, the President of Interpage Co. (Tr. 331:23-24.)

The only plausible inference from the Kerzhners' decision to create a company with a name almost identical to Mr. Vernikov's company is that they knew that products that they purchased through Vernikov's company and were selling to their customers included the "Interpage Co." name and label, and they wanted to claim ownership of those products. Further, although the Kerzhners both testified that none of the parties paid attention to which company name was used when entering into contracts, the evidence shows that the Kerzhners did enforce

---

[16] The history of Vernikov's Interpage Co., like everything in this case, also has its twists and turns. Vernikov testified that he started Interpage International in 1993, and that it was registered in New Jersey. The company then proceeded to go through different forms over the next two decades; Vernikov's former wife filed a doing business certificate for the name Interpage Co. in 2004, and Vernikov first filed a doing business certificate as Interpage Co. in 2000, and then again in 2003 and 2009. (Tr. 380:8-22; Def. Ex. A.) In 2011, Vernikov created another company called Interpage International Inc. (Tr. 386:21-387:5.) Vernikov admitted, however, that Interpage Co. was not a corporation in New York state in 2011. (Tr. 389:3-5; 391:13-15; 55:12-15 ("Q: And again, just to clarify, did Mr. Vernikov have a registered corporation known as Interpage in 2009? A: In 2009, he did not have any company under the Interpage name.").)

corporate distinctions when it was useful to them to do so. For example, when the Department of Human and Health Services was investigating a shipment of canned fish, Ms. Kerzhner signed an affidavit stating that,

> Mr. Gregory Vernikov of Interpage is responsible for this shipment and I am only renting him office and goods space in the warehouse. It is true that the invoice and customs form have my firm's name as the cosignee and importer and the customs bond is my company's name. But I allowed him to use my bond because his bond is expired.

(*See* Def. Ex. PP, at IPV2038.) [17] In other words, Ms. Kerzhner attempted to enforce corporate distinctions when it was beneficial to her to do so. In addition, Ms. Kerzhner's testimony on the distinction between Interpage Co. and ICI—and whether there was one—was evasive, at best. The following excerpt from her trial testimony is illustrative:

> Q: Do you dispute that any of the other payments that are in this Exhibit P were made on behalf of Interpage Co., Gregory Vernikov's Interpage Co.?
>
> A: Interpage Co. was our company, part of Threeline. Why was I not supposed to pay? I don't understand:
>
> The Court: Are you saying that the Interpage Co. that is on these invoices does not belong to Mr. Vernikov? Is that your testimony?
>
> A: No, I do not want to say that. These are the documents that we used and the name Interpage was – the name we used alongside with Threeline.
>
> The Court: But that's not my question. My question is: These invoices indicate that this is Interpage Inc., correct? Interpage Co. Sorry, Interpage Co. Correct?
>
> A: Yes.
>
> The Court: And that's not your company; is it? That's a pretty simple answer. Interpage Co., is that your company or not?

---

[17] I do not credit Ms. Kerzhner's claim that this affidavit was simply an "incorrect translation" that she never had corrected. (Tr. 152:5-24.)

> A: Interpage Co.?
>
> The Court: Interpage Co., is that your company?
>
> A: Interpage Co. is our company.
>
> The Court: Correct. And that is not the – I'm talking about the company that is referred to in these documents, Interpage Co. Is that or is that not your company? It's either a "yes" or "no" answer? Is it your company or is it not?
>
> A: No.

(Tr. 118:16-119:18.) And, despite his protestations that there were no distinctions among Threeline, Interpage Co., and ICI, Mr. Kerzhner also ultimately admitted that he knew that Interpage Co. and ICI were two different companies. (Tr. 210:4-10.) Further, Mr. Kerzhner conceded that no QuickBooks were maintained for ICI, and could not identify any transactions in which ICI engaged. (Tr. 128:7-22.)

Moreover, Vernikov noted that the ALB-Gold contract included references to the Delicious Wonders brand and trademark, which he claimed to own. (Tr. 339:3-4; 340:17-22; *see also* Pl. Ex. 16.)[18] He testified that he branded the ALB-Gold pasta with the Delicious Wonders label because he wanted his company, Interpage, to own the product. (Tr. 339:14-17.)[19]

---

[18] Vernikov testified that he owned the Delicious Wonders trademark through a company called Delicious World. (Tr. 340:17-22.) The defendants introduced evidence that Interpage Co. paid the incorporation fees and trademark registration for Delicious World. (Tr. 341:2-342:22.)

[19] Threeline eventually produced to the defendants a version of its QuickBooks report that included multiple references to the "Delicious Wonders" or "DW" product. *See* Pl. Ex. 66. However, that version replaced an initial version of the same document in which all references to "Delicious Wonders" or "DW" had been removed. Def. Ex. BD. On cross examination, Malvina Kerzhner admitted that she had removed all references to Delicious Wonders from the QuickBook database on March 20, 2016, prior to its production to defense counsel, because "Gregory raised the big issue that we are using Delicious Wonders." (Tr. 141:2-141:23; *see also* 141:25-142:2 (Q: And why did you make that change to the database? A: Well I was so stressed because of all that DW, DW bothering me, and I decided let's just get rid of the DW.).) When she reported to her son, Alexander Kerzhner, that she had done this, he informed counsel who then produced the original version of the database to defense counsel. (Tr. 142:3-12; *see*

Interpage Co. had sold Delicious Wonders products in the past. (Tr. 339:18-340:16; Def. Ex II; Def. Ex. HH.) Finally, the record evidence shows that even while Vernikov was a Threeline employee, Threeline was writing checks to "Interpage Co." for products purchased pursuant to exclusive contracts that Vernikov held with other companies, including Roshen. (Tr. 121:22-122:15; Def. Ex. R, at IPV00280.)

Therefore, I do not find the Kerzhners' claim that the corporate form did not matter, and that Vernikov signed the ALB-Gold agreement on behalf of ICI, a Threeline affiliate company, to be credible. First, the parties stipulated that Vernikov did not hold any position at ICI; however, he signed the contract as the "President" of Interpage Co. This suggests that he signed the contract on behalf of his own company, Interpage Co., and not on behalf of Threeline. Further, I find that the Kerzhners created ICI in order to try to claim ownership of Interpage Co.'s products, and that the use of ICI on the first page of the ALB-Gold contract, which was drafted by their son, Alexander Kerzhner, was an attempt to advance that goal. Finally, I credit Vernikov's testimony that he signed the ALB-Gold contract on behalf of his own company over that of Ms. Kerzhner's, whose testimony on this issue was unreliable and shifting, at best. For these reasons, I find that Mr. Vernikov signed the contract with ALB-Gold on behalf of his company, Interpage Co., and not on behalf of Threeline or its affiliate, ICI.

**The Creation of the Labels**

After Vernikov placed the first order of pasta from ALB-Gold on December 4, 2012, he and Leonid Kerzhner began developing the label for the pasta's packaging. (Tr. 335:8-14.) Leonid Kerzhner testified that he wanted to create a "private label" because ALB-Gold also sold

_____

*also* Tr. 293:2-294:12.) This attempt to manipulate the records suggests that Ms. Kerzhner knew that the pasta purchased from ALB-Gold belonged to Mr. Vernikov and his brand.

to several other distributors in the United States. (Tr. 216:11-16; *see also* Tr. 64:9-66:1.) He said that he asked Vernikov to create a label with a chicken on it, and Vernikov proposed several different versions of the label to him. (Tr. 218:7-15; *see also* Tr. 66:2-7; Pl. Ex. 6, Pl. Ex. 7.)[20] When he became frustrated that it was taking Vernikov too long to come up with a label that he liked, Kerzhner claims that he instructed his wife to create one. (Tr. 219:13-22.) He said that his wife found the logo on the internet, and that he then ordered Vernikov to submit the design to ALB-Gold. (Tr. 219:16-220:12.)[21] Similarly, Malvina Kerzhner testified that her husband asked her to find an image of a chicken, and that she found one on the internet. (Tr. 74:16-25.)

Vernikov, on the other hand, testified that the reason he showed his proposed labels to the Kerzhners was because "I was intending to sell the first container to them. Without negotiating the label, it was impossible to do." (Tr. 337:8-9.) He explained that he found the chicken-and-egg logo on the internet, and worked on it with Viktor, a Russian-speaking representative of ALB-Gold. (Tr. 338:3-9; Tr. 337:14-18.)[22] He included the Delicious Wonders trademark on some of his proposed labels; although Leonid Kerzhner reviewed the labels that he provided, (Tr.

---

[20] Threeline introduced as exhibits the various versions of the labels that Vernikov created. (Pl. Ex. 6, 7.) Ms. Kerzhner testified that a version of the label that Vernikov sent her on August 6, 2012 included the trademark for Granny Farm, which Threeline owned. (Pl. Ex. 6; Tr. 68:5-70:15; *see also* Tr. 218:16-24.) However, a comparison of that label with Pl. Ex. 20, which Threeline introduced as an example of the Granny Farm label, reveals that while the logos have some similarities, they are not the same.

[21] On cross examination, however, Kerzhner admitted that the chicken included on the first ALB-Gold shipment was essentially the same as one that Vernikov had proposed to him. (Tr. 239:10-244:7.)

[22] Indeed, in August 2013, an ALB Gold representative named Viktor Flaig wrote to Vernikov saying, "we do not have enough Delicious Wonders labels for your current [] orders. As you see, we have to order the labels. Which quantity should we print? Also, do you wish any changes on the artwork?" (Def. Ex. X, at IPV01541.)

237:13-239:14), neither he nor Malvina Kerzhner objected to the inclusion of the Delicious

Wonders trademark on the product packaging. (Tr. 131:18-22; 337:22-338:2.)

### The First Shipment of Pasta from ALB-Gold

The parties dispute whether Vernikov placed the first order for two containers of ALB-

Gold pasta on behalf of his own company, Interpage Co., or on Threeline's behalf. Vernikov

testified that ALB-Gold sold the first two containers of pasta to his company, Interpage Co., and

that he then sold them to Threeline. (Tr. 347:2-7; Tr. 346:7-13; *see also* Def. Ex. I (December

2012 invoice from Interpage, Co. to Threeline Imports, LCC); Def. Ex. X, at IPV00340

(November 26, 2013 email from Vernikov to Dorner stating, "Leonid from 'Threeline Imports'

is trying to kill our pasta business in USA. I used to sell him 'Delicious Wonders' pasta and

after I stopped in May 2013 all relationships, he started to sell all my exclusive products under

the unreasonable price.")). The Kerzhners, on the other hand, both deny that they ever spoke to

Vernikov about whether Threeline would buy ALB-Gold pasta product from the defendants.

(Tr. 216:7-10; 62:11-17.) Instead, the Kerzhners both testified that once the contract with ALB-

Gold was signed, Leonid determined the amount and quantity of pasta to be ordered, and that

Vernikov placed the order on Threeline's behalf. (Tr. 60:19-21, 62:6-13; 215:16-216:6.) The

parties do agree that the first two containers of pasta from ALB-Gold, bearing the chicken-and-

egg trademark, arrived at Threeline's warehouse in December of 2012. (Stip. ¶ 20.) In total,

each container had 1200 to 1400 boxes of pasta; each box contained about 15-20 individual bags

of pasta. (Tr. 225:21-25.)

ALB-Gold directed its invoices for these two containers of pasta to "Interpage Co." (Pl.

Ex. 11, 12.) Threeline then paid these invoices through Trilini International. (Tr. 76:6-17;

221:4-11.) Specifically, Malvina Kerzhner directed Trilini to make the payments directly to

ALB-Gold because Trilini was able to get more favorable exchange rates on payments made in euros; Threeline then reimbursed Trilini for the payments. (Tr. 77:1-5; Tr. 76:14-25; Pl. Ex. 9, 10.) Vernikov testified that it was standard practice for Threeline to pay invoices directed to Interpage Co. on its behalf. (Tr. 347:11-348:1; *see also* Def. Ex. P, at IPV00239 (payment made by Threeline imports on behalf of Interpage Co.); Def. Ex. Q (same). Threeline also paid for the shipping and transportation costs, as well as the customs broker fee, for the pasta containers. (Tr. 80:5-82:3; 82:11-15.) The parties agree that Threeline did not pay any commission to Vernikov in connection with this first shipment from ALB-Gold. (Stip. ¶ 18.)

When the shipment arrived, the "Delicious Wonders" logo appeared on the front of the pasta labels, along, of course, with the chicken-and-egg logo. (Pl. Ex. 43; Tr. 223:22-224:2.)[23] A label on the back of the pasta indicated that it was "Manufactured for Interpage Co.", and supplied Vernikov's email address and telephone number. (Pl. Ex. 43; Tr. 224:22-24.) Leonid Kerzhner testified that "there was no difference at the time" between Interpage Co. Inc. and Interpage Co." (Tr. 224:22-225:4.)

**Other Sales**

Threeline began selling the pasta from the first ALB-Gold shipment to its customers in January of 2013. (Tr. 85:22-86; Tr. 225:5-10; Pl. Ex. 38.) Interpage Co. then imported a third container of pasta, which it sold to a customer called Euphoria, on March 4, 2013. (Tr. 351:17-352:4; Def. Ex. L, at IPV00170.) At the time of this sale, Vernikov was still a Threeline employee. (Tr. 353:3-5.)

---

[23] Ms. Kerzhner testified that she and Leonid were upset that the pasta label included the Delicious Wonders logo, and asked Vernikov why it was included. (Tr. 83:8-24.)

Vernikov left Threeline on April 20, 2013 because he "noticed that [the Kerzhners] were trying to take over my business." (Tr. 353:14-354:1.) According to Vernikov, the Kerzhners were calling his suppliers and telling them that he was their employee, that he was a "nobody," and that they should do business with Threeline instead. (Tr. 353:21-354:1.) This contention is supported by record evidence. For example, a witness from Brivias Vilnis, a Latvian company that sold canned fish products, testified that his company had a contract with Interpage Co. and had been selling products to Vernikov since 2002 under the terms of the contract. (Tr. 190:6-24; Def. Ex. C.) The witness, Kristaps Koskins, further testified that Brivais Vilnis did not have any contract with Threeline Imports, and never sold products directly to Threeline. (Tr. 192:5-14.) In an August 20, 2013 email, however, Malvina Kerzhner wrote to a contact at Brivais Vilnis, and claimed that "for the past nine years, our company has done business with Brivais Vilnis company. All these years, our company has engaged in the distribution of your products in the territory of the United States." (Def. Ex. BH; *see also* Tr. 200:2-201:17.) Kerzhner went on to say that while Vernikov "has served as liaison on this account," and "it may have been a management error on our end to use his name as opposed to ours, it is important that this distinction is made and that you are aware that it was, in fact, our organization that you had been dealing with." (*Id.*) Koskins testified that he interpreted this email to be a request by Threeline to do business with Brivas. (Tr. 195:25-196:4.) In addition, Koskins testified that he met Leonid Kerzhner at a 2013 food exhibition, and that Kerzhner said that he wanted to do business with Brivais, and that "if we continued working with Gregory, it would be wors[e] for us. Because he's stronger, bigger, and he has more money." (Tr. 197:12-16.) In other words, the record evidence and credible testimony both support Vernikov's contention that Threeline and the Kerzhners were attempting to co-opt his business contracts as their own.

17

Once he left Threeline, Vernikov continued to import ALB-Gold pasta and sell it to his customers. (Tr. 354:4-355:1.) In fact, on August 21, 2013—after Vernikov had left Threeline—Claus Dorner wrote to Vernikov attaching "the new improved artwork of 'Delicious Wonders' labels." (Def. Ex. X, at IPV00343.) Dorner wrote, "[w]ould you please check and approve the labels as soon as possible. Without the labels, we can not start the production of your order, because we put the labels during the pasta production on the bags." (*Id.*) In September of 2013, Vernikov imported a fourth container, containing 26,020 units of pasta, which he then sold to his customers, including Ester's Deli and others. (Def. Ex. H, at IPV00225; Def. Ex. N.) Vernikov imported the fifth container of pasta, containing 25,180 units, in November 2013.[24] (Def. Ex. H, at IPV00221.)

The Kerzhners testified that they learned that Vernikov was importing and selling pasta from ALB-Gold to other customers in the summer of 2013. (Tr. 226:1-7; *see also* Tr. 156:25-157:4.) They also testified that Vernikov eventually began to import and distribute a pasta product from a different manufacturer, Armbruster, that also bore the chicken-and-egg logo. (Tr. 230:4-230:25; 261:10-21; Pl. Ex. 43 ("Schnittnudeln" pasta). Leonid Kerzhner testified that the Armbruster pasta that Vernikov was selling "was a darker looking, different looking pasta and it sold less and even customers could see that." (Tr. 231:8-14; *see also* Tr. 231:17-21 (the Armbuster pasta "looks completely different. It looks darker. It looks cheap on a shelf.")). Kerzhner testified that he received complaints about the Ambruster pasta from some of his customers. (Tr. 232:14-233:14.)

---

[24] Vernikov testified that after the first two containers, he ultimately purchased an additional fourteen containers of pasta from ALB-Gold on behalf of his company, Interpage Co. (Tr. 392:3-5; Pl. Ex. 37; Def. Ex. N, Def. Ex. O.)

At some point, although exactly when is not clear, Threeline apparently started to buy pasta directly from ALB-Gold that bore the chicken-and-egg label, and that included the Threeline name at the top of the package. (Tr. 228:3-10.) Threeline sold this pasta in stores. (Tr. 228:3-10; Pl. Ex. 69.)

### Trademark Registration

The plaintiff applied for registration of the chicken-and-egg logo with the United States Patent and Trademark Office ("U.S.P.T.O") on April 15, 2014. On November 25, 2014, the U.S.P.T.O. issued the plaintiff a trademark on this logo, under registration number 4,644,787. Malvina Kerzhner testified that after registration of the trademark, Threeline continued to sell pasta products bearing the chicken-and-egg logo. (Tr. 96:24-97:2.)

### Cease-and-Desist Letters

On March 24, 2015, Alexander Kerzhner sent cease-and-desist letters to Vernikov stating that Threeline "has recently discovered that you are producing and/or selling competing products under the Threeline Chicken Mark without Company's prior authorization or permission." (Pl. Ex. 27, 34; Stip. ¶ 25.) The letter continued: "You are clearly identified as the importer, seller and distributor of the Infringing Product even though you have no rights, license, approval or authorization to sell, distribute, license or otherwise promote any product bearing the Threeline Chicken Mark." Kerzhner followed-up with another letter on April 9, 2015, indicating that he had not received any response to his earlier letter, and that "[t]his letter constitutes your final notice of Threeline's demand that you immediately cease using the Threeline Chicken Trademark wherever it may be in connection with your business." (Pl. Ex. 34.)

### DISCUSSION

For the reasons explained below, the Court finds that despite its trademark registration, the plaintiff failed to establish that it had priority of use over the chicken-and-egg logo, and has therefore failed to prove its claim of trademark infringement and counterfeiting against the defendants. By contrast, the defendants have established both their priority of use over the chicken-and-egg logo and that the plaintiff was infringing its common law rights in that logo. Further, the defendants have also proven their remaining New York state claims for unjust enrichment and unfair competition against the plaintiff.

## I.      Trademark Infringement and Counterfeiting

The plaintiff and the defendants each assert trademark infringement claims against each other for their use of the chicken-and egg logo. To establish a claim for trademark infringement under the Lanham Act, a plaintiff must show that the defendant used in commerce, without the plaintiff's consent, a "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). To prevail on an infringement claim, the plaintiff must show that "it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." *Arrow Fastener v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995) (quoting *Gruner + Jahn USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993); *see also Topps Co. v. Gerrit J. Verburg Co.*, No. 96 Civ. 7302, 1996 WL 719381, at *4 (S.D.N.Y. Dec. 13, 1996) ("Section 32 [of the Lanham Act] thus prohibits the use in commerce of another's registered trademark where such use is likely to cause confusion, or to cause mistake, or to deceive.").

## A.  Ownership of the Mark

It is undisputed that the plaintiff registered the chicken-and-egg logo at issue in this case with the United States Patent and Trademark Office on November 25, 2014.  The registration of a trademark creates a presumption that the mark is valid. *De Beers LV Trademark v. DeBeers Diamond Syndicate*, 440 F.Supp.2d 249, 266 (S.D.N.Y. 2006) (citing *Wal-Mart Stores, Inc., v. Samara Brothers, Inc.*, 529 U.S. 205, 209 (2000)); *Tiffany and Co. v. Costco Wholesale Corp.*, 994 F.Supp.2d 474, 479 (S.D.N.Y. 2014) ("[T]he fact that the USPTO accepted [a] mark for registration creates a presumption that the mark is valid.") (quoting *American Ort, Inc. v. Israel*, No. 07 Civ. 2332, 2007 WL 2049733, at *4 (S.D.N.Y. Jul. 17, 2007)); *see also* 15 U.S.C. § 1115. Indeed, an owner's rights in a registered trademark "will trump those of anyone who, prior to filing, had not (1) used the mark, (2) filed an application with the PTO to register the mark, which is pending or has resulted in registration, or (3) filed a foreign application to register the mark and filed an application under Section 44(d) to register the mark in the United States, which is pending or has resulted in registration." *De Beers LV*, 440 F.Supp.2d at 266 (citing 15 U.S.C. § 1057(c)).

However, this presumption is rebuttable, and the defendants may "prov[e] any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a); *see also Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) ("When a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of [the] mark's protectibility by a preponderance of the evidence.").

"It is well established that the standard test of ownership is priority of use." *Tactica Intern., Inc. v. Atlantic Horizon Intern., Inc.*, 154 F.Supp.2d 586, 599 (S.D.N.Y. 2001); *see also*

*Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1472 (Fed. Cir. 1987) ("The common law and the Lanham Act require that trademark ownership be accorded to the first bona fide user.") "The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue using the mark commercially." *LaSociete Anonyme des Parfums Le Galion v. Jean Patou*, 495 F.2d 1265, 1270 (2d Cir. 1974).

In order to establish "use in commerce" sufficient to overcome the presumption of validity created by the plaintiff's registration of the trademark, however, the defendants must show that they were using the mark in commerce before the plaintiff and that such use was made "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Windows User, Inc., v. Read Bus. Pub. Ltd.*, 795 F.Supp. 103, 108 (S.D.N.Y. 1992). "To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *LaSociete Anonyme des Parfums Le Galion,* 495 F.2d at 1271-72. A court must determine whether a trademark has been used in commerce, "on a case by case basis, considering the totality of the circumstances" around the use of the mark. *Chere Amie, Inc. v. Windstar Apparel, Corp.*, No. 01 Civ. 0040, 2002 WL 460065, at *4 (S.D.N.Y. Mar. 26, 2002).

Here, both parties attribute their first use of the chicken-and-egg logo in commerce to the sale of two containers of ALB-Gold pasta that arrived at Threeline's warehouse in December of 2012. Notably, this is earlier than the April 12, 2013 date of first use that Threeline claimed in its trademark registration. "Where an applicant seeks to prove a date earlier than the date alleged in its [trademark] application, a heavier burden has been imposed on the applicant than the

common law burden of preponderance of the evidence." *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1473 (Fed. Cir. 1987). "The reason for such an increased evidentiary burden, supported by common sense, is that a change of position from one 'considered to have been made against interest at the time of filing of the application' requires enhanced substantiation." *Id.* (quoting *Stanspec Co. v. American Chain & Cable Co.*, 531 F.2d 563, 567 (C.C.P.A. 1976)). Therefore, the plaintiff must prove its use of the chicken-and-egg logo in commerce by December of 2012 by "clear and convincing" evidence. *Rockwood Chocolate Co. v. Hoffman Candy Co.*, 372 F.2d 552, 553 (C.C.P.A. 1952).

The first question is whether the two containers of pasta that arrived at the Threeline warehouse in December of 2012 inured to the interest of Threeline or to Vernikov and his company, Interpage Co.[25] First, as explained above, I find that Vernikov entered into the ALB-Gold contract on behalf of his own company, Interpage Co., and not on behalf of Threeline or any affiliated entity, such as ICI.[26] The invoices from ALB-Gold for these shipments are

---

[25] The parties disagree as to who created the chicken-and-egg logo: Vernikov, with the assistance of ALB-Gold representatives, or Malvina Kerzhner. As the Court noted in its summary judgment opinion, however, "[t]he invention of a mark is, for the most part, an inappropriate consideration in determining who has the exclusive right to its use, as priority of adoption and use are the important considerations." *Wrist-Rocket*, 379 F.Supp. at 913 (citing *Montgomery v. Kalak Water Co. of N.Y., Inc.*, 196 F.Supp. 173, 177 (S.D.N.Y. 1961); *see also Buti v. Impressa Perosa, S.R.L.*, 935 F.Supp. 458, 468 (S.D.N.Y. 1996) ("Unlike patent law, rights in trademarks are not gained through discovery or invention of the mark, but only through actual usage. Trademark priority is not automatically granted to the person who was first to conceive of the idea of using a given symbol as a mark . . . To acquire ownership of a trademark, one must actually use the mark in the sale of goods or services.") (quoting 2 J. McCarthy, McCarthy on Trademarks & Unfair Competition (3d ed. 1996) § 16.03).

[26] The plaintiff continues to rely on its claim that Vernikov was a full-time employee of Threeline at the time that he placed the order with ALB-Gold in support of the proposition that Vernikov placed the order on Threeline's behalf. However—and as noted in the Court's summary judgment decision—whether or not Vernikov was a part or full-time employee of Threeline, the evidence shows that he was also operating his own Interpage business out of Threeline's warehouse, and that the Kerzhners knew about it. Therefore, the question is whether Vernikov placed the first ALB-Gold order on behalf of Threeline or his own company.

addressed to "Interpage Co.," which is Vernikov's company. Further, the evidence shows that payments made by Trilini International to ALB-Gold for the shipments were made on "behalf of Interpage Co.," and that it was a standard arrangement between the parties that Trilini would make these payments. The fact that Threeline paid for the shipment and its associated costs, and did not pay Vernikov any commission, does not necessarily show that the shipment inured to Threeline's benefit. Rather, this is consistent with Vernikov's testimony—which I credit—that his arrangement with the Kerzhners when he moved into their warehouse was that he would use the space rent-free, and that, in turn, he would sell goods to Threeline at cost. This appears to be precisely what happened here. Finally, the pasta label includes both the "Delicious Wonders" logo, which Vernikov established that he had regularly used in the past, and the words "Manufactured for Interpage Co." Threeline's name does not appear anywhere on the pasta packaging. [27] In sum, I find that the first two containers of pasta that included the chicken-and-egg logo were imported by the defendants, and that they, in turn, sold those two containers to Threeline. The first use in commerce of the logo is therefore attributable to the defendants, not to Threeline. [28]

---

[27] To support their claim that they first used the chicken-and-egg logo, the plaintiff points to other products Threeline sold that included trademarks that were registered to Threeline. For example, the plaintiff noted that the "Granny's Farm" trademark, which was registered to Threeline, was included on products whose labels also stated that they were "Imported by Interpage International." (*See* Pl. Ex. 20-22.) The plaintiff points out that the defendants do not claim any ownership stake in these products, despite the inclusion of Interpage's name on the label. (Stip. ¶ 31.) However, the pasta product that arrived in the first two shipments from ALB-Gold did not state that the pasta was "*Imported by* Interpage International," as do the Granny Farm products, but rather that it was "*Manufactured for* Interpage Co." (emphasis added.) The pasta also included Vernikov's email address, while, as the plaintiff points out, the Granny Farm products include Threeline's warehouse address and phone number. In sum, the pasta label on the ALB-Gold shipment indicated that the pasta was manufactured for Interpage Co., and not just that it was its importer.

[28] Although the defendants' importing of the pasta, alone, does not constitute a "use in commerce," *In re Silenus Wines, Inc.*, 557 F.2d 806, 807-808 (C.C.P.A. 1977), their sale of pasta

The next question is whether the defendants' use of the chicken-and-egg logo was "deliberate and continuous, not sporadic, casual or transitory." *LaSociete Anonyme des Parfums Le Galion,* 495 F.2d at 1271-72. Vernikov testified that after he imported the first two containers of pasta from ALB-Gold, he imported an additional fourteen containers. For example, there is no dispute that he imported another container containing 23,800 units of pasta in the spring of 2013, which he sold to one of his customers, Euphoria. In September of 2013, he imported a fourth container, containing 26,020 units of pasta, which he then sold to his customers including Ester's Deli, Alex's Meat Distributors, Uptown Entertainment, Inc., and Royal Dragon LLC. Vernikov imported the fifth container of pasta, containing 25,180 units, in November 2013. These sales are sufficient to establish that the defendants' use of the chicken-and-egg logo in commerce was "deliberate and continuous."

Finally, the defendants have shown that their use of the mark was "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Windows User, Inc., v. Read Bus. Pub. Ltd.,* 795 F.Supp. 103, 108 (S.D.N.Y. 1992). "[I]t is beyond cavil that the actual sale to the public" of goods with the marked affixed to it is "an activity which would create an association in the mind of the consumer public between the defendant and said mark." *Id.,* at 109. Here, the plaintiff sold at least five containers of pasta that included the chicken-and-egg logo to its customers. In addition, the pasta that arrived from ALB-Gold in December of 2012 noted that it was "Manufactured for Interpage Co.", and included Vernikov's email address. It also prominently included the "Delicious Wonders" logo on the front of the package; Interpage Co. had sold

to Threeline—while intrastate in nature—does qualify as such. *Id.,* at 809 ("Clearly, intrastate sale of imported wines by the importer sufficiently affects commerce with foreign nations to qualify those intrastate sales for the Trademark Act definition of 'commerce.'")

products with this logo in the past. Under these circumstances, the defendants have established that their use of the mark was "sufficiently public" to establish that it was the owner of the mark.

Therefore, the defendants have established that they were the first to use the chicken-and-egg logo in commerce, and thus have priority over its use. *See Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 113 (S.D.N.Y.1989) ("[T]rademark rights develop when goods bearing the mark are placed in the market and followed by continuous commercial utilization."), *rejected on other grounds by Car–Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 269 (2d Cir.1995)).

## B.     The Defendants' Lanham Act Counter-Claim

As the defendants have established their common law rights in the chicken-and-egg logo, the Court now turns to their Lanham Act counter-claim for infringement, unfair competition , and false designation of origin against the plaintiff.[29] (*See* Defendants' Counterclaims, ECF 40, ¶¶ 48-56.) Section 43(a)(1)(A) of the Lanham Act allows the producer of a product or service to initiate a civil action against a person who "uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of [the producer's] . . . goods." 15 U.S.C. § 1125(a)(1)(A). To show unfair competition and false designation of origin under § 43(a)(1)(A) of the Lanham Act, the defendants must prove "(1) the existence of a valid mark; and (ii) that [Threeline's] actions are likely to confuse the buying public, that is, 'an appreciable number of ordinarily prudent

---

[29] Section 32 of the Lanham Act protects parties with a registered trademark. Since the defendants in this case have established priority of use over the chicken-and-egg logo, but do not have a registered trademark on that mark, their claims fall under section 43(a) of the Lanham Act, which does not require federal registration of a mark. *Two Pesos v. Taco Cabana,* 505 U.S. 763, 768 (1992) ("Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks.") (internal citations omitted).

purchasers." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 519 (S.D.N.Y. 2008), reversed in part on other grounds by 600 F.3d 93 (2d Cir. 2010) (citing *Twentieth Century Fox Film Corp. v. Marvel Enterprises,* 220 F.Supp.2d 289, 290 (S.D.N.Y. 2002)). The defendants' § 43 claims are governed by the same analysis as federal infringement claims. *Id.* Therefore, whether the use of a mark is likely to cause confusion turns on whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of the defendant's mark." *Arrow Fastener*, 59 F.3d at 384 (internal citation omitted).

In this Circuit, courts consider whether use of a mark is likely to cause confusion under the eight factors articulated in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These eight factors are: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap;" (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of its buyers." *Arrow Fastener Co.*, 59 F.3d at 391 (internal citation omitted). These factors are not exclusive and their analysis is "not a mechanical process." *Id.* (internal citations omitted). "However, . . . in cases where counterfeit marks are involved, it is not 'necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Edward B. Beharry & Co., Ltd. v. Bedessee Imports Inc.*, No. 06–CV–5707 (JBW), 2006 WL 3095827, at *2 (E.D.N.Y. Oct. 31, 2006) (quoting *Lorillard Tobacco Company v. Jamelis Grocery, Inc.,* 378 F.Supp.2d 448, 455 (S.D.N.Y. 2005)); *see also Topps Co., Inc. v. Gerrit J. Verburg Co.,* No. 96 Civ. 7302, 1996 WL 719381, at *6 (S.D.N.Y. Dec. 13, 1996) ("Where the marks are identical, and the goods are also identical and

directly competitive, the decision can be made directly without a more formal and complete discussion of all the *Polaroid* factors.").

Here, the plaintiff admits that it was selling pasta product in packaging that was nearly identical to that sold by the defendants, and that used an identical chicken-and-egg mark. (Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law, ¶¶ 106, 123-25.) This admission is borne out by a comparison of the pasta that the plaintiff was selling as Threeline Imports with that sold by Vernikov with the Delicious Wonders logo. (*See* Pl. Ex. 43.) Most importantly, the chicken-and-egg logo, which is included on the bottom right hand side of the label, is nearly identical on both packages. They both include a chicken, along with two white eggs, a brown egg, and a broken brown egg with the yolk spilling out. In other words, the plaintiff is essentially using a counterfeit mark that would be "inherently confusing" to the customer.

The rest of the packaging is also strikingly similar. The top of both companies' pasta labels includes a green banner, with the words "egg pasta" on the Delicious Wonders version, and the words "egg noodles" on the Threeline label. Six wheat stalks protrude from either side of the green banner. Both packages indicate that the pasta is made "from pure Durum Wheat Semolina," and that it is made in Germany from fresh eggs from "cage free chicken." The only real difference is that the Delicious Wonders pasta does not include a Kosher symbol, whereas the Threeline version does, and notes that the egg content of the pasta is 20%.

Therefore, the defendants have shown that the plaintiff's use of the mark is nearly identical to its own, and is therefore likely to cause confusion among its customers.[30] The

---

[30] The plaintiff also argues that the defendants acquiesced to its use of the chicken-and-egg logo, and cannot now assert their rights to it. (Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law, ¶¶ 142-148.) The Court considered a similar argument in connection with

defendants have therefore established that the plaintiff engaged in infringement, unfair competition, and false designation of origin under the Lanham Act; the question for the next phase of this proceeding is whether the plaintiff is liable to the defendants for monetary damages, and whether injunctive relief is appropriate.[31]

## II.    Unfair Competition

The defendants also assert a counterclaim against the plaintiff for unfair competition under New York common law. "A claim under the Lanham Act, coupled with a showing of bad faith or intent, establishes a claim for unfair competition" under New York state law. *Coach, Inc.*, 908 F.Supp.2d at 436 (quoting *Burberry Ltd. & Burberry USA v. Designers Imps., Inc.*, No. 07 Civ. 3997(PAC), 2010 WL 199906, at *8 (S.D.N.Y. Jan. 19, 2010)). "[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995) (quoting *Rosenfeld v. W.B. Saunders, A Division of Harcourt Brace Jovanovich, Inc.*, 728

---

the plaintiff's motion for summary judgment, and found that the doctrine of laches did not apply to the defendants' delay in bringing their infringement claim against the plaintiff. Specifically, the Court found that the about one year delay between the defendants' discovery of the plaintiff's use of the chicken-and-egg logo and the filing of their counterclaims against the plaintiff did not constitute "inexcusable delay" in asserting their rights. The Court similarly finds that the defendants did not inexcusably delay in asserting their rights for the purposes of the plaintiff's claim that they acquiesced to their use of the chicken-and-egg logo.

[31] The plaintiff argues that the defendants have not presented any evidence of actual consumer confusion to support their claim for monetary damages. (Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law, at 44.) While a claim for injunctive relief requires a showing of a "likelihood of confusion among consumers," a claim for monetary damages requires "evidence of actual consumer confusion," unless the party can "adequately demonstrate[] that a defendant has intentionally set out to deceive the public." *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*, 926 F.2d 134, 139 (2d Cir. 1991); *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992). This is an issue that can be resolved at the damages phase of this trial, during which the defendants will have the opportunity to put in evidence as to their damages claims.

F.Supp. 236, 249–50 (S.D.N.Y.1990)). "Use of a counterfeit mark creates a presumption of bad faith under New York law." *Coach, Inc.*, 908 F.Supp.2d at 436.

As noted above, the plaintiff is liable to the defendants for unfair competition under the Lanham Act. This establishes the first element of the defendants' unfair competition counterclaim under New York state law; as to the second element, the evidence shows that the plaintiff did act with "bad faith or intent" in infringing the defendants' chicken-and-egg logo. As explained above, I find that the Kerzhners created ICI to attempt to co-opt products that included Vernikov's Interpage Co. label as their own. Further, I find that Threeline's insertion of the name "ICI" on Interpage's contract with ALB-Gold was an attempt to capitalize on the similarity between the names of the two companies, so that Threeline could claim that the contract with ALB-Gold was its own.[32] That the Kerzhners took these steps shows that they knew that the ALB-Gold contract, as well as the chicken-and-egg logo, belonged to the defendants.

The Kerzhners' testimony, which was untrustworthy and shifting, further supports the conclusion that they acted in bad faith in infringing on the defendants' logo. First, it is clear that the Kerzhners knew that the "Delicious Wonders" label was associated with Vernikov; there can be no other explanation for Malvina Kerzhner's efforts to wipe Threeline's Quickbooks of any references to "Delicious Wonders" or "DW" before turning the database over to her counsel for production to the defense. Further, while the Kerzhners initially claimed that they reviewed

---

[32] The plaintiff characterizes the theory that it incorporated ICI in order to steal the ALB-Gold contract as "the most far-fetched of conspiracy theories – that Threeline caused Interpage Co. Inc. to be incorporated in 2009, so that over three years later in December, 2012/January, 2013, Threeline could 'steal' a contract from Defendants (the ALB-Gold Contract)." (Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law, at 33.) But at trial, Malvina Kerzhner testified that ICI was created to protect products that Threeline was already selling that had the Interpage name on them. In other words, the testimony shows that Threeline's attempt to co-opt Interpage's products was both retrospective and prospective in nature.

every label for the ALB-Gold pasta that Vernikov proposed to them—including ones that conspicuously included the "Delicious Wonders" logo—they then claimed to be surprised and angry when the containers arrived and the pasta labels prominently included that logo, which was associated with Vernikov. This claim is simply not credible; it, too, weighs in favor of a finding that they knew that the defendants had ownership rights over the pasta's label. Finally, there is evidence that the Kerzhners were actively trying to co-opt the defendants' other contracts with third-parties, such as Brilais Vilnis. In sum, the evidence establishes that the plaintiff was aware that the chicken-and-egg logo belonged to the defendants, and that its use of that logo on its own products was in bad faith. I therefore find that the plaintiff is liable to the defendants for unfair competition under New York State law; the issue of damages on this claim will be for the next phase of this proceeding.

## III.    Unjust Enrichment

The defendants also counterclaim against the plaintiff for unjust enrichment under New York common law, alleging that, "Threeline's retention of monies gained through its deceptive business practices, infringement, [and] acts of deceit . . . would serve to unjustly enrich Threeline." (Counterclaim, ¶¶ 81-83.) The elements of a claim for unjust enrichment under New York law are that: "(1) defendant was enriched; (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Coach, Inc.*, 908 F.Supp.2d at 436 (quoting *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F.Supp.2d 519, 544 (S.D.N.Y.2012)).

As explained above, the defendants have established that the plaintiff infringed on their chicken-and-egg logo through their sale of pasta product, that they did so in bad faith, and that they were enriched by that conduct. The plaintiff was therefore enriched at the defendants'

expense; given the plaintiff's bad faith in infringing on the defendants' logo, "equity and good conscience" cannot allow the plaintiff to retain any enrichment at the plaintiff's expense. In sum, the plaintiff is liable to the defendants for unjust enrichment under New York state law.

## CONCLUSION

For the reasons stated above, I find that the plaintiff did not prove at trial that it had valid rights to the chicken-and-egg logo, and therefore has not proved its Lanham Act infringement and counterfeiting claims against the defendants. On the other hand, I find that the defendants have established common law rights in the chicken-and-egg logo, and have shown that the plaintiff is liable to them for Lanham Act trademark infringement, unfair competition, and false designation of origin, as well as common law unfair competition and unjust enrichment. The Court will consider damages on these claims—including requests for attorney's fees—in the next phase of these proceedings.

Further, as a result of these findings, the May 21, 2015 preliminary injunction is dissolved. To discuss the damages phase of this case, the parties are to appear at a status conference before this Court on March 29, 2017 at 11:00 a.m.

**SO ORDERED.**


s/Ann M. Donnelly
_____

Ann M. Donnelly
United States District Judge


Dated: March 3, 2017
      Brooklyn, New York