1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK

2

    ------------------------------x
3                                        15-CV-2333(AMD)
    THREELINE IMPORTS, INC.,
4                                        United States Courthouse
            Plaintiff,                   Brooklyn, New York
5
            – versus –                   January 17, 2017
6                                        9:30 a.m.
    GRIGORIY VERNIKOV, et al.,
7
            Defendants.
8
    ------------------------------x
9
            TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
10              BEFORE THE HONORABLE ANN DONNELLY
                 UNITED STATES DISTRICT JUDGE
11

12

    APPEARANCES
13
    Attorney for Plaintiff:   ROSENBERG FORTUNA & LAITMAN LLP
14                            666 Old Country Road
                              Suite 810
15                            Garden City, New York 11530
                              BY:  ANTHONY R. FILOSA, ESQ.
16                                 DAVID I. ROSENBERG, ESQ.

17
    Attorney for Defendant:   EPSTEIN DRANGEL LLP
18                            60 East 42nd Street
                              Suite 2520
19                            New York, New York 10165
                              BY:  JASON M. DRANGEL, ESQ.
20                                 SPENCER J. WOLGANG, ESQ.

21
    Court Reporter:           LINDA D. DANELCZYK, RPR, CSR, OCR
22                            Phone:  718-613-2330
                              Fax:  718-804-2712
23                            Email:  LindaDan226@gmail.com

24  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.
25

1          THE COURTROOM DEPUTY:  All rise.

2          THE COURT:  Everyone can have a seat.

3          THE COURTROOM DEPUTY:  This is civil cause for a

4  bench trial, Docket Number 15-CV-2333, Threeline Imports, Inc.

5  versus Vernikov, et al.

6          Counsel state your appearance, plaintiff first.

7          MR. FILOSA:  For the plaintiffs, Anthony Filosa,

8  Rosenberg Fortuna & Laitman 666 Old Country Road, Garden City,

9  New York.  Good morning, Your Honor.

10          MR. ROSENBERG:  Good morning, Your Honor, also for

11  the plaintiff, David Rosenberg, same firm.

12          MR. DRANGEL:  Good morning, Your Honor, Jason

13  Drangel of Epstein & Drangel, appearing for the defendants.

14          MR. WOLGANG:  Good morning, Your Honor, Spencer

15  Wolgang, also for the defendants.

16          THE COURT:  All right.  As I gather by seeing you

17  all here, you were not able to work this out; is that right?

18          MR. FILOSA:  Yes, Your Honor.  Your Honor, and your

19  staff can confirm we put in a late shift following Thursday's

20  pretrial conference, so it's not for want of trying, Your

21  Honor.

22          THE COURT:  And this is your client, but you

23  obviously expressed to them that having reviewed most of the

24  evidence in this case exhaustively, I really think this is

25  something that should not be taking up court time.  I'll give

1    you the trial, obviously, but it seems to me some kind of a

2    personal dispute between all of you.  I really don't

3    understand why you can't work it out.

4          I mean as I say, it's fairly obvious to me that

5    there's some kind of bad blood there and I don't

6    hundred percent appreciate using the federal court to resolve

7    it.  But we're here, so I guess we'll get going.

8          All right.  So because this is a bench trial, you

9    can -- do you have any statements you want to or not?  I'm

10   fairly familiar with the position of both sides, but if you

11   want to make an opening statement?

12         MR. FILOSA:  Yes.  May I, Your Honor.

13         THE COURT:  Sure.  Go right ahead.

14         I'm just going to remind the parties that I would

15   like you to speak slowly.

16         Oh, one other thing.  We not need to have -- I know

17   there's an interpreter here, so we'll have the interpreter's

18   appearance on the record.

19         Have you been sworn in?

20         THE INTERPRETER:  No.

21         (Whereupon, the interpreter was sworn.)

22         THE COURTROOM DEPUTY:  Please put your name on the

23   record, please.

24         THE INTERPRETER:  Bakhodir Abdullaev.

25         THE COURT:  All right.  Now, just because we do have

OPENING STATEMENT - FILOSA

1     an interpreter, I am going to ask everybody to speak slowly.

2     I want to make sure that we don't drive the court reporter

3     insane.  So just bear in mind that there's no need to speak at

4     lightning speed and it's probably easier for the interpreter

5     as well.

6          All right, go ahead.

7          MR. FILOSA:  May it please the Court.  We are here

8     to determine one thing, and one thing only, who is the owner

9     of the trademark chicken and egg logo that is used on imported

10    pasta products sold by the plaintiff, Threeline Imports.

11         Now despite the parties' disputed position on

12    collateral matters, on the issues which are material to the

13    determination of who owns the chicken and egg, namely when the

14    mark was first used in commerce, and whose goods the mark

15    identifies, the facts are beyond dispute and in some instances

16    the parties have stipulated to these facts, and these facts

17    point to Threeline as the owner of the chicken and egg mark.

18         The parties do not dispute that the mark was created

19    in 2012 to be used for a pasta label on a product manufactured

20    by German pasta manufacturer, ALB-GOLD.

21         THE COURT:  Slow down just a little bit.

22         MR. FILOSA:  Certainly.

23         You will learn that the defendant, Mr. Vernikov, was

24    a full-time salaried employee of Threeline between August 2009

25    and April of 2013.

OPENING STATEMENT – FILOSA

1          You will hear that Threeline, through its affiliate

2    company, Interpage Co. Inc., entered into an exclusive sales

3    and importation agreement with ALB-GOLD.

4          Mr. Vernikov concedes that at no time was he an

5    officer, director, shareholder or employee of Interpage Co.

6    Inc.

7          The evidence will show that in late July and early

8    August, 2012, the principals of Threeline, Malvina Kerzhner

9    and Leonid Kerzhner, tasked their employee, Mr. Vernikov, with

10   assisting in the creation of a label to be displayed on the

11   ALB-GOLD pasta products.

12         The undisputed evidence shows that between August

13   and the first week of October 2012, Mr. Vernikov submitted not

14   less than seven labels to Leonid and Malvina for Threeline's

15   approval.  Each label was rejected by Threeline.

16         Now that Mr. Vernikov submitted these labels to

17   Threeline over such a lengthy period of time begs the question

18   why, if the buck stopped with Mr. Vernikov with respect to the

19   approval of the label, did the buck not truly stop with

20   Mr. Vernikov with respect to the creation of the label.  The

21   evidence will show that assisting in the design and the

22   creation of labels was amongst Mr. Vernikov's duties as an

23   employee of Threeline.

24         The evidence will further show that when in

25   October 2012 Mr. Vernikov submitted yet another label to

OPENING STATEMENT - FILOSA

1    Leonid in which Leonid had rejected, Leonid grew frustrated at

2    the length of time it was taking, over two months, for

3    Mr. Vernikov to design a label which met Threeline's approval.

4            You will hear that thereafter, Leonid instructed

5    Malvina to locate an image of a brown chicken on her computer,

6    which she did; to locate an image of eggs, which she did as

7    well.  You will hear that these two images were combined and

8    were provided to ALB-GOLD to place on the label of ALB-GOLD

9    pasta products, which Threeline purchased from ALB-GOLD.

10           Now, turning to the first use in commerce of the

11   chicken and egg mark, you will hear from the defendants that

12   the first use came when the defendants allegedly, quote, sold

13   the ALB-GOLD pasta products bearing the mark to plaintiff.

14           Now, I use the word "sold" in quotes because the

15   evidence will show that there was no such sale by defendants

16   to Threeline.  The undisputed evidence will show that

17   defendants received no fee, no commission, no compensation or

18   any other consideration from Threeline from this so-called

19   sale.

20           The undisputed evidence will show there it was

21   Threeline that purchased the product from ALB-GOLD; that

22   Threeline paid for the product; that Threeline paid for the

23   ocean freight; that Threeline paid for the inland

24   transportation of product; that Threeline paid for the

25   Customs' broker fees.  The product was shipped by ALB-GOLD to

OPENING STATEMENT - FILOSA

1    Threeline and was delivered and stored at Threeline warehouse

2    in January 2013.

3              Defendants have the stipulated that in January 2013,

4    Threeline started selling the ALB-GOLD pasta product bearing

5    the chicken and egg mark to Threeline's customers.  It is

6    these sales which constitute the first use in commerce of the

7    chicken and egg mark.  And it's these sales which make

8    Threeline the owner of all right, title, and interest into a

9    valid mark in the chicken and egg label.

10             In 2014, Threeline applied for and received federal

11   registration for the chicken and egg mark with the United

12   States Patent & Trademark Office.  This registration creates a

13   presumption in favor of Threeline that the mark is valid and

14   that Threeline is the owner of the mark.

15             THE COURT:  I'm sorry, when was that, April of 2014?

16             MR. FILOSA:  The application was April of 2014, the

17   registration was November 2014, Your Honor.

18             THE COURT:  So they applied in 2014, they got the

19   trademark in November of 2014.

20             MR. FILOSA:  Correct.

21             THE COURT:  All right.  So you're saying the date of

22   the action on the trademark then is November?

23             MR. FILOSA:  That's when the federal registration

24   received the first use in commerce which, again, is the

25   relative date.  It began in January in 2013 when Threeline

OPENING STATEMENT – FILOSA

1   started selling the products to its customers.

2          THE COURT:  Okay.

3          MR. FILOSA:  Now, in order for defendants to

4   overcome the presumption of validity created by Threeline's

5   registration of the trademark, defendants must show by a

6   preponderance of the evidence that they were using the mark in

7   commerce before plaintiff, and that such use was made in a way

8   sufficiently pubic to identify and distinguish in marked goods

9   in an appropriate segment of the public mind as those of the

10  adopter of the mark.

11         Defendants will not be able to sustain this burden

12  of proof.  Again, regarding the defendants' alleged first use,

13  there was no sale by defendants to Threeline of the ALB-GOLD

14  pasta products.

15         Now, you will hear from the defendants that they are

16  the owner of the chicken and egg mark because that image was

17  placed on the ALB-GOLD pasta product with a logo or logo known

18  as Delicious Wonders, a logo which defendants claim to own.

19         Do not let defendants confuse the issue.  As this

20  Court has advised defendants on numerous occasions, in both

21  awarding preliminary injunction enjoining the defendants' sale

22  of products bearing the chicken and mark, and in denying the

23  defendants' successive motions to vacate that preliminary

24  injunction, the only mark in suit is the chicken and egg

25  image.

OPENING STATEMENT - FILOSA

1        So let me state it unequivocally and without

2   reservation.  Threeline has no quarrel or dispute with

3   defendants' sale of pasta products bearing Delicious Wonder's

4   label or logo.  The world is big enough for two and 200 German

5   pasta manufacturers and salesman.

6        It is defendants' use of the chicken and egg mark

7   for which Threeline applied for and received federal trademark

8   registration which Threeline objects, and which Threeline

9   contends constitutes and trademark infringement and

10  counterfeit.

11       While defendants claim to be the owner of the

12  chicken and egg mark, it was not until well after Threeline

13  commenced this case that defendants first petitioned for

14  cancelation of Threeline registration of the chicken and egg

15  mark.

16       Defendants' own sworn testimony will show that as

17  early as May 2014, defendants were aware that Threeline was

18  selling pasta products bearing what defendants contend is

19  their chicken and egg trademark and did nothing about it.

20       Defendants did not contact an attorney; did not

21  contact Threeline; they didn't send a cease and desist letter;

22  they certainly didn't commence any litigation.

23       Now why is that you ask?  The evidence will show

24  that Mr. Vernikov certainly was not ignorant regarding one's

25  rights to register a trademark, since during the time he was

OPENING STATEMENT - FILOSA

1    employed by Threeline, the evidence will show that Threeline

2    registered not less than four trademarks, and that

3    Mr. Vernikov corresponded with Threeline's general counsel

4    regarding the registration of one of those marks.

5            Rather, the evidence will show that in a telling

6    moment of candor before this Court, that Mr. Vernikov

7    testified under oath when asked why he did nothing to protect

8    his alleged rights in the chicken and egg mark, he responded,

9    quote, it's the name that's important, alluding to his alleged

10   Delicious Wonder's logo, quote, not the chicken.

11           Now this deposition you will learn that Mr. Vernikov

12   testified in response to why he did nothing in May 2014 upon

13   learning of Threeline sales of product there and what he

14   contends is his mark, he responded that Threeline's, quote,

15   not my competitor.

16           These two sworn statements by defendant, namely that

17   the chicken is allegedly not important and Threeline is not a

18   competitor, constitute binding admissions which defeat any

19   claim by defendants they have been harmed by Threeline's use

20   of the mark.

21           Now an element to the parties' claims here is that

22   the other party's use of the mark presents a likelihood of

23   confusion.  The evidence will show that what we are dealing

24   with here are counterfeit products sold by defendants.

25           The package of the defendants' products is

OPENING STATEMENT - FILOSA

1   essentially identical to packaging used by Threeline.  Both

2   contain the identical images of a brown chicken and eggs.

3   Both contain between six wheat stalks protruding from the

4   banner which says "egg pasta" and underneath such banner both

5   labels contain the words "pasta from pure durum wheat semolina

6   made in Germany," and use the same sentence structure and word

7   emphasis in this phrase.

8           Because counterfeit marks are inherently confusing,

9   the evidence will show that Threeline satisfied its element of

10  its claim.

11          Now the evidence will show that Mr. Vernikov

12  defendant Threeline's employment in April 2013.  Thereafter,

13  Threeline learned that defendants were selling counterfeit of

14  the pasta product bearing the chicken and egg mark.

15          One measure of damages for a successful claim in a

16  trademark claim is the defendants' profits plus any damages

17  sustained by the plaintiff, attorneys fees, and the costs of

18  the action.

19          Treble damages is mandatory if the Court finds the

20  defendants' action were willful.  Here the evidence will show

21  that defendants' conduct was willful, and that the willfulness

22  is evidenced by the fact that the Threeline registered

23  trademark was created by Threeline and first in commerce by

24  Threeline at a time when Mr. Vernikov was a employee of

25  Threeline; that defendants' were aware of Threeline's first

1    use in commerce of the trademark when Threeline sold the

2    contents of the first two containers of a pasta product

3    bearing the chicken and egg mark to Threeline's customers.

4    And that defendants began infringing and counterfeiting the

5    Threeline mark after Mr. Vernikov left Threeline's employment.

6              The evidence will also show that defendant continued

7    to sell counterfeit products after they received Threeline's

8    cease and desist letters in March and April 2015.

9              The cases hold that this alone, meaning sales

10   following receipt of a cease and desist letter constitutes

11   wilfulness which entitled Threeline to treble damages.

12             You will see invoices dated following the date that

13   this Court ordered a preliminary injunction enjoining the

14   defendant from further sales of the product showing that

15   defendant had continued to sell the product.  This is the

16   epitome of wilfulness and bad faith on the part of the

17   defendants.

18             The evidence will also show that Threeline's

19   entitled to reasonable attorneys' fees.  Under the statute,

20   the Court may, in exceptional cases, award reasonable both

21   attorneys' fees to the prevailing party.  Exceptional cases

22   include willful infringement.

23             Because counterfeiting infringement creates

24   irreparable harm for Threeline, Threeline is entitled also to

25   the continuation of the preliminary injunction previously

OPENING STATEMENT - DRANGEL

1    entered by the Court and the issuance of a permanent

2    injunction on the terms identified in Threeline's complaint.

3           For all these reasons, the evidence shall show that

4    Threeline's entitled to judgment on all claims set forth in

5    its complaint, and this is the relief for which Threeline

6    respectfully prays.  Thank you.

7           THE COURT:  Thank you.

8           Counsel?

9           MR. DRANGEL:  Good morning.  May it please the

10   Court.

11          The principal issue for consideration is not what

12   came first, the chicken or the egg, instead, who was first to

13   use the chicken and the egg as that phrase is understood under

14   the U.S. trademark law.  That may be a bit corny, but it's

15   true.

16          Throughout this case, Threeline has argued that this

17   issue is cut and dry.  Simply put, Threeline steadfastly

18   argues that:

19          One, since Gregory Vernikov was a W2 employee of

20   Threeline, when the initial two containers of ALB-Gold pasta

21   bearing the chicken and egg trademark was shipped to

22   Threeline's warehouse; and two, Threeline owns a trademark

23   registration for the chicken and egg trademark.  That proves

24   that the chicken and egg trademark belongs to Threeline.

25          The problem with Threeline's argument is that the

OPENING STATEMENT - DRANGEL

1   facts in evidence do not support this argument.

2           First, with regard to Mr. Vernikov's employment, as

3   Your Honor correctly noted in footnote 15 of our summary

4   judgment opinion, and I quote, the parties dispute whether

5   Vernikov was a full-time or part-time employee of Threeline.

6   However, whether he was a full or part-time employee, there is

7   no dispute that he was also operating his own import/export

8   business from Threeline's warehouse.  Therefore, the more

9   relevant question is whether Vernikov placed the order for

10  pasta from ALB-GOLD on behalf of Threeline or on behalf of his

11  own company, end quote.

12          That is a hundred percent accurate.  However,

13  despite my attempts to have Threeline stipulate to these

14  facts, Threeline still argues that everything my clients did

15  while in the Threeline warehouse was solely for the benefit of

16  Threeline.

17          Incredibly, Threeline will try to convince Your

18  Honor that in 2009, Gregory Vernikov stepped away from a

19  business that took him over 15 years to create, to turn over

20  all of his relationships, distribution contracts and industry

21  knowledge for a prestigious 48,000-dollar a year part-time job

22  at a buyer for Threeline.

23          Gregory Vernikov founded Interpage in 1993 upon

24  coming to America from the Ukraine.  Essentially through a

25  large number of exclusive and nonexclusive agreements, Gregory

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

OPENING STATEMENT – DRANGEL

1   built the Interpage business to import and sell quality food

2   products, primarily from Eastern Europe to relevant markets in

3   the United States.

4          Gregory Vernikov met Lenny Kerzhner, the general

5   manager of Threeline, in or about 2003.  At the time Lenny

6   Kerzhner up at showed up at Gregory Vernikov's Interpage

7   warehouse in Brooklyn, Lenny was purchasing products for

8   relative markets located in Philadelphia.

9          Lenny and his wife, Maya, began to work for a

10  company called Threeline in or about 2004, 2005.  The company

11  was then called Trilini Imports.

12         At the time, it was a wholesale company focused on

13  selling confectionary products.  Threeline is somehow related

14  to a company called Trilini International, most notably run by

15  a man named Roman Katsnelson that sells ingredients for

16  confectionary products primarily in Europe.

17         Gregory Vernikov and Interpage began to sell Lenny

18  and Maya through their Threeline company on or about 2004,

19  2005.  He sold them products that were they were not familiar

20  with, particularly pastas.

21         Gregory Vernikov moved his Interpage company into

22  the Threeline warehouse in or about 2006 as a means to reduce

23  overhead.  In exchange for free rent and commissions paid to

24  Interpage, Gregory Vernikov completed task and sold products

25  at cost to Threeline with Threeline paying him import and

OPENING STATEMENT – DRANGEL

1    transport fees.  All the while, Interpage continued to sell

2    and to an expanding customer base.

3         There is no question that Gregory Vernikov ran his

4    Interpage business in an unorthodox fashion, but there is

5    nothing illegal about it.  In fact, it makes a lot of sense.

6         By permitting third parties to pay for goods

7    Interpage purchased through its relationships with foreign

8    manufacturers, including import and transport fees, in some

9    cases permitting direct shipment to the goods to customers and

10   having customers pay commissions on the purchases directly to

11   Interpage, and/or having the manufacturer pay to Interpage,

12   given that Gregory did not pay rent to Threeline to run its

13   business or to store its goods, other than frozen goods which

14   is separately during that time period through a third party,

15   permitted Interpage and Gregory to have little to no overhead

16   and charge its customers a fair price.

17        Sometimes Threeline and other customers would pay

18   Interpage for purchased items directly.  Sometimes Threeline

19   and other customers would pay Interpage manufacturer directly,

20   always making clear on why are payments on behalf of

21   Interpage.

22        Sometimes Threeline would have the wires paid by

23   Interpage's foreign manufacturer to -- sorry, Interpage's

24   foreign manufacturer by Trilini International, the company

25   that is run by Roman Katsnelson.

17

OPENING STATEMENT – DRANGEL

1        For his troubles, Mr. Katsnelson and Trilini

2    International were paid 3 percent commission.  Each of these

3    transactions also recognize Interpage as the party who the

4    transaction was being made for, specifically on behalf of

5    Interpage.

6        Regardless of who paid, for nearly all imported

7    products, Gregory Vernikov acted as the importer and

8    co-signee, he and Interpage company, and was identified as

9    such on import records including bills of lading for all

10   Interpage products.  As co-signee, it is IP that is the owner

11   and therefore liable and responsible for the goods until they

12   arrive at a warehouse.

13       After Gregory divorced from his wife in or about

14   2008, 2009, though, Threeline and Gregory agreed that monthly

15   commissions would no longer be paid to Interpage, the company,

16   instead, Gregory Vernikov would receive approximately the same

17   monthly commission for the same services and sales as a

18   part-time W2 employee.

19       THE COURT:  Can I just ask?  What is the reason, I'm

20   sure we'll get evidence, because it's confusing to me, why

21   doesn't Threeline just order directly from whomever they want

22   to get the pasta?  I don't get that.  I guess I'll find out,

23   right?

24       MR. DRANGEL:  Well, that's the whole -- Gregory has

25   the relationship with them.  He has the relationship with

OPENING STATEMENT - DRANGEL

1    multiple pasta manufacturers.  And because of that, the

2    relationship goes through Interpage.

3              THE COURT:  Okay.  And why do they give him a W2?  I

4    mean --

5              MR. DRANGEL:  Because he was originally paid

6    commissions, and then after as a result of the divorce that he

7    was involved in, they worked out instead because his wife was

8    somewhat involved with the prior company.

9              THE COURT:  Just so they wouldn't have to give money

10   to the wife?

11             MR. DRANGEL:  Yes, it was a divorce issue.

12             THE COURT:  That's a little bit sketch think on both

13   sides.  All right, go ahead.

14             MR. DRANGEL:  Gregory continued to run his Interpage

15   business from the Threeline warehouse as he had done from 2006

16   to 2009.  Gregory paid taxes for his W2 wages and on proceeds

17   from his Interpage business.  As you can see from his tax

18   returns, by 2013 this arrangement was hurting his business so

19   he left.

20             As far as the issue of who owned the chicken and egg

21   trademark, it is clear that Gregory had an equal right to own

22   it through Interpage, as Threeline did during the relevant

23   time period.  The parties stipulate that the chicken and egg

24   trademark was first applied to a pasta product originating

25   from a German manufacturer named ALB-GOLD.

OPENING STATEMENT - DRANGEL

1          While Lenny Kerzhner attended the Anuga food show in

2    Germany --

3          THE COURT:  The what show?

4          MR. DRANGEL:  Anuga, Anuga-N-U-G-A, food show in

5    Germany in October 2011 with Gregory Vernikov, it was Gregory

6    who secured the relationship with ALB-GOLD and completed the

7    distribution agreement with ALB-GOLD for Interpage.

8          Despite Threeline's hesitancy to acknowledge it,

9    there can be no dispute that Gregory's business has always

10   been called Interpage, dating back to 1993.  Sometimes it was

11   Interpage Co., sometimes Interpage International, sometimes

12   it's a corporation, and sometimes it's a d/b/a or assumed

13   name, tradename, service mark, but it was always known as

14   Interpage to manufacturers, distributors, retailers and

15   consumers.

16         As you will see during the course of this trial, the

17   documented evidence will show that Gregory and his business

18   were identified as such.  Threeline would always stipulate,

19   though, that, and I quote, in or about 2005, Threeline was

20   aware that Vernikov did business in some form under an assumed

21   name, Interpage, end quote.

22         This is an important fact only recently because

23   early on in this case, it was Threeline's position that

24   Gregory entered the ALB-GOLD agreement through Gregory

25   Vernikov's Interpage Co. company, but that was simply for

OPENING STATEMENT - DRANGEL

1    Threeline's benefit.

2         Maya, Lenny and Alex Kerzhner all testified to this

3    fact during the depositions.  Incredibly, in making a summary

4    judgment motion, Threeline changed its tune.  It now appears,

5    from counsel's opening statement, to be Threeline position

6    that a New York entity company called Interpage Co. Inc. is

7    the party to the ALB-GOLD agreement with ALB-GOLD, not Gregory

8    Vernikov or his Interpage company.

9         As a stipulated fact, Interpage Co. Inc. is a

10   company incorporated on February 18th, 2009 by Roman

11   Katsnelson, the individual from Trilini International that I

12   mentioned earlier.

13        The parties further stipulate that Gregory Vernikov

14   is not an officer, director, shareholder or employee of

15   Interpage Co. Inc.  In fact, despite Threeline's claim that

16   Gregory was offered a part of this company, Gregory had no

17   knowledge of this company.

18        Roman Katsnelson, the incorporator of ICI,

19   acknowledged that, and I quote, that this business does

20   nothing.  This company is basically -- doesn't do anything,

21   end quote, with no business cards, letterhead, email accounts,

22   filing no tax returns, no QuickBook accounts and having a bank

23   account with few or minor transactions.

24        In light of all this, Threeline argues that somehow

25   its owners, Maya and Leonid, authorized and/or required that

OPENING STATEMENT – DRANGEL

1   Gregory Vernikov sign the ALB-GOLD contract as an employee of

2   Threeline on behalf of the Interpage Corp. Inc., Company Inc.,

3   and the company has stipulated they are neither shareholders

4   or employees of.

5          THE COURT:  Can I just ask you a question?  What is

6   your position, what's the reason that your argument that they

7   set up this company that doesn't do anything is the exact same

8   name as the defendants?

9          MR. DRANGEL:  Well, that's why it's shocking that it

10  exists to start with.

11         THE COURT:  You have a -- there's no jury here so do

12  you have an argument as to why you say they did that?

13         MR. DRANGEL:  Only they would know why they did it,

14  but my client was not part of that company at all.

15         THE COURT:  So his company with the same name

16  already existed.

17         MR. DRANGEL:  Right.

18         THE COURT:  So they just started another fake

19  company that doesn't do anything with the exact name.

20         All right, I get it.  Go ahead.

21         MR. DRANGEL:  Other than the identification of ICI

22  in the caption and the signature line, nothing else in the

23  course of the relationship -- strike that, sorry.

24         Yes, other than the identification of the Interpage

25  company in the caption and the signature line of the ALB-GOLD

OPENING STATEMENT – DRANGEL

1    agreement, nothing in the course of the relationship between

2    Gregory and Threeline and the execution and pursuit of the

3    ALB–GOLD agreement relationship supports that this is actually

4    what happened.

5         While the parties dispute whether Alex Kerzhner, son

6    of Maya and Leonid, drafted the ALB–GOLD agreement, there is

7    no dispute that a predecessor agreement for a pasta product

8    called Franz Tress pasta was drafted by Alex Kerzhner and

9    nearly identical to the ALB–GOLD agreement.

10        Both the Franz Tress agreement and ALB–GOLD

11   agreement contain Gregory Vernikov's home address, signed by

12   Gregory Vernikov as president, contain his signature and the

13   stamp of his Interpage Co. company dating back to 1993.

14        Threeline does not dispute that Interpage is proper

15   party to the Franz Tress agreement.  Further, an amendment to

16   the agreement signed by Gregory Vernikov on behalf of

17   Interpage entitled Interpage to commissions on sales of the

18   ALB–GOLD product.

19        Even before the ALB–GOLD agreement was executed,

20   Gregory worked with ALB–GOLD to design a label for the

21   ALB–GOLD pasta product.  It was decided by Gregory Vernikov

22   that the ALB–GOLD pasta product would bear the Delicious

23   Wonders trademark, a trademark owned by a company, Delicious

24   World, that Gregory was an officer and shareholder off.

25        Delicious World primarily sold cakes and pastry

OPENING STATEMENT – DRANGEL

1   products under the Delicious World trademark -- Delicious

2   Wonders, sorry about that.

3            Given that Gregory, through Interpage, paid for the

4   initial shipments and initially imported the Delicious Wonder

5   products, that it financed the incorporation, development of

6   marketing materials and paid for early exhibits of the

7   products at trade shows, Delicious Wonders permitted Gregory

8   and Interpage to use the Delicious Wonders trademark first on

9   a cod liver product, and then on an ALB-GOLD pasta product.

10           Given that the Interpage name appeared on the

11  Delicious Wonders pastry and cake products as importer, as

12  well as the cod liver products, wholesalers, retailers and

13  customers were likely to associate Delicious Wonders trademark

14  with Interpage.

15           Accordingly, Interpage chose to use the Delicious

16  Wonders trademark as an identification of sorts; i.e. the

17  trademark, on the ALB-GOLD pasta product.  Despite allegations

18  that Lenny was surprised to learn that the ALB-GOLD pasta

19  product bore the Delicious Wonders trademark when the first

20  two containers arrived in the Threeline warehouse, the

21  evidence shows widespread knowledge of this fact by everyone

22  at Threeline.

23           For instance, the early product packaging labels,

24  samples that Lenny acknowledges reviewing, all prominently

25  bore the Delicious Wonders trademark.  They likewise indicated

OPENING STATEMENT – DRANGEL

1    manufactured for Interpage Co. prominently.

2          Threeline became so concerned that the Delicious

3    Wonders trademark acted as a source identifier for Gregory

4    Vernikov and Interpage, that they undertook to conceal the

5    fact that they identified the ALB-GOLD pasta to Threeline

6    customers as Delicious Wonders on invoices by, first, not

7    producing the invoices that bore that designation during the

8    initial phases of discovery, and then upon order of

9    Magistrate Levy to produce the complete Threeline QuickBook

10   database by deleting every reference to Delicious Wonders in

11   the QuickBook database prior to turning it over to defendants

12   in discovery.

13          THE COURT:  How do you know that happened?

14          MR. DRANGEL:  Because after we received that, two

15   days later, Threeline decided to give us a different version

16   of it, which did not have the deletion of the Delicious

17   Wonders trademarks to it.  We have copies of both of the

18   databases, and during the course of the trial we will see how

19   these items were deleted from the database.

20          Of course, the label to the ALB-GOLD pasta packaging

21   bore the chicken and egg trademark at issue in this lawsuit as

22   well.  Lenny and Maya claimed at the preliminary injunction

23   hearing that they had a Brooklyn-based designer create the

24   chicken and egg trademark and label.

25          During the deposition of Maya, though, she admitted

OPENING STATEMENT – DRANGEL

1   that this testimony was false.  In fact, it was also

2   determined that evidence produced in support of this claim was

3   proven to be tampered with.

4            What the evidence does show is that Gregory Vernikov

5   communicated with ALB-GOLD to create the label for the

6   ALB-GOLD pasta, including the chicken and egg trademark.  And

7   despite arguments by Threeline that Gregory required the

8   permission of Lenny and Maya to use the final design, he

9   simply sought their are permission as customers.

10           The final ALB-GOLD pasta label for the chicken and

11  egg trademark, the Delicious Wonders trademark, identified

12  Interpage by manufactured by Interpage Co., bore Interpage UPC

13  code, and Gregory Vernikov's email address and cell phone

14  number.

15           Finally, once the agreement, product and packaging

16  were all finalized, an order was placed.  Threeline placed the

17  first order from Interpage for two containers of ALB-GOLD

18  pasta, which was relayed by Interpage by ALB-GOLD.  ALB-GOLD

19  then issued purchase orders addressed to Gregory's Interpage

20  Co. with Gregory's home address.

21           As was custom for some euro purchases, Threeline

22  sent the purchase orders to Trilini International for payment,

23  paid Trilini their 3 percent commission, and the goods were

24  shipped to Threeline's warehouse.

25           Gregory and Interpage were identified on all import

OPENING STATEMENT - DRANGEL

1    shipping documents for the initial two containers of ALB-GOLD

2    pass as co-signee and importer.

3            While Interpage did not receive a direct commission

4    for the shipment, the transaction was handled as part of its

5    agreement with Threeline for free rent, Threeline also

6    obtained a 10 percent discount and Interpage received its

7    usual commission by W2 payment.  Likewise, per the terms of

8    the ALB-GOLD agreement, Interpage was entitled to a commission

9    from ALB-GOLD.

10           It is not really clear how an argument can even be

11   made given all this evidence, which Lenny and Maya were

12   parties to, that Threeline is the owner of the chicken and egg

13   trademark and can claim first use.

14           As for the chicken and egg trademark registration

15   itself that Threeline hung its hat on in wrongfully obtaining

16   an injunction in this case causing severe financial damage to

17   my clients, Threeline now acknowledges that the date of first

18   use in the registration is wrong and argues the same date of

19   first use that Interpage now relies upon for its own.

20           However, as Your Honor indicated in the summary

21   judgment order, since Threeline is now attempting to rely on

22   an earlier date of first use than was identified in the

23   registration, the presumptions that are afforded to a

24   trademark owner no longer apply and Threeline must come

25   forward with clear and convincing evidence that it owns the

OPENING STATEMENT - DRANGEL

1    trademark, and that the first use is its own.

2              Under U.S. trademark law, if my clients are correct,

3    and we are confident they are, the first use of the chicken

4    and egg trademark will be the sale of the first two containers

5    of the pasta bearing the chicken and egg trademark by

6    Interpage to Threeline in December of 2012.  If Threeline is

7    correct, than its first use will be the sale of first two

8    containers of pasta to its customers in January of 2013.

9              Furthermore, Threeline will need to show that it

10   followed up the first use with substantial exclusive

11   continuous use of the chicken and egg trademark prior to my

12   clients.

13             Your Honor has already acknowledged in the summary

14   judgment order that Interpage's sales of nearly 120,000 units

15   of ALB-GOLD pasta products bearing the chicken and egg was not

16   de minimis.  Moreover, Threeline faces a greater burden in

17   this case, because not only do they need to show there was --

18   that their's was the first use, but they must also overcome

19   clear evidence that the relevant public, wholesalers and

20   retailers, are more likely to identify the ALB-GOLD pasta

21   product bearing the chicken and egg trademark and other

22   Interpage source identifiers, such as their company name,

23   contact details and DW trademark as originating from Interpage

24   and not Threeline.

25             Counsel argues that Gregory Vernikov waited too long

OPENING STATEMENT – DRANGEL

1    to pursue this action.  This could be said even more so for

2    Threeline.  As counsel indicated, Threeline knew as early as

3    2013 that Gregory was selling, yet waited nearly two years

4    before taking action in this case.

5            It should be noted at this point that a number of

6    the wholesale and retail witnesses identified in our witness

7    list, who have been subpoenaed to testified, have indicated

8    they have been contacted by members of Threeline and are

9    concerned about testifying and, therefore, will not be doing

10   so voluntarily.

11           If there was such a clearcut case as Threeline

12   suggests, then Threeline and its owners would not have

13   tampered with evidence, perjured themselves, and on eve of

14   trial, interfered with trial witnesses.

15           My clients are at a disadvantage here since many of

16   the relevant emails that show communications between it and

17   ALB-GOLD, as stipulated, have been deleted from Threeline's

18   server after Gregory Vernikov left.

19           THE COURT:  Can I just ask you.  You're saying that

20   the plaintiffs tampered with witnesses?  What did they do?

21           MR. DRANGEL:  Again, we have subpoenaed a number of

22   witnesses, as you've seen on our witness list, and a number of

23   them have told us that they were contacted by Threeline, and

24   as a result they are not going to appear.

25           THE COURT:  Contacted and what was said to them?

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

PROCEEDINGS

1            MR. DRANGEL:  I don't know the specifics and I don't

2    necessarily want to get into the specifics because it's mostly

3    hearsay, but I'm just told.

4            THE COURT:  Well, it's an extremely serious

5    allegation, and if it's true, there can be some serious

6    consequences for the plaintiffs.  I just want to make sure

7    they're aware of that.

8            All right, go ahead.

9            MR. DRANGEL:  Threeline is not new to the litigation

10   game.  Our review of ECF records for Southern District and

11   Eastern District show a bevy of cases where Threeline was

12   alleged to have infringed, or it alleged infringement in an

13   aggressive manner.

14           All the evidence to be presented at trial will show

15   that Interpage is the proper owner of the chicken and egg

16   trademark and Threeline is the infringer and liable for any

17   and all damages it caused to Gregory Vernikov and Interpage.

18           Thank you, Your Honor.

19           THE COURT:  All right, give me just one second.

20           (Discussion was had off the record.)

21           THE COURT:  All right, are you ready to call your

22   first witness?

23           MR. FILOSA:  Yes, Your Honor.

24           The plaintiff calls Malvina Kerzhner.

25           THE COURT:  Is she going to be testifying with the

PROCEEDINGS

1    assistance of the interpreter?

2            MR. FILOSA:  Yes.

3            THE COURT:  Does she need the interpreter?  It goes

4    much more quickly if she doesn't.  I'm fairly confident she's

5    testified without one before.  But it's up to you, if she

6    really needs it, she can use, it just takes a much longer

7    time.

8            Go ahead.

9            MR. FILOSA:  We assume for the introductory

10   material, Your Honor, no, and then perhaps I think for my

11   questions, I believe she can testify without the assistance of

12   the interpreter only for her answer, which is the format that

13   we followed during the course of the deposition, if she feels

14   she can be more eloquent using her native tongue.

15           THE COURT:  That's fine.  It might be easier for the

16   court reporter, too.  So let's just go ahead and use the

17   interpreter.

18           MR. FILOSA:  Thank you.

19           (Witness takes the witness stand.)

20   MALVINA KERZHNER, called as a witness, by the Plaintiffs,

21   having been first duly sworn/affirmed, was examined and

22   testified as follows:

23           THE COURT:  All right.

24           THE COURTROOM DEPUTY:  State your name for the

25   record.

M. KERZHNER – DIRECT – FILOSA

1         THE WITNESS:  Malvina Kerzhner, the full name.

2         THE COURTROOM DEPUTY:  Have a seat.

3         THE COURT:  All right, since we have the

4   interpreter, let's go ahead and use the interpreter.

5         A couple of things.  I want you to answer only the

6   question that you're being asked.  Don't volunteer any

7   information, just give the answer to the question that the

8   lawyer is asking you.

9         Wait until the lawyer is finished asking the

10   questions, whichever lawyer is asking the questions, before

11   you start answering, so that the court reporter can get

12   everything down.

13         If there's a question that you don't understand, or

14   you need to have repeated, let us know.

15         All right, go ahead.

16         (Through the interpreter.)

17   DIRECT EXAMINATION

18   BY MR. FILOSA:

19   Q    Good morning, Ms. Kerzhner.

20   A    Good morning.

21   Q    What is your affiliation with the plaintiff, Threeline

22   Imports?

23   A    I'm the president of the company, Threeline Imports.

24   Q    And for how long have you held that title?

25   A    With Threeline Imports, we've been working since

M. KERZHNER – DIRECT – FILOSA

1    June 2006.

2    Q    And what is your –– what are your responsibilities with

3    respect to the company?

4    A    I usually work in accounting, accounts payable.  I also

5    handle logistics, help out the girls with billing.  And

6    communicating with clients over the internet because Leonid

7    doesn't use internet.

8         THE COURT:  All right, you have to wait until he

9    finished talking because he's providing a translation, and if

10   you're talking at the same time, I can't hear and the court

11   reporter can't hear.

12        Next question.

13   Q    Can you explain to the Court what the business of

14   Threeline is?

15   A    Threeline Imports handles export of products from

16   European countries and parts of the former Soviet Union and

17   sales of goods in the United States.

18   Q    Can you identify for the Court what types of products?

19   Provide examples.

20   A    We sell confectionary products, a lot of candy goods,

21   pasta, and grain products.  And other –– finished fruit,

22   vegetable, candy products.

23        THE COURT:  The stuff that you're selling, is

24   that –– are you selling it to people in the United States, or

25   is that what you're doing?

M. KERZHNER – DIRECT – FILOSA

1          THE WITNESS:  Yes.

2          THE COURT:  And so this is -- these are items that

3   you're importing from Eastern Europe?

4          THE WITNESS:  Yes.

5          THE COURT:  Are you also exporting?

6          THE WITNESS:  No.

7          THE COURT:  Yes or no?

8          THE INTERPRETER:  No.

9   Q    And can you explain to the Court who the customers of

10  Threeline are?

11         THE WITNESS:  Hello?

12         THE INTERPRETER:  We have an issue with the...

13         THE COURT:  You know what might be easier, you want

14  to just stand up here?

15         THE INTERPRETER:  Okay.

16  A    Yes, we work in the 40 or 45 states of the United States.

17         We mostly sell to distributors, to smaller-sized

18  distributors that don't usual handle their own imports, or if

19  they handle imports in smaller amounts.  And we also sell to

20  large grocery stores.

21         THE COURT:  How many people work there at Threeline?

22         THE WITNESS:  Currently it's 12 to 14 people.

23         THE COURT:  Okay.

24  BY MR. FILOSA:

25  Q    Does Threeline maintain a warehouse?

M. KERZHNER – DIRECT – FILOSA

1   A    We have a -- we have a warehouse.  We have machinery.  We

2   have equipment.

3   Q    Where is the warehouse located?

4   A    14A 53rd Street, Brooklyn, New York 11235-0032 is the ZIP

5   code.

6   Q    Who are the shareholders of Threeline?

7   A    I own two thirds of the shares of Threeline, and one

8   third of the shares are owned by Euro Candy Company, which is

9   owned by three people.

10          THE COURT:  Who are the three people?

11          THE WITNESS:  Roman Katsnelson, Arkady Volovik and

12   Yuri Leschinscy.

13   Q    Does Leonid hold any position with Threeline?

14   A    He's the manager of the company.

15   Q    And what are Leonid's responsibilities as manager of

16   Threeline?

17   A    He has many responsibilities.  He orders goods.  He sells

18   goods.  He manages everything that happens in the warehouse

19   down to each employee picking up a box and placing it on a

20   pallet.

21          THE COURT:  Does he get a W2?

22          THE WITNESS:  Yes, of course.

23          THE COURT:  Is he your husband?

24          THE WITNESS:  Yes.

25   Q    Are you familiar with a company known as Trilini

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    International Ltd.?

2    A    Yes, it's a company, our partners, that we work together

3    with.

4    Q    And what is the business of Trilini International Ltd.?

5    A    Trilini International supplies confectionary factories in

6    Europe and former Soviet countries with supplies to produce

7    goods -- ingredients, such as cocoa beans and other items that

8    I'm not really familiar with the details their business.

9             THE COURT:  Who owns that company?

10            THE WITNESS:  Roman.

11            THE COURT:  The same guy that owns -- wait a second.

12   Roman Katsnelson, is that the same guy that's a shareholder in

13   your company?

14            THE WITNESS:  Yes.

15            THE COURT:  All right, what about those other two

16   people, Arkady and Yuri --

17            THE WITNESS:  Yes.

18            They are also -- it's their company, the Trilini

19   International.

20            THE COURT:  And how do you know those guys?  How do

21   you Roman Katsnelson, Arkady, and all those fellows?

22            THE WITNESS:  We became acquainted with Yuri

23   Leschinscy in 2003 or 2004.

24            THE COURT:  Does Trilini mean Threeline?  Does that

25   mean the same thing?

36

M. KERZHNER – DIRECT – FILOSA

1          THE WITNESS:  It's also the same thing, but we have

2     a totally different entity.

3          THE COURT:  All right, go ahead.

4          THE WITNESS:  It's an affiliated company.

5     BY MR. FILOSA:

6     Q    What relationship, if any, exists between Threeline

7     Imports and Trilini International Ltd.?

8     A    I mentioned this before, we are affiliated company and

9     there is nothing else.

10    Q    Does Trilini International Ltd. maintain separate

11    offices?

12    A    Yes, they have a totally separate, beautiful office.

13         THE COURT:  Where is the totally separate office?

14         THE WITNESS:  41 Terrace Place in Brooklyn.

15         THE COURT:  And are you a shareholder of Trilini?

16         THE WITNESS:  No.

17         THE COURT:  Go ahead.

18    BY MR. FILOSA:

19    Q    Now, are you familiar with the defendant, Gregory

20    Vernikov?

21    A    Yes.

22    Q    When did you meet Mr. Vernikov?

23    A    I cannot say exactly.  I think it was in 2004 or 2005.

24    Q    How did you meet Mr. Vernikov?

25    A    He came to our warehouse.

M. KERZHNER – DIRECT – FILOSA

1   Q    And what did you say to him and what did he say to you

2   when he came to the warehouse at this time?

3   A    I did not say anything.

4        He could not work at his previous place of

5   employment, so he wanted to work with us.  He discussed it

6   with Leonid and he came to work for us.

7   Q    What was your understanding of his previous employment

8   prior to this time of joining Threeline?

9   A    I had an understanding that he had a very unsuccessful

10  business, that he had a small barn that he was maintaining.

11       THE COURT:  A barn in New York City?

12       THE WITNESS:  Garage.  A garage.  It was like a

13  garage.

14       I think he purchased a condominium at the time and

15  he couldn't -- actually made a down payment and he couldn't

16  run his business further, something like that.  He had

17  financial difficulties.

18  Q    Again, just to focus the time period, the time period

19  you're testifying to is approximately 2005?

20  A    Yes.

21  Q    So did there come a time that Mr. Vernikov began working

22  out of Threeline's warehouse?

23  A    Yes.

24  Q    And when was that?

25  A    At around the same time, in 2005.

PROCEEDINGS

1           THE COURT:  What was he doing?

2           THE WITNESS:  He was doing what we were teaching him

3   to do.  He was mainly engaged in -- as a buyer.

4           THE COURT:  You were teaching him?

5           THE WITNESS:  No, not we were not teaching him, we

6   were learning together how to do it, but he was doing what we

7   were telling him to do.  What I and Leonid were telling him to

8   do.

9           THE COURT:  So you were telling him what to do in

10  2005?

11          THE WITNESS:  Yes, we would give him tasks to do.

12  For instance, if we needed to start a new line, our goal was

13  to expand our business.

14          THE COURT:  Were you giving him a W2 in 2005?

15          THE WITNESS:  No.

16          THE COURT:  So he wasn't working for you then; is

17  that correct?

18          THE WITNESS:  He worked, he had his own company but

19  he worked for us.  You wanted to be paid by 1099.

20          THE COURT:  So he had his own company?  And he was

21  working for you?

22          THE WITNESS:  Yes.

23          THE COURT:  And you weren't giving him a W2?

24          THE WITNESS:  At that time, no.

25          THE COURT:  And how much were you paying him for his

PROCEEDINGS

1   work for you?

2            THE WITNESS:  It varied depending on the sales

3   amount.

4            THE COURT:  It varied?

5            THE WITNESS:  Yes, it varied.

6            THE COURT:  Well, give me an estimate.  For 2005,

7   how much did you pay him for working for you?

8            THE WITNESS:  I do not remember.  I don't have the

9   paperwork with me.

10            THE COURT:  Next question, please.

11   BY MR. FILOSA:

12   Q    What was your understanding of defendant, of the name

13   under which Mr. Vernikov did business prior to working out of

14   the Threeline warehouse?

15   A    I -- Interpage, I did not know, I did not even know the

16   name of the company at the time, I just knew him as Gregory

17   Vernikov.

18            THE COURT:  When did you learn the name of the

19   company?

20            THE WITNESS:  When we were -- had started working

21   together.  I did not know what he had.

22            THE COURT:  When did you learn it, what year?

23            THE WITNESS:  2006 or 2007.

24            THE COURT:  Okay, so for 2005 and 2006, he was

25   working at your company but also running his business out of

PROCEEDINGS

1    your warehouse?

2            THE WITNESS:  He did not engage in any business out

3    of our warehouse.

4            THE COURT:  All right.  And so you didn't -- did you

5    even know that he had another business?

6            THE WITNESS:  Yes.

7            THE COURT:  And when did you learn that?

8            THE WITNESS:  2005 or 2006.

9            THE COURT:  So in 2005 or 2006, you learned that he

10   has this other business, correct?

11           THE WITNESS:  It's not a business, it was a name

12   that he had the name in which he engaged in business.

13           THE COURT:  That sounds like a business to me.

14           THE WITNESS:  He had an account.

15           THE COURT:  The question is a simple question:  Did

16   you know that he had a business?

17           THE WITNESS:  Yes.

18           THE COURT:  When did you learn it?

19           THE WITNESS:  2005 or 2006.  At around the same time

20   when he started working for us.

21           THE COURT:  And where was your understanding -- let

22   me rephrase it.

23           Where did he run this business?

24           THE WITNESS:  I guess from our office, if it was a

25   business.

M. KERZHNER – DIRECT – FILOSA

1    THE COURT:  I thought you said that you didn't think

2  he ran it out of your business.

3    THE WITNESS:  I know that the entire business was --

4  I know that the entire business was paid from the interest of

5  Threeline Imports.

6    What kind of a business it is if he could not decide

7  anything without our approval.

8    THE COURT:  Well, that's not really what I asked

9  you.

10    You said that you didn't know that he had a

11  business.  Now, you say you do know that he had a business,

12  correct?

13    THE WITNESS:  No, I said that I know that he had

14  that name of the business.

15    THE COURT:  Next question.

16  BY MR. FILOSA:

17  Q    Ms. Kerzhner, did there come a time that Mr. Vernikov

18  became an employee of Threeline?

19  A    Yes.

20  Q    When was that?

21  A    In 2009.

22  Q    And what were the circumstances under which Mr. Vernikov

23  became an employee of Threeline?

24  A    I think it was in late 2008, early 2009.  He was going

25  through a divorce with his wife.  Actually, the Interpage

PROCEEDINGS

1   business was his wife's business.  She withdraw all the money

2   from his business account and ended up in a difficult

3   financial position without money again.  And the name

4   Interpage did not exist anywhere on paperworks.

5           THE COURT:  I'm so confused, I'm sorry.

6           You said that he had something with just the name in

7   2005 and 2006.

8           So what happens between 2005 and 2009?  You said his

9   wife took all the money from his business account?  From

10  Interpage?

11          THE WITNESS:  Yes.

12          THE COURT:  So he must have -- at that time then, he

13  must have realized that he was doing the business because

14  there's money in a business account, correct?

15          THE WITNESS:  There was a little bit of money and we

16  were aware of the on goings.

17          THE COURT:  Go ahead.

18          MR. FILOSA:  To clarify, Your Honor, at this point

19  the plaintiffs have already stipulated that in the beginning

20  of 2005, defendants -- excuse me, Threeline was aware that

21  Mr. Vernikov was doing business under some form, under an

22  assumed name, Interpage.  That's been stipulated to.

23          THE COURT:  Sounds a little bit different than what

24  she just testified to, but go ahead.

25

M. KERZHNER – DIRECT – FILOSA

1   BY MR. FILOSA:

2   Q    When Mr. Vernikov became an employee of Threeline, how

3   was Mr. Vernikov compensated?

4   A    W2.

5           THE COURT:  Did you give him a check every two

6   weeks?

7           THE WITNESS:  Yes.

8           THE COURT:  How much did you pay him?

9           THE WITNESS:  I think a thousand dollars a week.

10          THE COURT:  All right.  Go ahead.

11  BY MR. FILOSA:

12  Q    Ms. Kerzhner, can you take a look at Exhibit 3 in

13  plaintiff's exhibit book, please.

14          THE INTERPRETER:  Counsel, can you repeat?

15          MR. FILOSA:  Number 3.

16  Q    Do you recognize these documents, Ms. Kerzhner?

17  A    Yes.

18  Q    And what do you understand them to be?

19  A    Yes, it's a W2 form for 2009.

20          MR. FILOSA:  Your Honor, we would like to offer

21  these documents into evidence, Your Honor, as Plaintiff's

22  Exhibit 3.

23          THE COURT:  Any objection?

24          MR. DRANGEL:  No, Your Honor, but I think –– should

25  we just stipulate now that ––

M. KERZHNER – DIRECT – FILOSA

1          THE COURT:  That's what I thought.  Aren't you

2     stipulating to all these exhibits?

3          MR. FILOSA:  The understanding I have with counsel

4     is to the extent that an exhibit is objectionable be raised,

5     so our silence would be assumed that it's submitted into

6     evidence.

7          THE COURT:  If you're upset about something, you'll

8     let me know then, but unless I hear otherwise, it's all in,

9     all right?

10          MR. FILOSA:  Yes, Your Honor.

11     Q    Again, Ms. Kerzhner, just thumbing through the assorted

12     pages of Plaintiff's Exhibit 3, we can agree that the first

13     page is Mr. Vernikov's 2009 W2 form?

14     A    Yes.

15     Q    The second page is Mr. Vernikov's 2010 W2 form?

16     A    Yes.

17          THE COURT:  You know, I can read it, it's all in

18     evidence, so I can see that he's got W2s here until 2013.

19     Okay?

20          Yes, I can see those, so no need to go through each

21     one.

22     Q    Can you just clarify for the Court during what time

23     period was Mr. Vernikov a W2 employee of Threeline?

24          THE COURT:  I'm going to go out on a limb here and

25     guess that it's between 2009 and 2013.

M. KERZHNER – DIRECT – FILOSA

1        MR. FILOSA:  The two partial years.

2        THE COURT:  Okay.

3   Q    For what period, beginning in 2009, did Mr. Vernikov

4   become a salaried employee of Threeline?

5   A    From August 2009 until April 2013.

6   Q    And what were Mr. Vernikov's responsibilities as an

7   employee of Threeline?

8   A    He engaged in import.  Helped Threeline company expand

9   our import lines.  He engaged in some of the logistics with

10  the containers and I also helped with that.  He also handled

11  labels, if it was necessary.  He was helped out by some

12  designer companies.  We also hired some consulting services.

13  That was his job.

14        THE COURT:  Can I see the lawyers at the sidebar for

15  just a minute?

16        (Continued on the next page.)

17        (Sidebar conference.)

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1      THE COURT:  Who is this person sitting with you at

2   the table?

3      MR. FILOSA:  At our counsel table?

4      THE COURT:  Yes.

5      MR. FILOSA:  Alex Kerzhner is there, who is an

6   attorney, the son of Malvina and Leonid Kerzhner, their

7   outside general counsel.  He's a member of the bar of the

8   EDNY.

9      THE COURT:  If he wants to stay a member of the bar

10  at the EDNY, he should stop signaling to her and doing

11  whatever he's doing from the table.

12      It's extremely distracting, and I can see.  So I

13  don't know if he is signaling, maybe he's just nervous she's

14  not going to say something, but you might want to tell him.

15      MR. FILOSA:  I will notify him.

16      THE COURT:  Maybe because it's his mother and all of

17  that, you know, but he's very intently focused on her and has

18  made a few motions, maybe they're not signals, I don't know,

19  but let's stop it.  Okay?

20      MR. FILOSA:  Certainly.

21      THE COURT:  Thank you.

22      (End of sidebar conference.)

23      (Continued on the next page.)

24

25

47

M. KERZHNER – DIRECT – FILOSA

1          (In open court.)

2     BY MR. FILOSA:

3     Q    What was Mr. Vernikov's position or title with Threeline

4     when he became an employee?

5     A    Exporter, buyer.

6     Q    Did Mr. Vernikov's responsibilities include negotiating

7     purchase terms for products purchased by Threeline?

8     A    Yes, of course, he would be on the phone and on the

9     internet, and if there was an issue he would go is to Leonid

10    and resolve the issue.

11    Q    Did Mr. Vernikov have final authority to approve the

12    terms of a purchase order for product purchased by Threeline?

13    A    No.

14    Q    Did Mr. Vernikov's responsibilities include helping

15    locate product which Threeline would purchase?

16    A    Yes, of course.

17    Q    Did Mr. Vernikov have final authority to approve any

18    particular product which Threeline purchased?

19    A    No, he could propose, but he could not decide anything.

20    Q    Who had final authority with respect to approving

21    products purchased by Threeline?

22    A    Leonid had.

23    Q    Can you turn to Exhibit Number 44 in plaintiff's book.

24         MR. ROSENBERG:  Your Honor, may I just approach the

25    witness with the book.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

M. KERZHNER – DIRECT – FILOSA

1       THE COURT:  Sure.

2   Q   Do you recognize Plaintiff's Exhibit 44, Malvina?

3   A   Yes.

4   Q   What do you understand it to be?

5       THE COURT:  It's a business card, right?

6       THE WITNESS:  (In English.)  It's a business card.

7       THE COURT:  Okay, and this has Trilini Imports and

8   it has the same address as your -- as Threeline, correct?

9       THE WITNESS:  Yes.

10      THE COURT:  Just that was just the question.

11      THE WITNESS:  Because until 2006 we were Trilini

12  Imports.

13      THE COURT:  Go ahead.

14  BY MR. FILOSA:

15  Q   During this time, where did Mr. Vernikov report for work,

16  Ms. Kerzhner?

17      THE INTERPRETER:  I'm sorry, counsel.

18  Q   During the time that Mr. Vernikov was an employee of

19  Threeline, where did Mr. Vernikov report for work?

20  A   To our address, 14A 53rd Street.

21  Q   And what were Mr. Vernikov's hours of employment?

22  A   From 8 to 5.

23  Q   And who supervised Mr. Vernikov's work?

24  A   Leonid and I did.

25  Q   And to whom did Mr. Vernikov report?

M. KERZHNER – DIRECT – FILOSA

1   A    Mostly if it was financial matters, he would contact me.

2   If it was general questions regarding purchasing and sales, he

3   would contact Leonid.

4   Q    Ms. Kerzhner, did there come a time that Threeline began

5   purchasing a pasta product manufactured by a company known as

6   Franz Tress?

7   A    Yes.

8   Q    When was that?

9   A    If I remember correctly, 2009.

10  Q    And how did Threeline learn of Franz Tress?

11  A    Leonid went into exhibitions, he took Gregory with him to

12  find --

13          THE COURT:  So the question is:  How did you learn

14  of this pasta?

15          THE WITNESS:  They were on an exhibition at a stand

16  where other participants put their products in Germany.

17          THE COURT:  Okay, go ahead.

18  BY MR. FILOSA:

19  Q    Who attended the exhibition?

20  A    Leonid and Gregory did.

21  Q    Where was the exhibition located?

22  A    In Germany, Cologne.

23  Q    Who paid for Leonid and Gregory's travel expenses?

24  A    We always paid for it.  We always paid for it.  It was

25  our travel expenses of Threeline Imports.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

M. KERZHNER – DIRECT – FILOSA

1   Q    And who paid for Leonid and Gregory's lodging expenses at

2   the exhibition?

3   A    We did, Threeline Imports.

4   Q    Ms. Kerzhner, can you turn to Plaintiff's Exhibit 18.

5        Are you familiar with Plaintiff's Exhibit 18,

6   Ms. Kerzhner?

7   A    Yes, I have already seen this.  It's a Franz Tress

8   contract.

9   Q    Did Franz Tress request a contract?

10  A    Yes.

11  Q    Do you know who prepared Plaintiff's Exhibit 18?

12  A    Gregory did.

13  Q    Who instructed Gregory to prepare Plaintiff's Exhibit 18?

14  A    I instructed him to prepare this document.  And I told

15  him that if he needed assistance, I gave him permission to

16  contact my son.

17  Q    And who is your son, Ms. Kerzhner?

18  A    Alex Kerzhner, who was a law student at the time.

19       I told my son that if Gregory contacted him, he

20  could provide assistance.  Saying that we needed this

21  contract, and by "we," I mean Threeline Imports.

22       THE COURT:  Where does -- how come it doesn't say

23  Threeline Import on the contract?  It says "Interpage".

24       THE WITNESS:  Gregory always wanted for this name of

25  the Interpage Co. Inc. to appear on documents, and we both

M. KERZHNER – DIRECT – FILOSA

1    were owners of this Interpage Co. Inc.

2                THE COURT:  You owned that company, too?

3                THE WITNESS:  No, no.

4                THE INTERPRETER:  I'm sorry.

5                THE WITNESS:  Interpage Co. Inc. belonged to Trilini

6    International and Threeline Imports.

7                THE COURT:  I'm sorry, Interpage belonged to what?

8                THE WITNESS:  Interpage Co. Inc. was organized by

9    Roman Katsnelson in early 2009, and at the time Gregory did

10   not have the company.

11               THE COURT:  But this doesn't say Interpage Co. Inc.,

12   it says "Interpage Co."

13               That's a different company, correct?

14               MR. FILOSA:  Again, referring to Plaintiff's

15   Exhibit 18, Your Honor, it identifies the distributor as

16   Interpage Co. Inc.

17               THE COURT:  I see.

18   BY MR. FILOSA:

19   Q    Ms. Kerzhner, you see that the agreement identifies

20   Interpage Co. Inc. as distributor?  Do you see that?

21   A    Yes.

22   Q    Now are you familiar with a company known as Interpage

23   Co. Inc.?

24   A    Yes.

25   Q    Okay.  And what do you understand that company to be?

PROCEEDINGS

1    A    It's our company, Interpage Co. Inc., which was organized

2    by Roman Katsnelson.

3              THE COURT:  When?

4              THE WITNESS:  In early 2009.

5              THE COURT:  Early 2009?

6              THE WITNESS:  Yes.

7              THE COURT:  Did you help set that company up?

8              THE WITNESS:  No.

9              THE COURT:  Do you know why it has the almost

10   identical name to Interpage Co.?  Why does it have the same

11   name?

12             THE WITNESS:  Yes, I do.

13             THE COURT:  Why?

14             THE WITNESS:  Because in early 2009, Gregory did not

15   have a company and Trilini that too many lines.

16             THE COURT:  So it had too many lines so -- I just

17   don't -- this is what I don't understand.

18             Why did you name the company the exact same name as

19   the defendant?

20             THE WITNESS:  It is because our products and cans

21   had the name "Interpage" on them and they were already in

22   line.

23             THE COURT:  But wasn't that his company?

24             THE WITNESS:  No.

25             THE COURT:  Whose was it?

M. KERZHNER – DIRECT – FILOSA

1          THE WITNESS:  Roman Katsnelson.

2          THE COURT:  And when did he come up with the name

3   "Interpage"?

4          THE WITNESS:  In 2009.

5          THE COURT:  So is it your testimony that there was

6   no Interpage before 2009 by anyone?

7          THE WITNESS:  Prior to 2009, he had the company, but

8   by 2008 he lost the company and the account, bank account, and

9   Threeline was operating under two names; both Threeline and

10   Interpage.

11          THE COURT:  All right.  Go ahead.

12          There is no question.

13   BY MR. FILOSA:

14   Q   And who do you understand the shareholders of Interpage

15   Co. Inc. to be?

16   A   Roman Katsnelson and us, and I, Threeline Imports.

17   Q   Did you have any discussion with Mr. Katsnelson or

18   Mr. Vernikov regarding the formation of Interpage Co. Inc.?

19   A   Yes.

20   Q   And what was said during that discussion?

21   A   We discussed that Gregory did not have a company and

22   there was no way to protect our lines, and we needed to create

23   a company name that would have the "Interpage" name on it.

24   Q   And Mr. Vernikov was present for this discussion?

25   A   No, we told him about it.  But he was present when our

M. KERZHNER – DIRECT – FILOSA

1    partners brought us the corporate book.  And we proposed to

2    him that since he did not have a company of his own, to be a

3    shareholder of our company that we opened up.

4    Q    And what did Mr. Vernikov say in response?

5    A    I don't need it, I'm good as it is, I'll work for you

6    guys until I get to retirement.

7    Q    Did Mr. Vernikov object to the use of the name Interpage

8    Co. Inc. to you at that time?

9    A    No.  On the contrary.  At the time he was happy that the

10   company was opening.

11   Q    And, again, what was the purpose of the formation of the

12   company, Interpage Co. Inc.?

13   A    Just to continue operating and to use what we have built

14   up to the outside.

15   Q    Can you turn to Plaintiff's Exhibit 36, please.

16        Do you recognize Plaintiff's Exhibit 36,

17   Ms. Kerzhner?

18   A    I understand what it is.

19   Q    Can you explain what your understanding is?

20   A    That Interpage International Inc. was opened in

21   April 2011.

22   Q    So in 2009, when Interpage Co. Inc. was formed, do you

23   know whether Mr. Vernikov had any New York registered

24   corporation under the name Interpage Co. or any other

25   variation of Interpage in 2009?

M. KERZHNER - DIRECT - FILOSA

1    A    No.

2            THE COURT:  The question -- I think repeat the

3    question.  Just answer the question that the lawyer's asking

4    you.  It makes it much easier.

5            Next question.  The answer is "no," right?

6            THE INTERPRETER:  She didn't know.

7            THE COURT:  All right, next question.

8            MR. ROSENBERG:  One second, Your Honor.

9            THE COURT:  Sure.

10           (Pause.)

11   BY MR. FILOSA:

12   Q    And, again, just to clarify, did Mr. Vernikov have a

13   registered corporation known as Interpage in 2009?

14   A    In 2009, he did not have any company under the Interpage

15   name.

16   Q    Did Threeline purchase pasta from Franz Tress following

17   the execution of the Franz Tress agreement?

18   A    Yes.

19   Q    Who paid for the pasta?

20   A    Threeline paid for it.

21   Q    Who did Threeline pay?

22   A    We were invoiced in euros, and when we get invoiced in

23   euros, we -- our partners, Trilini International, makes the

24   payments.

25   Q    And by whom was Threeline invoiced?

M. KERZHNER - DIRECT - FILOSA

1   A    Franz Tress.  Company Franz Tress.

2   Q    Did Mr. Vernikov issue any invoice to Threeline for the

3   Franz Tress pasta?

4   A    No.

5   Q    Did any business under which Mr. Vernikov -- any business

6   under which Mr. Vernikov did any business, issue Threeline any

7   invoice for the Franz Tress pasta?

8   A    We never received invoices from Mr. Vernikov.  We only

9   received -- we always received invoices from manufacturers.

10  Q    And where was the pasta delivered?

11  A    To our warehouse.

12  Q    Did Threeline pay Mr. Vernikov any fee or any commission

13  in connection with Threeline's purchase of Franz Tress pasta?

14  A    Aside from the salary, we never paid commission for

15  merchandise or goods.

16  Q    Did Threeline pay Mr. Vernikov any fee or commission or

17  any other compensation in connection with the negotiation and

18  execution of the Franz Tress contract?

19  A    This was part of his duties and he received his salary

20  for those duties.

21  Q    So the answer's "no"?

22  A    No.

23         THE COURT:  So when the lawyer asks you a question,

24  if the answer is no just say "no," you don't have to go into

25  this explanation.

M. KERZHNER – DIRECT – FILOSA

1       Next question.

2  Q    Did Threeline buy any Franz Tress pasta from the

3  defendants?

4  A    No.

5  Q    When Threeline purchased the Franz Tress pasta from Franz

6  Tress, who paid all the shipping charges for that purchase?

7  A    We did, Threeline.

8  Q    Who paid all the freight charges?

9  A    Threeline company.

10  Q    Who paid the Customs brokers fees?

11  A    Threeline company.

12  Q    What did Threeline do with the pasta that it purchased

13  from Franz Tress?

14  A    Sold it to clients.

15  Q    Did Franz Tress pay Mr. Vernikov or any of the defendants

16  any commission in connection with Threeline's purchase of the

17  Franz Tress pasta?

18  A    No.

19  Q    Did Franz Tress pay the defendants any commission or any

20  compensation in connection with the execution of the Franz

21  Tress agreement?

22  A    No.

23  Q    Did defendants sell Franz Tress pasta?

24  A    No.

25  Q    Ms. Kerzhner, are you familiar with a company known as

M. KERZHNER – DIRECT – FILOSA

1  ALB-GOLD?

2  A    Yes.

3  Q    How did Threeline learn of ALB-GOLD?

4  A    Also through an exhibition.

5  Q    And when was this exhibition?

6  A    I think 2011.

7  Q    Who attended the exhibition?

8  A    All the exhibitions were attended by Leonid and he would

9  take Mr. Vernikov with him.  I never attended exhibitions.

10 Q    Okay, and this particular exhibition, do you recall where

11 it was held?

12 A    I think in Germany.

13 Q    We're referring to the Anuga trade show?

14 A    Anuga trade show.

15 Q    And who paid for Leonid and Mr. Vernikov's attendance at

16 this Anuga trade show?

17 A    Threeline Imports.

18 Q    And who paid for the hotel for Mr. Vernikov and Leonid?

19 A    Threeline Imports.

20 Q    And so Threeline learns of ALB-GOLD pasta products at the

21 Anuga trade show.

22       What, if anything, did Leonid say to you regarding

23 ALB-GOLD pasta following his return from the Anuga trade show?

24       THE COURT:  What did Leonid say?

25       MR. FILOSA:  Yes.

M. KERZHNER – DIRECT – FILOSA

1    A    He did not say anything to me, he gave instruction to

2    Mr. Vernikov to continue communication to purchase the pasta.

3    He did not give me instructions.

4    Q    Did you have a conversation with Mr. Vernikov regarding

5    ALB–GOLD following their return from the Anuga trade show?

6             THE COURT:  The question is:  Did you have any

7    conversation with him?

8             I'm sorry, you can translate what she said, but that

9    sounded like a very long answer for what should be a "yes" or

10   a "no".  Let's put the question again.

11            Did you have any conversation with the defendant

12   about this when they got back from this exhibition?

13            THE WITNESS:  When they returned, I did not have a

14   conversation, but later I did.

15            THE COURT:  All right.  Next question.

16   BY MR. FILOSA:

17   Q    Did Threeline instruct Mr. Vernikov to request a product

18   list from ALB–GOLD?

19   A    Yes.

20   Q    Can you turn to Plaintiff's Exhibit 4.

21            And, Ms. Kerzhner, do you recognize Plaintiff's

22   Exhibit 4?

23   A    Yes.

24   Q    Who do you understand Claus Doerner to be?

25   A    He's a manager at ALB–GOLD.

M. KERZHNER – DIRECT – FILOSA

1   Q    Turning to the page Bates-numbered in the lower

2   right-hand corner Threeline 1051 on Exhibit 4.  Looking at the

3   email in the middle of the page, do you see Gregory?

4   A    Yes.

5   Q    And the email address is Gregory@Trilini.com.

6            Do you see that?

7   A    Yes.

8   Q    Can you explain to the Court what email server that is?

9   A    We use Trilini International's server.

10  Q    And who's the "we" in that response?

11  A    Threeline Imports uses the servers of Trilini

12  International.

13  Q    Again, I'm looking at the email in the middle of the

14  page, it appears that Gregory writes to Mr. Doerner:

15           "Hi, Claus.  Yes, the product looks good.  Please

16  send us samples of bandnudeln" -- and I'll spare everyone the

17  pronunciation of rest.

18           THE COURT:  It is in evidence, so.

19  Q    Who determines receipt of the product.  There's a list of

20  products and the amounts, who determined these amounts?

21  A    Only Leonid.

22  Q    Now, turning to the first page of Plaintiff's Exhibit 4,

23  you see that it reads it's from.  Who is Viktor F. Flaig?

24  A    He's a Russian-speaking employee of ALB-GOLD.

25  Q    And we'll read along.

M. KERZHNER - DIRECT - FILOSA

1           Dear, Gregory, please find attached a list with

2    available egg pastas.  You can get a picture to each shape

3    when you click to, quote, please click here, in the Excel

4    file.

5           THE COURT:  You know, if you want to just point her

6    to something in particular, because it is in evidence, you

7    don't have to read it.

8    Q    Turning to the last page of Plaintiff's Exhibit 4.

9    A    Okay.

10   Q    Do you recognize this Excel spreadsheet?

11   A    Yes, that's what ALB-GOLD sent us.

12   Q    Okay.  Did you discuss this spreadsheet with Leonid?

13   A    Gregory discussed it with Leonid.

14   Q    Do you have an understanding what they discussed?

15   A    Quantity of the first container.

16   Q    Turn to Plaintiff's Exhibit 5, please, Ms. Kerzhner.

17          And, again, you'll see this.

18          Do you recognize this email?

19   A    Yes.

20   Q    And your email to Gregory dated July 30, 2012 at

21   Gregory@Trilini.com, subject pasta order:  Grecia, send the

22   order this way.

23          Do you see that?

24   A    Yes.

25   Q    And again, "Grecia" referring to Mr. Vernikov?

M. KERZHNER – DIRECT – FILOSA

1    A    Yes.

2    Q    And let's take a look at the second page of the exhibit.

3    You see that there are numbers in the right-hand margin of the

4    Excel?

5    A    Yes.

6    Q    Who determined the numbers in the right-hand margin of

7    Plaintiff's Exhibit 5?

8    A    Leonid did.

9    Q    Who determined which varieties of pasta to order?

10   A    Leonid did.

11   Q    From whom did Threeline order the ALB-GOLD pasta

12   reflected in this exhibit?

13   A    From ALB-GOLD.

14   Q    Now, during this time period, did Threeline have any

15   discussion with the defendants whether Threeline would

16   purchase ALB-GOLD pasta from the defendants?

17   A    No.

18   Q    Okay.  During this time, did Threeline have any

19   discussion with the defendants as to whom would be paid for

20   the ALB-GOLD pasta products?

21   A    No.

22   Q    Did Threeline ever agree to pay defendants any price, any

23   commission, or any other compensation in connection with

24   Threeline's purchase of ALB-GOLD pasta?

25   A    It was never discussed.

M. KERZHNER – DIRECT – FILOSA

1          THE COURT:  All right, this might be a good time for

2     a break.

3          Do you know how much more you have?

4          MR. FILOSA:  I'd say an hour.

5          THE COURT:  Let's get to the chicken and the egg;

6     shall we?

7          MR. FILOSA:  Next.

8          THE COURT:  All right, we'll be in recess for about

9     five minutes.

10         MR. FILOSA:  Okay.

11         (Whereupon, a recess was taken at 11:48 a.m.)

12         THE COURTROOM DEPUTY:  All rise.

13         THE COURT:  All right, everybody, have a seat.

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Kerzhner - Direct/Filosa

1              (In open court.)

2              (Through the interpreter.)

3              THE CLERK:  The witness is reminded that she is

4    still under oath.

5              THE WITNESS:  Yes.

6              THE COURT:  Go ahead.

7    DIRECT EXAMINATION

8    BY MR. FILOSA (continuing):

9    Q    So, Ms. Kerzhner, did there come a time that Threeline

10   began discussing with Mr. Vernikov the label that was going to

11   be placed on the ALB-GOLD pasta product?

12   A    Yes.

13   Q    When was that?

14   A    From early July 2012.

15   Q    What was said?

16   A    We wanted to put -- we wanted to put our own label on

17   that pasta for Threeline Imports.

18   Q    What was the label displayed on the Franz Tress pasta?

19   A    Franz Tress had its own label, and we purchased it from

20   them with their label of grandmother.

21   Q    So the Franz Tress pasta bore a Franz Tress label?

22   A    Yes.

23   Q    Can you explain to the court why Threeline became

24   interested in purchasing ALB-GOLD pasta in addition to Franz

25   Tress?

MICHELE NARDONE, CSR -- Official Court Reporter

Kerzhner – Direct/Filosa

1  A    Because it was of good quality.  It was a kosher product,

2  and they were giving us a slightly better price than Franz

3  Tress.

4            THE COURT:  Did they have their own label on their

5  pasta?

6            THE WITNESS:  They had several distributors in

7  America, and they wanted to distinguish it so that each

8  company would have its own label.

9            THE COURT:  Even though it's all from the same

10  place?

11            THE WITNESS:  Yes.

12            THE COURT:  All right.  Next question.

13  BY MR. FILOSA:

14  Q    Ms. Kerzhner, the "they" that you are referring to, what

15  pasta manufacturer are you referring to --

16            THE COURT:  You have to wait until he finishes the

17  question.

18  Q    What pasta manufacturer were you referring to in response

19  to the court's question?

20  A    ALB-GOLD product.

21  Q    So did ALB-GOLD offer Threeline the opportunity to sell

22  the ALB-GOLD pasta product under a private label?

23  A    Yes.

24  Q    Why was that, to your understanding?

25  A    To distinguish it.  They had several distributors, and

66

Kerzhner – Direct/Filosa

1    they wanted each distributor to have its own label.

2    Q    So you have –– so you testified you had –– Threeline had

3    a conversation with Mr. Vernikov regarding creation of a label

4    to be displayed on the ALB–GOLD pasta product.

5         What's said?

6    A    We wanted to have a beautiful label, and we preferred to

7    have a chicken on it.

8    Q    Can you turn to Plaintiff's Exhibit 6, please.

9         Do you recognize Plaintiff's Exhibit 6,

10   Ms. Kerzhner?

11   A    Yes.

12   Q    Okay.  Can you turn to the second page of Exhibit 6.

13        Is this a photograph of a label which Mr. Vernikov

14   submitted to Threeline for its approval?

15   A    That was one of the first ones.

16        THE COURT:  I'm sorry.  I just have a question.  If

17   ALB–GOLD sends pasta, is it the case that it will have

18   different names on it?

19        THE WITNESS:  Yes.

20        THE COURT:  So it could be –– one could be –– what

21   was the name of the one that you were distributing?

22        MR. FILOSA:  Is Your Honor referring to the noodle

23   type?

24        THE COURT:  No, no, no.  I want to know the name of

25   it.  What's the brand?

MICHELE NARDONE, CSR –– Official Court Reporter

Kerzhner − Direct/Filosa

1          THE WITNESS:  We sold it as Brown Chicken.

2          THE COURT:  But the very same pasta from the very

3    same place could be sold under a different name by somebody

4    else, right?

5          THE WITNESS:  Yes.

6          THE COURT:  And could they be different prices?

7          THE WITNESS:  Yes, of course.

8          THE COURT:  Of course?  But it's the same pasta,

9    right?

10          THE WITNESS:  They wanted to keep up a certain

11    level, and when they found out that Gregory was selling the

12    pasta they found out he was selling it at a much lower price,

13    and they did not want that to happen.

14          THE COURT:  I don't know what that means.  So did

15    you sell more than one -- did you sell ALB pasta under more

16    than one name?

17          THE WITNESS:  No.  We sold it under one name.

18          THE COURT:  Okay.  And that was egg?

19          THE WITNESS:  It was called Brown Chicken.

20          THE COURT:  Go ahead.

21    BY MR. FILOSA:

22    Q    Again, to clarify the court's question, under what

23    company name did you sell what you were referring to as the

24    Brown Chicken pasta?

25    A    Threeline Imports.

MICHELE NARDONE, CSR -- Official Court Reporter

Kerzhner – Direct/Filosa

1    Q    When you are referring to what you just called -- well,

2    what you just called to the court Brown Chicken, what are you

3    referring to?

4    A    The chicken that is depicted on our image.

5    Q    Turning again to the second page of Plaintiff's

6    Exhibit 6, do you recognize this photograph?

7    A    Yes.

8    Q    Okay.  Is this a label that Gregory Vernikov submitted to

9    Threeline for its approval?

10   A    Yes.

11   Q    Did Threeline approve this label?

12   A    No.

13   Q    Do you recognize, Ms. Kerzhner, let's look at the image

14   on the top of the pasta bag, the farm and -- it looks like it

15   depicts a farm and a field.  A farmhouse and a field.  Excuse

16   me.

17   A    Yes.

18   Q    Do you recognize that image?

19   A    Yes.

20   Q    Had you previously seen that image, prior to seeing this

21   photograph?

22   A    Yes.

23   Q    Okay.  When did you -- what did you recognize that image

24   to be?

25   A    That part belongs to another brand of ours that was

Kerzhner – Direct/Filosa

1    previously registered, called Granny's Farm.  That's

2    associated with the line that handles vegetable and fruit

3    canned products.

4              THE COURT:  Is that also from ALB?

5              THE WITNESS:  From Bulgaria.

6              THE COURT:  Okay.  Go ahead.

7    BY MR. FILOSA:

8    Q    Can you turn to Plaintiff's Exhibit 19.

9              Is this the Granny's Farm trademark that you were

10   referring to in your testimony moments ago?

11   A    Yes.

12   Q    Is this the farmhouse and field image that you were

13   referring to in your testimony moments ago?

14   A    Yes.

15   Q    Turn to Plaintiff's Exhibit 20, please.

16             THE COURT:  How much are we going to be talking

17   about Granny's Farm?  I thought the question was Chicken and

18   Eggs here?

19             MR. FILOSA:  No.

20             THE COURT:  So let's not talk about Granny's Farms,

21   all right, unless it's important.

22             MR. FILOSA:  We are just tying it into the image

23   submitted, Your Honor.

24             THE COURT:  All right.  I can compare them.

25

Kerzhner - Direct/Filosa

1    BY MR. FILOSA:

2    Q    Again, just briefly, Ms. Kerzhner, Plaintiff's

3    Exhibit 20, is this label, is this a product that Threeline

4    sold under the Granny's Farm trademark?

5    A    Yes, it belongs to Threeline.

6    Q    Same question for 21.

7    A    Yes.

8    Q    And same question for 22.

9    A    Yes.

10   Q    So, again, turning back to the second page of Plaintiff's

11   Exhibit 6, Mr. Vernikov submitted a proposed label to

12   Threeline for the ALB-GOLD pasta for Threeline's approval

13   using an image of a trademark previously registered by

14   Threeline; is that correct?

15   A    Yes.

16   Q    Following the submission of the label, the sample label

17   that's shown on Plaintiff's Exhibit 6, did Mr. Vernikov submit

18   additional proposed labels to Threeline for its approval?

19   A    He provided -- he showed several labels.

20   Q    It you turn to Plaintiff's Exhibit 8.

21        Looking at the first page, is this a label which

22   Mr. Vernikov submitted to Threeline for its approval?

23   A    Yes.

24   Q    Did Threeline approve this label?

25   A    No.

Kerzhner – Direct/Filosa

1   Q     Next page, second page of Plaintiff's Exhibit 8, same

2   questions:  Is this a label that Mr. Vernikov submitted to

3   Threeline for its approval?

4   A     Yes.

5   Q     Did Threeline approve of this label?

6   A     No.

7   Q     Third page, is this a label that Mr. Vernikov submitted

8   for Threeline's approval?

9   A     He did, and we did not like it.

10   Q     Now, at any time did Threeline give Mr. Vernikov any

11   direction as to what they wanted to see on the label?

12   A     Yes.  Prior to that we sold it with an image of a white

13   chicken; and we just told him to make it simple, to change the

14   color of the chicken to a darker one, a dark chicken.

15   Q     What's the significance of a chicken?  Why a chicken?

16   A     It's a German pasta, and it's associated with the

17   quantity of eggs in the consistency of pasta and quality.

18   Q     Following along, in the next image on Plaintiff's

19   Exhibit 8, is this an image of a label that Mr. Vernikov

20   submitted to Threeline for its approval?

21   A     Yes.

22   Q     Did Threeline approve of this label?

23   A     No.

24   Q     The next page of Plaintiff's Exhibit 8, is this an image

25   that Mr. Vernikov submitted for approval?

Kerzhner – Direct/Filosa

1          THE COURT:  I'm going to assume that all of these

2   are images that were submitted and that they didn't like them.

3   Am I right about that?

4          THE WITNESS:  Yes.

5          MR. FILOSA:  Fair enough.

6          THE COURT:  Let's go on to the next one, then.

7   BY MR. FILOSA:

8   Q    Can you turn to Plaintiff's Exhibit 7.  Do you see the

9   e-mail on the bottom of Plaintiff's Exhibit 7?

10          Can you translate into English what the Russian text

11   is on the e-mail from Gregory to Leonid on which you were

12   copied, Ms. Kerzhner?

13   A    (In English) Translate to English?

14          THE COURT:  Why don't you read it.  The translator

15   can read it.

16          THE INTERPRETER:  Leonid, look at this final version

17   of labels.  If something -- if there is something that you

18   don't like, let me know.

19   Q    Following the e-mail chain up, then, we see, Malvina,

20   that you forwarded this e-mail to info@Pravdamedia.

21   A    Yes.

22   Q    Who is Pravda Media?

23   A    It's a company that helped us with the label during

24   registration, with the design.

25   Q    It's fair to say that Threeline did not like this label,

MICHELE NARDONE, CSR -- Official Court Reporter

Kerzhner – Direct/Filosa

1    also?

2    A    Yes.

3    Q    Did Threeline communicate with Pravda Media regarding the

4    creation of the Chicken and Egg label?

5    A    Well, yes, he also wrote me.  We knew.

6    Q    Take a look at Plaintiff's Exhibit 52, please.  Is this a

7    copy of your communication with tomorrow me at Pravda Media

8    regarding the proposed Chicken and Egg label?

9    A    Yes.

10   Q    We see that they ultimately recommend that, quote, I

11   think the best solution is to purchase a design illustration.

12        Ultimately did Threeline retain Pravda Media to

13   create the Chicken and Egg label?

14   A    He showed some things to us.  We didn't like it, and then

15   he sent this electronic link.

16   Q    Okay.  So following -- getting back to Plaintiff's

17   Exhibit 7, following Mr. Vernikov's submission of this label

18   to Threeline for Threeline's approval what, if anything, did

19   Threeline do next with respect to the design of the label to

20   be displayed on the ALB-GOLD pasta?

21   A    It was October, and this e-mail is dated October 4.  So

22   from July to October nothing -- turned out that nothing was

23   done.

24   Q    Did Leonid ever express any dissatisfaction or

25   frustration to you about how long it was taking Mr. Vernikov

MICHELE NARDONE, CSR -- Official Court Reporter

Kerzhner − Direct/Filosa

```
 1   to propose a label which met Threeline's approval?

 2            THE COURT:  That sounds like hearsay to me.

 3            MR. FILOSA:  To the extent that she was a party to a

 4   discussion with Leonid?  Did Leonid ever express any

 5   dissatisfaction to her?

 6            THE COURT:  That sounds like hearsay and I think

 7   that's what it is, unless there is some exception to the

 8   hearsay rule.  I'm assuming there isn't.

 9            Something that's not hearsay.  It's an out-of-court

10   statement offered for the truth, right.  Last time I checked

11   unless they changed it?

12   Q    So what happened next with respect to the creation of the

13   Chicken and Egg label?

14   A    It turned out that the order was ready.  The label was

15   not ready.

16            When Gregory came up to us with another label that

17   we did not like, which was in October, Leonid became

18   frustrated.  He said how long -- how much longer can you -- do

19   you have to go for.  He said find any image of a chicken that

20   looks nice and we will use that.  I opened up the computer,

21   started scrolling through and saw a chicken that I liked, and

22   showed it to him and he also liked it.

23            He told Gregory it cannot be any easier than this,

24   just take this chicken, submit it and they will use it to

25   create the label.
```

MICHELE NARDONE, CSR −− Official Court Reporter

75

Kerzhner - Direct/Filosa

1    Q    Were these images submitted to ALB-GOLD?

2    A    Yes.

3    Q    Just so we have the chronology clear, the order was

4    placed prior to the approval of the label, correct?

5    A    Yes.

6    Q    Turning to -- can you turn to Plaintiff's Exhibit 11,

7    please.

8         Do you recognize Plaintiff's Exhibit 11,

9    Ms. Kerzhner?

10   A    Yes.

11   Q    What do you understand it to be?

12   A    It's an invoice from ALB-GOLD that I received.

13   Q    Who determined the types of pasta identified on these

14   invoices?

15   A    Leonid did.

16   Q    Who determined the quantities of pasta identified on this

17   invoice?

18   A    Leonid.

19   Q    Turning to Plaintiff's Exhibit 12, same question:  Who

20   determined the varieties of pasta identified in this invoice?

21   A    Only Leonid.

22   Q    Who determined the varieties?

23   A    Also Leonid.

24   Q    Did Threeline pay for the pasta identified on Plaintiff's

25   Exhibit 11?

MICHELE NARDONE, CSR -- Official Court Reporter

Kerzhner – Direct/Filosa

1          THE COURT:  Did you hear the question?  Did

2     Threeline pay for it?

3          THE WITNESS:  Yeah, yeah, yeah.  I'm looking for the

4     document.

5     A     Yes.

6     Q     And same question for Exhibit 12, did Threeline pay for

7     the pasta identified on Exhibit 12?

8     A     Yes.

9     Q     To whom was payment made?

10          THE INTERPRETER:  Pardon me?

11    Q     To whom was payment made?

12    A     The payment was made to Trilini International Company,

13    which made a payment in euros for us to Germany.

14    Q     Did Threeline reimburse Trilini for this euro

15    transaction?

16    A     Yes.  There is a check here, number 5457, that made the

17    payment for Trilini International.

18    Q     Again, you are referring to Plaintiff's Exhibit 10?

19    A     Yes.

20    Q     Turning back to Plaintiff's Exhibit 9, do you recognize

21    Plaintiff's Exhibit 9?

22    A     Yes.

23    Q     Can you explain to the court what that is?

24    A     This is the payment that was made from J.P.Morgan Bank to

25    Trilini International for pasta.

Kerzhner – Direct/Filosa

1   Q    Can you explain to the court why it is that Trilini paid

2   ALB-GOLD and then Threeline reimbursed Trilini?

3   A    Trilini International has a lot of transactions in large

4   sums in different currencies, and usually they have better

5   rates.

6            THE COURT:  Isn't that your company, Trilini?

7            THE WITNESS:  No.

8            THE COURT:  All right.  Go ahead.

9            THE WITNESS:  Trilini International?

10           THE COURT:  Yes.  Go ahead.

11  Q    Just to clarify, the Trilini company that you are

12  referring to is the Trilini Company International that you

13  previously identified, the shareholders of which are Roman

14  Katsnelson, Arkady Volovik, and Yuri Leschinsky?

15  A    Yes.

16  Q    Taking a look at Plaintiff's Exhibit 10, do you recognize

17  the handwriting?

18  A    Yes.

19  Q    Whose handwriting is that?

20  A    That's our bookkeeper's.

21  Q    Does Threeline -- did Threeline pay Trilini any fee or

22  foreign exchange fee for processing this transaction in euros?

23  A    We paid three percent commission to Trilini

24  International.

25  Q    Taking a look again on Plaintiff's Exhibit 9, whose

MICHELE NARDONE, CSR -- Official Court Reporter

78

Kerzhner – Direct/Filosa

1   handwriting is that?

2          THE COURT:  I thought she just answered that, the

3   bookkeeper.

4          MR. FILOSA:  With respect to 10, now 9.

5          THE COURT:  Okay.

6   A    There were two containers there, and we paid for both

7   containers.

8          THE COURT:  He just wants to know whose handwriting

9   is on number 9.  I'm going to say it's the bookkeeper.

10         THE WITNESS:  Bookkeeper.

11  Q    Can you explain to the court what the contents of a

12  container, approximately what are we talking about in terms of

13  boxes, bags?

14  A    Each container had from 1200 up to 1400 boxes.

15  Q    How many -- approximately how many pieces, how many bags

16  per box?

17  A    Fifteen to twenty, depending on the sizes of bags.

18  Q    Now, had Trilini previously paid for products bought by

19  Threeline in euros on Threeline's behalf?

20  A    They have always made payments, especially when I asked

21  them to, and especially when it's in euros.

22  Q    In these instances did Threeline reimburse Trilini for

23  that payment?

24  A    Yes, of course.  We had the checks and we made payments

25  to them plus the three percent commission.

Kerzhner – Direct/Filosa

1    Q    Turning back to Plaintiff's Exhibit 11, did Threeline pay

2    the defendants any fee, any commission, or any other

3    compensation for Threeline's purchase of the ALB-GOLD pasta

4    reflected in the exhibit?

5    A    No.

6    Q    Turning to Plaintiff's Exhibit 12, same question:  Did

7    Threeline pay defendants any fee, any commission, any other

8    compensation for Threeline's purchase of the pasta reflected

9    in this invoice?

10   A    No.

11   Q    Okay.  Again, you see both invoices, Plaintiff's

12   Exhibit 12 and Plaintiff's Exhibit 11, refer a special

13   discount ten percent.  Do you see that?

14   A    Yes.

15   Q    Do you have an understanding of why a special discount of

16   ten percent was given?

17   A    Yes.

18   Q    All right.  What is that?

19   A    Leonid wanted to purchase those nest pastas that are in

20   lumps.  This factory did not produce those nest pastas.  They

21   said that they could provide us this pasta that's produced by

22   another manufacturer but under their label.  But we were told

23   to purchase in a large quantity.  There were three types, that

24   we need to purchase in a large container.

25           In other words, we purchased two containers right

MICHELE NARDONE, CSR -- Official Court Reporter

Kerzhner – Direct/Filosa

1   away, and for doing so we were provided this ten percent

2   discount.

3   Q    Who is Cargo Partner Network, Ms. Kerzhner?

4   A    This is a company that engaged in ocean freight.

5   Q    Do you know if they provided the ocean freight for the

6   shipment of the ALB-GOLD pasta reflected on those two

7   invoices?

8   A    Yes, they did.

9   Q    Was it part of Mr. Vernikov's responsibilities as an

10   employee of Threeline to arrange for shipment of product to

11   Threeline's warehouse?

12   A    Yes.  He had the logistics, and this was part of the

13   logistics, how to bring the goods into America.

14   Q    Can you take a look at Plaintiff's Exhibit 14.

15        Do you recognize this document?

16   A    Yes.

17   Q    Can you explain to the court what it is?

18   A    This is the invoice from Cargo Partners for one

19   container.  One container cost $1,790.

20   Q    Did Threeline pay this invoice?

21   A    Yes.

22   Q    Was it -- did Cargo Partner again provide shipment for

23   the second container of ALB-GOLD pasta?

24   A    Yes.

25   Q    So it's 1790 each, for each container?

MICHELE NARDONE, CSR -- Official Court Reporter

Kerzhner — Direct/Filosa

1    A    Yes.

2    Q    Can you turn to Plaintiff's Exhibit 13.

3              THE COURT:  Does it say Threeline on any of these,

4    or are we back into the Interpage business?  These are all

5    just Interpage?

6              MR. FILOSA:  Plaintiff's Exhibit 14 identifies

7    Interpage International Inc.

8              THE COURT:  Okay.  Go ahead.

9    Q    Turning to Plaintiff's Exhibit 13, Ms. Kerzhner, do you

10   recognize that document?

11   A    Yes.

12   Q    Okay.  Does that reflect Threeline's payment to Cargo

13   Partner of the ocean freight for the two containers of

14   ALB—GOLD pasta?

15   A    Yes.

16   Q    Who is Transportation Services International?

17   A    This is a company that brings containers from the port.

18   Q    Did Transportation International provide what I will call

19   the inland transportation for the first two containers of

20   ALB—GOLD pasta?

21   A    Yes.

22   Q    Take a look at Plaintiff's Exhibit 15.  You see that's an

23   invoice from Transportation Services to the attention of Maya,

24   Leonid.

25   A    It's a delivery order with attention to Maya, Leonid.

Kerzhner – Direct/Filosa

1    Q    Did Threeline pay Transportation Services International's

2    invoice in connection with this delivery order?

3    A    Yes, of course.

4              THE COURT:  Is it a check that says it's from

5    Threeline or from Interpage?

6              THE WITNESS:  I paid from Threeline.

7              THE COURT:  Paid from Threeline?  Okay.

8    Q    Again, just to be clear, is the Maya referred to in that

9    exhibit, are you also known as Maya, Ms. Kerzhner?

10   A    I'm known only by Maya.  Malvina is only on paper.

11   Q    Was there a customs broker involved in the shipment of

12   the first two containers of ALB-GOLD pasta product?

13   A    Sure.  Broker is necessary to import goods.

14   Q    Who paid the customs broker fee?

15   A    Only Threeline Imports.

16   Q    When was the pasta product in the first two containers of

17   the ALB-GOLD shipment delivered to Threeline?

18   A    In late January.  I think January 24, 2013.

19   Q    Did that -- did the pasta product contained in that

20   shipment bear the chicken and egg label at issue in this case?

21   A    Yes.

22             MR. FILOSA:  May I hand up what's identified as

23   plaintiff's exhibit -- part of Plaintiff's Exhibit 43?

24             THE COURT:  Uh-huh.

25   Q    Looking at the pasta bag, Plaintiff's Exhibit 43,

Kerzhner – Direct/Filosa

1   Ms. Kerzhner, do you recognize that pasta product?

2   A     Yes.

3   Q     Is that the label under which pasta product contained in

4   the first two containers of the ALB-GOLD product that was

5   shipped to Threeline by the label that was reflected on that

6   pasta bag?

7   A     Yes.

8   Q     Do you see the label identifies at the top Delicious

9   Wonders or, better still, DW, that is labeled DW?  Do you see

10  that?

11  A     Yes.

12  Q     When the pasta was received bearing the DW logo did you

13  say anything to Gregory, and did Gregory say anything to you

14  regarding that label?

15  A     Leonid became upset that why this DW logo is there and

16  why the tail of the chicken is cut out.  Gregory said that

17  this looked better because we needed to fill up the top

18  portion.

19  Q     Did you express any disapproval to Gregory, the fact that

20  DW was on the bag?

21  A     Yes, of course.

22  Q     What did you say to Gregory, and what did he say to you?

23  A     Why did we need to put DW here when this label belongs or

24  is associated with the cakes, with frozen cakes.

25            THE COURT:  With what?

MICHELE NARDONE, CSR -- Official Court Reporter

Kerzhner – Direct/Filosa

1          THE WITNESS:  Frozen cakes.

2          THE COURT:  Frozen cakes?

3          THE WITNESS:  Yeah, frozen cakes.

4          THE COURT:  We are going to have to break in about

5   five minutes.

6          MR. FILOSA:  So I think this is an actual stop

7   point, Your Honor.

8          THE COURT:  So you want to stop now?

9          MR. FILOSA:  Yes.

10         THE COURT:  We will be in recess until 2:20.  You

11  don't have a whole lot left, do you?

12         MR. FILOSA:  No.

13         THE COURT:  Okay.  All right.

14         (Lunch recess.)

15         (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

KERZHNER – DIRECT – FILOSA

1          A F T E R N O O N   S E S S I O N

2               (Time noted:  2:20 p.m.)

3               (In open court.)

4               THE COURTROOM DEPUTY:  All rise.

5               THE COURT:  Everybody can have a seat.

6               All right, I do want to remind everyone, you know,

7    all good things must come to an end at some point including --

8    I don't have any time for you past this week, so I'm not so

9    sure how much I have to hear about eggplant and other things,

10   I thought -- whatever all those other things you were talking

11   about.  I thought the issue here was the chicken and egg.

12              So I take your point about some of it in terms of

13   background, but I don't think it is really advancing the ball.

14              All right.  Do you want to have the witness take the

15   stand again?

16              (Whereupon, the witness resumes the stand.)

17              THE COURTROOM DEPUTY:  The witness is reminded that

18   she's still under oath.

19              THE COURT:  Go ahead.

20   DIRECT EXAMINATION (CONTINUED)

21   BY MR. FILOSA:

22   Q    All right, Ms. Kerzhner, following Threeline's receipt of

23   the shipment of the first three ALB-GOLD pasta containers, did

24   Threeline sell those pasta products to its customers?

25   A    Yes.

86

KERZHNER - DIRECT - FILOSA

1    Q    And when did Threeline commence selling that product?

2    A    The same date that we received it.  It was the end of

3    January, something around the 20th or so.

4    Q    Take a look at Exhibit 38 in plaintiff's book, please.

5         Do you recognize Plaintiff's Exhibit 38,

6    Ms. Kerzhner?

7    A    Yes.

8    Q    And what do you recognize that to be?

9    A    Those are our invoices.

10   Q    For the sale of the ALB-GOLD pasta products?

11   A    That includes ALB-GOLD pasta.

12   Q    To whom did Threeline sell the ALB-GOLD pasta products?

13   A    There are stores, there are wholesale.

14        THE COURT:  I take it they're all on the invoices,

15   correct?

16        MR. FILOSA:  Correct.

17        THE COURT:  No need to go through each one.

18   Q    And where are those customers located, just explain to

19   the Court?

20        THE COURT:  I can also take a guess here just by

21   looking at it that they're in Brighton Beach or in Brooklyn?

22        Can't I just read them and tell where they are, each

23   one?  I mean I'm looking at first one it says "Brooklyn, New

24   York," and -- oh, here's something from Burnsville, Minnesota.

25        So I can see.  I can read.  So if you want to make

KERZHNER – DIRECT – FILOSA

1    argument -- they're in evidence, if you want make arguments

2    about them later, that's fine.

3         Next question.

4    Q    Can you just identify for the Court, turn to Plaintiff's

5    Exhibit 39.

6    A    Yes.

7    Q    Just identify what that is for Court, please.

8    A    It's an excerpt from QuickBooks.  It's a report from the

9    first day of sale.

10   Q    For a particular type of ALB-GOLD pasta?

11   A    Of each particular type.

12   Q    Turn to Plaintiff's Exhibit 40, and just explain to the

13   Court what that is?

14   A    It's a similar report for another item.  It's

15   Schitznoodle.  It's a different name of a pasta.

16   Q    And that's a variety of ALB-GOLD pasta product, a noodle

17   type?

18   A    Yes.

19   Q    And again just collectively, if we do the same for

20   Exhibit 62 through 68?

21   A    We have nine types of pasta, and these are the nine types

22   of pasta in the first two containers.

23   Q    And, again, turning to Plaintiff's Exhibit 69, can you

24   identify that for the Court?

25        THE COURT:  I take it this is another excerpt of the

KERZHNER – DIRECT – FILOSA

1   records; is that right?

2              MR. FILOSA:  Yes.

3   A    Yes, it's some other report that's also related to pasta.

4   Q    Take a look at Plaintiff's Exhibit 16, please.

5   A    Okay.

6   Q    Do you recognize that document?

7   A    It's a contract between ALB-GOLD and Interpage Co. Inc.

8   Q    You see identified Interpage Co. Inc. as a distributor.

9         Do you have an understanding why the agreement was

10  executed by Interpage Co. Inc.?

11  A    It was our company, Interpage Co. Inc.

12  Q    Now, following Threeline's sale of the entirety of the

13  contents of the first two containers of ALB-GOLD pasta,

14  Threeline continued to purchase product from ALB-GOLD,

15  correct?

16  A    Yes.

17  Q    Can you turn to Plaintiff's Exhibit 70, please.

18             THE INTERPRETER:  Did you say 17?

19             MR. FILOSA:  7-0, I'm sorry.

20  A    Okay.

21  Q    Can you just identify these documents for the Court, what

22  do you understand them to be?

23  A    That's also an invoice from ALB-GOLD, but in 2014.

24  Q    And Threeline paid for these invoices for the product

25  reflected in these invoices?

KERZHNER – DIRECT – FILOSA

1    A    Yes.

2    Q    Again, did they pay under the same arrangement with

3    Trilini, where this was quoted in euros, paid by Trilini in

4    euros and reimbursed by Trilini in U.S. dollars?

5    A    Yes.

6    Q    And, again, the pasta that was reflected -- that was

7    purchased from ALB-GOLD, reflected in Plaintiff's Exhibit 70,

8    that pasta bore the chicken and egg trademark?

9    A    Yes.

10          MR. FILOSA:  I'd like to offer up further samples of

11   the ALB-GOLD pasta product bearing the chicken and egg mark.

12          THE COURT:  Any objection?

13          MR. DRANGEL:  No.

14          THE COURT:  Just tell us what number this is.

15          Do you have to transfer -- do you need all the bags

16   over on your table?  Are you going to show them to her?

17          MR. ROSENBERG:  I'm going to show them to the

18   witness and to the Court.  This is all part of 43, Your Honor.

19          Does the Court want to have a bag?

20          THE COURT:  No, I do not.  Thank you.

21   BY MR. FILOSA:

22   Q    Ms. Kerzhner, do you recognize those products to be the

23   products which Threeline sold under the chicken and egg

24   trademark label?

25   A    Yes.

KERZHNER - DIRECT - FILOSA

1  Q    See the bag identified that the pasta product is kosher.

2       Do you see that?

3  A    Yes.

4  Q    Do you know if the pasta products sold by defendants

5  under its chicken and egg label is kosher?

6  A    No.

7  Q    No, it is not or, no, you don't know?

8  A    It was not kosher.

9  Q    Other than the chicken and egg mark at issue in this

10 case, has Threeline applied for and received trademark

11 registration of other trademarks?

12 A    Yes.

13 Q    Can you turn to Plaintiff's Exhibit 19, please.

14      THE COURT:  Can you just -- why is this relevant?

15 Why do I care about the other ones?

16      MR. FILOSA:  Can I have a proffer outside the

17 presence of the witness or...

18      THE COURT:  I thought we were here to decide one

19 discrete issue.

20      MR. FILOSA:  Can we have a sidebar?

21      THE COURT:  Fast one, yes.

22      (Continued on the next page.)

23      (Sidebar conference.)

24

25

SIDEBAR CONFERENCE

1          MR. FILOSA:  Again, Your Honor, the relevance of

2    offering other Threeline registered trademarks with the

3    chicken and egg is, again, it shows that these trademarks were

4    registered while Mr. Vernikov was an employee.

5          The evidence will show that Threeline sold these

6    products that are on the registered trademark --

7          THE COURT:  Okay, do you stipulate to this?

8          MR. DRANGEL:  Yes.

9          THE COURT:  Okay, good.

10         MR. ROSENBERG:  And that his client --

11         THE COURT:  Wait.  Wait.

12         MR. ROSENBERG:  His makes no claim --

13         MR. FILOSA:  His client makes no claim to those

14    trademarks, which they've stipulated to.

15         MR. DRANGEL:  Which is already a stipulated fact.

16         THE COURT:  I just don't care about it.

17         If I don't have to think about it, I would rather

18    not.  Because there are three people who seem to own about 17

19    companies.  So if I don't have to worry about other

20    trademarks, I really would rather not hear it.

21         MR. FILOSA:  It just shows to the Court is the

22    performance, because on that label, Mr. Vernikov's Interpage

23    company is identified on the rear of the label, yet he claims

24    no right, title or interest in that product.  We sold it

25    without his objection.

SIDEBAR CONFERENCE

1        THE COURT:  Do I have to have this lady testify

2   about this?

3        MR. FILOSA:  Will they stipulate to that?

4        MR. DRANGEL:  It's already stipulated.

5        THE COURT:  I'm going to stop everyone.  You cannot

6   talk over one another because the court reporter can't take it

7   down.

8        So your question is will they stipulate to what?

9        MR. FILOSA:  The fact that those products were sold

10  under a Threeline registered trademark, again, bearing on the

11  rear of the label identification of Mr. Vernikov's Interpage

12  company.

13       MR. DRANGEL:  Yes.

14       THE COURT:  Good.

15       MR. FILOSA:  Without his objection.

16       THE COURT:  All right, so that -- so that means we

17  don't have to ask any more questions about it.

18       MR. FILOSA:  We wouldn't go through that colloquy,

19  Your Honor.  Thank you.

20            (End of sidebar conference.)

21            (Continued on the next page.)

22

23

24

25

KERZHNER – DIRECT – FILOSA

1           (In open court.)

2    BY MR. FILOSA:

3    Q    Ms. Kerzhner, was it a part of Mr. Vernikov's duties as

4    an employee of Threeline to participate in the creation and

5    design of labels?

6    A    Yes.

7    Q    And did you communicate with Mr. Vernikov, while he was

8    an employee, regarding the creation and design of other

9    labels, other than the chicken and egg?

10   A    Sure.  Yes.

11   Q    Take a look at Plaintiff's Exhibit 46.  This is an email,

12   Bates numbered in the lower right-hand corner Threeline 0045.

13           See the email in the middle of the page from

14   Gregory@Trilini to AKerzhner@KerzhnerLaw, cc to Maya@Trilini?

15   A    You said what page?

16   Q    Page 45.

17           THE COURT:  Is the defense disputing any of this

18   stuff about Granny's Farm?  I'm not sure what -- I mean this

19   has nothing do, again, with the chicken and egg, correct?

20           MR. FILOSA:  Correct.  This doesn't relate to the

21   chicken and egg mark.

22           MR. DRANGEL:  Yes, Your Honor, we stipulated to

23   these facts.

24           THE COURT:  So there you have it.  Let's move on to

25   something that's not stipulated.

KERZHNER – DIRECT – FILOSA

1  BY MR. FILOSA:

2  Q    Again, Ms. Kerzhner, turning your attention back to the

3  pasta product contained in the first two containers of the

4  ALB-GOLD shipment, the bag we marked as the first Plaintiff's

5  Exhibit 43.

6  A    Yes.

7  Q    And, Ms. Kerzhner, you see that pasta bag contains a

8  barcode.

9         Do you see that?

10 A    Yes.

11 Q    While Mr. Vernikov was employed by Threeline, did you

12 ever have a conversation with Mr. Vernikov regarding the use

13 of barcodes on Threeline products?

14 A    Yes.

15 Q    What did you say to him and what did he say to you?

16 A    When it was time that we needed barcodes for some

17 product, Gregory Vernikov told me that, Maya, you don't need

18 to buy barcodes, I have barcodes that I have had for a long

19 time and have used.

20 Q    Okay.  Now, the barcode reflected on Plaintiff's

21 Exhibit 43, is that one the barcodes that you just referred to

22 moments ago?

23 A    Probably.  Yes.

24 Q    Now, turning your attention to Plaintiff's Exhibit 21.

25 A    Okay.

KERZHNER – DIRECT – FILOSA

1    Q    Do you recognize this product?

2    A    Yes.

3    Q    Is that product a product that Threeline sold?

4    A    Yes.

5    Q    Under its Granny Farm trademark?

6    A    Yes.

7    Q    Do you recognize the barcode there?

8    A    Yes.

9    Q    Okay.  Is that one of the barcodes that you testified to

10   moments ago that was the subject matter of your discussion

11   with Mr. Vernikov?

12   A    Yes.

13   Q    Mr. Vernikov's employment with Threeline ended on or

14   about April 20, 2013, correct?

15   A    Yes.

16   Q    How did his employment terminated?

17   A    He came to my office and said, "Maya, I'm leaving."

18   Q    What, if anything, did you say in response?

19   A    What could I say.  He was leaving, he could leave.

20        THE COURT:  So you didn't have any fights or

21   anything like that before, he just walked in and said "I'm

22   leaving"?

23        THE WITNESS:  Previous to that he had said that he

24   might start working for himself.

25        THE COURT:  Go ahead.

KERZHNER – DIRECT – FILOSA

1   BY MR. FILOSA:

2   Q    Now, Ms. Kerzhner, there came a time that Threeline

3   applied for and received federal registration, trademark

4   registration for the chicken and egg mark, correct?

5   A    Yes.

6           THE COURT:  That's also stipulated, right?

7           MR. FILOSA:  Yes.

8           THE COURT:  The dates and all that?

9   Q    Take a look at Plaintiff's Exhibit 2, Ms. Kerzhner.

10  A    Yes.

11  Q    What do you -- do you recognize this to be the trademark

12  registration?

13          THE COURT:  This is stipulated, right?

14          MR. FILOSA:  Yes.

15          THE COURT:  Okay.

16  A    Yes.

17          THE COURT:  I got that.

18  Q    Who prepared the application for Threeline, for the

19  registration of the trademark?

20  A    My son, Alex Kerzhner.

21  Q    And who provided Alex with the information contained in

22  the application?

23  A    I did.

24  Q    Now following the registration of the mark, did Threeline

25  continue to sell pasta products bearing the registered

KERZHNER – DIRECT – FILOSA

1    trademark?

2    A    Yes.

3    Q    Now, did there come a time that Threeline discovered that

4    defendants were selling product bearing the Threeline

5    registered trademark?

6    A    Yes.

7    Q    Did Threeline at any time authorize defendants to sell

8    product bearing the Threeline registered trademark?

9    A    No.

10   Q    And what, if anything, did Threeline do upon discovering

11   that defendants were selling product bearing the Threeline

12   registered trademark?

13   A    We first sent him a letter that he cannot sell.  But no

14   one responded to us.

15   Q    Take a look at Plaintiff's Exhibit 27.

16        Is that the letter you're referring to?

17   A    Yes.

18   Q    What, if anything, did Threeline do thereafter, after

19   sending this letter and receiving no response, what did

20   Threeline do?

21   A    As far as I remember, we sent him another letter and

22   there was no response.

23   Q    Take a look at Plaintiff's Exhibit 34.

24        Do you recognize that document as the -- that's the

25   letter that you previously testified to?

KERZHNER – DIRECT – FILOSA

1   A    Yes, we were waiting for his response and he did not want

2   to respond or communicate to us.

3   Q    Has Threeline received any complaints from any party

4   regarding defendants' sale of pasta product bearing the

5   chicken and egg mark?

6   A    In the beginning, when Gregory started selling the

7   products on his own by himself, we started receiving

8   complaints from customers in the summer of 2013 that Gregory

9   was selling the same pasta for a cheaper price.

10          THE COURT:  They were complaining about that?

11          THE WITNESS:  Yes, clients refused to purchase our

12   products, because Gregory was providing at cheaper price.

13          THE COURT:  So they called to complain, to say that?

14          THE WITNESS:  Yes, when our salespersons called to

15   place an order, they would hear that another company was

16   giving a cheaper price for the product.

17          THE COURT:  Oh, I see.  So nobody called you up and

18   said -- and complained to you, this was just something that a

19   customer said when your representative called them?

20          THE WITNESS:  Correct.  We usually call the

21   customers to place the order.

22          THE COURT:  I see.

23   BY MR. FILOSA:

24   Q    Did Threeline receive any complaints regarding the

25   quality of the pasta product that defendants' sold under the

KERZHNER – DIRECT – FILOSA

1   chicken and egg label?

2   A     Initially, no.  Initially, no, when he was selling

3   this -- this pasta from this shipment.  But later when he

4   started importing a different pasta with the same label,

5   clients did not complain to us, but they realized that the

6   pasta was of lower quality and they started coming back to us.

7         THE COURT:  They started doing what?

8         THE WITNESS:  They started purchasing from us again

9   when they realized that the pasta that was cheaper from the

10  other company.

11        THE COURT:  So who did that?  Who did --

12        THE WITNESS:  Gregory.

13        THE COURT:  No, no, no.  Who's the person that said

14  that they -- who started buying from you again who hadn't

15  bought from you before?

16        THE WITNESS:  Many clients that used to purchase

17  from us, they returned.

18        THE COURT:  Name one.  Give me a name of one.

19        THE WITNESS:  There are a lot of them.  There's a

20  store, Dina's, in Staten Island.  There was client in Chicago.

21  I forgot the name.

22        THE COURT:  Okay, go ahead.

23  BY MR. FILOSA:

24  Q     Ms. Kerzhner, are you familiar with a company, Hyson USA?

25  A     Yes.

KERZHNER – DIRECT – FILOSA

1   Q     Where is Hyson USA located?

2   A     Hyson, Chicago.

3   Q     Is that one of the companies that you previously

4   testified to that you received a complaint from regarding the

5   quality of the product that defendants sold?

6            THE COURT:  Is that person -- before you answer that

7   question, is that person going to testify here?

8            MR. FILOSA:  They're not.

9   A     Yes, there was also Grante and Hyson, they're both in

10  Chicago.

11  Q     What did Hyson -- what did a representative from Hyson

12  say to you and what did you say to that person regarding --

13           THE COURT:  How is this admissible?  I just want to

14  know, under what theory does a person who will never come in

15  here and be cross-examined, how do this come into evidence?  I

16  don't understand.

17           MR. FILOSA:  Well, to the extent we're not offering

18  it for the truth of its content, but at the very least the

19  fact that she received a complaint, not necessarily the fact

20  that, again, it's offered for the truth of its content.  So on

21  that basis.

22           THE COURT:  Some person that will never testify.

23  All right, I'll take it for what its worth.  Go ahead.

24           You can answer.

25  A     Can you repeat the question.

KERZHNER - DIRECT - FILOSA

1   Q    What did the person from Hyson say to you and what did

2   you say in response?

3   A    The pasta with our logo is sold in stores at a cheaper

4   price and it differs in color than our pasta.  Under the same

5   label.

6            THE COURT:  More bags, the same thing?

7            MR. ROSENBERG:  This is the discolored pasta that

8   was --

9            THE COURT:  Okay.  Go ahead.

10           MR. ROSENBERG:  May I approach the witness?

11  BY MR. FILOSA:

12  Q    Ms. Kerzhner, take a look at the bag of pasta which we

13  will have marked as part of Plaintiff's Exhibit 43.

14           Do you recognize that bag of pasta?

15  A    Yes.

16  Q    What do you recognize it as?

17  A    This is the pasta from Armbruster company.  This is the

18  same chicken logo.

19  Q    And was this pasta product sold by defendants under the

20  chicken and egg label?

21  A    Yes.

22  Q    Can you explain to the Court the significance between the

23  difference in the color of that pasta product versus the same

24  Threeline pasta products, which you should have on the bag,

25  the same variety sold under the Threeline chicken and egg

KERZHNER - CROSS - DRANGEL

1   label?

2   A    This pasta is of a worst quality.  And it differs in

3   color and it's not kosher.

4           You could see the difference once it's cooked.

5   Q    Is the fact that the Threeline brand of chicken and egg

6   pasta kosher important to Threeline?

7           THE WITNESS:  (In English.)  Sure.

8   Q    And why is that?

9           THE COURT:  Wait, wait, wait.

10  A    Yes.

11          THE COURT:  Let's have the interpreter -- I don't

12  want it in English.  Let him translate the question.

13          Did you get it?

14          THE INTERPRETER:  The answer is "sure".

15  Q    And why is that?  Can you explain to the Court, please?

16  A    Because we have a kosher client that only uses kosher

17  pasta.

18          MR. FILOSA:  No further questions, Your Honor.

19          THE COURT:  All right.  Cross-examination?

20          Just be mindful of the interpreter so you're not

21  talking over him.

22  CROSS-EXAMINATION

23  BY MR. DRANGEL:

24  Q    Good afternoon, Ms. Kerzhner, thank you for being here.

25          I'm going to draw your attention first to an exhibit

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

KERZHNER - CROSS - DRANGEL

1    that plaintiff had you already look at, it's Plaintiff's

2    Exhibit 44.

3              Are you familiar with that exhibit?

4    A    Yes.

5    Q    Can you tell me what that is?

6    A    Oh, it's a business card of Gregory.

7    Q    Okay.  And it says the company is Trilini Imports,

8    correct?

9    A    Yes.

10   Q    Did you work for a company named Trilini Imports?

11   A    Yes.

12   Q    And when did the Trilini Imports company cease to

13   exhibits?

14   A    In 2006.

15   Q    Okay.  And when did -- Threeline Imports, when was that

16   incorporated?

17   A    In June 2006.

18   Q    And was Gregory Vernikov a employee of Trilini Imports at

19   any time?

20             THE WITNESS:  (In English.)  He was employee of

21   Trilini Imports, but...

22             THE COURT:  Why don't you do it with the

23   interpreter.

24             THE WITNESS:  (In English.)  Oh.

25   A    At that time he was not an employee.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

KERZHNER - CROSS - DRANGEL

1    Q    Okay.  Why would he have a Trilini Imports' business card

2    then?

3    A    Because he worked with us for Trilini Imports.

4         THE COURT:  I thought you just said he didn't work

5    for Trilini Imports?

6         THE WITNESS:  He did not work on a salary, on a W2,

7    but he -- he showed this business cards, and he used it

8    whenever he was traveling.

9         THE COURT:  I'm sorry, you said he did not work on a

10   salary, didn't get a W2, but what else?

11        THE WITNESS:  1099.

12        THE COURT:  So he got paid by Trilini Imports?

13        THE WITNESS:  Yes.

14        THE COURT:  So he did work for Trilini Imports?

15        THE WITNESS:  Yes.

16   BY MR. DRANGEL:

17   Q    Are you confusing Threeline and Trilini Imports?

18   A    No.

19   Q    Okay.  So he received 1099s both from Threeline Imports

20   and Trilini Imports?

21   A    Trilini existed until 2006.  In 2006, Threeline Imports

22   was incorporated.

23   Q    And, again, the question was:

24        Did he, Gregory Vernikov, receive 1099 payments on

25   behalf of one or both of those entities?

KERZHNER - CROSS - DRANGEL

1    A    Until he became an employee in 2009.

2    Q    Have any 1099 statements been produced in this matter?

3    A    I do not know.

4    Q    As far as you know, 1099 statements exist that were

5    issued to Gregory or to Interpage Co.; do you know?

6            MR. FILOSA:  Objection to the extent it assumes

7    facts not in evidence.  There hasn't been any testimony that

8    the 1099s were issued to Interpage Co.

9            THE COURT:  I mean, if she knows.

10   A    I do not know, Your Honor.

11   Q    Okay, between the years of 2006 and 2009, before Gregory

12   Vernikov became an employee, what types of compensation did he

13   receive other than 1099 from Threeline?

14   A    He could receive commissions for sold products, but not

15   as a buyer.

16   Q    So he received a 1099 as a buyer, and in addition he

17   received commission payments?

18   A    He could receive commissions if he sold something, yes,

19   if he went physically and sold goods.

20   Q    Are you aware that he ever did that?

21   A    Yes.

22   Q    Whose products were those?  Were those Threeline products

23   or Interpage products?

24   A    Only Threeline Imports.  He did not have his own

25   products.

KERZHNER – CROSS – DRANGEL

1   Q     Okay.  So he would be paid a commission based on how many

2   units he would sell of a product of Threeline's; is that

3   correct?

4   A     Yes.

5   Q     Was he paid a flat fee per month?

6   A     No, there were additional commissions if he sold

7   something extra.

8   Q     Was he paid a flat salary between the years 2006 and

9   2009, Gregory Vernikov?

10  A     No.

11  Q     Was Interpage, Gregory Vernikov's Interpage, paid a flat

12  amount per month while he was in Threeline warehouse between

13  2006 and 2009?

14        THE COURT:  You have to let him finish asking the

15  question.

16  A     Approximately.  But not exactly the same.

17  Q     Okay.  And was that payment made to Interpage Co. or to

18  Gregory Vernikov himself?

19  A     I do not remember.

20        MR. WOLGANG:  Your Honor, may I?

21        THE COURT:  Yes.

22        (Pause.)

23        MR. DRANGEL:  Your Honor, I'm going to approach the

24  witness and hand her a new exhibit, which is a printout of a

25  document that's taken from the QuickBook database that we

KERZHNER - CROSS - DRANGEL

1    talked about earlier.

2            It's in response to statements that -- by the

3    witness that our client was only paid by 1099, and we have

4    evidence that, in fact, Interpage Co., a company that they say

5    did not exist, received commission payments.  So we'd like to

6    introduce that.

7            THE COURT:  Is this from the plaintiff's records?

8            MR. DRANGEL:  These are all from plaintiff's

9    records.

10           THE COURT:  All right, let's just show it to

11   counsel.

12           MR. DRANGEL:  I have copies.

13           THE COURT:  All right.  Any objection?

14           MR. ROSENBERG:  Your Honor, can we just have one

15   minute because we haven't seen it.

16           THE COURT:  Yes.

17           You haven't seen it before?

18           MR. FILOSA:  No, we have not.

19           MR. DRANGEL:  It's a printout from the actual

20   database itself.

21           THE COURT:  I see.

22           MR. FILOSA:  No objection, Your Honor.

23           THE COURT:  Okay.  So what number is this?

24           MR. DRANGEL:  This is Exhibit BG.

25           THE COURT:  BG?  B like boy, G like George.

KERZHNER - CROSS - DRANGEL

1          MR. DRANGEL:  Correct.

2          THE COURT:  All right.

3    BY MR. DRANGEL:

4    Q    Ms. Kerzhner, who had access to the QuickBook database at

5    Threeline?

6    A    We have several employees that have access to that

7    database.  We have several folks that enter data into

8    QuickBooks.

9    Q    Okay.  And as far as officers, I assume you have access

10   to QuickBooks?

11   A    Yes.

12   Q    And does Lenny Kerzhner have access to QuickBooks?

13   A    He only looks at it, he doesn't do anything.

14        THE COURT:  Does he have access to it, that's the

15   question.

16   A    Yes.

17   Q    Okay.  With regard to this document, it appears to show

18   payments to Interpage Co. between the years of 2006 and 2009,

19   and they appear to be monthly or semi-monthly, and some of the

20   designations identify the payment as commission.

21        Can you confirm that these payments --

22        THE COURT:  You know --

23        MR. DRANGEL:  Sorry.

24        THE COURT:  -- you have an interpreter.  Start over

25   again, if you can.

KERZHNER – CROSS – DRANGEL

1    Q    Okay.  With regards to this document, it identifies

2    Interpage Co., and a number of payments made between 2006 and

3    2009 to the Interpage Co.  In some of them were memo notes

4    indicating commission.

5          Can you confirm that these were monthly commission

6    payments to Interpage Co.?

7    A    They were not monthly, we don't see monthly payments

8    here.  There are some payments for 2006, 2008, but it's not

9    monthly.

10   Q    Okay, but they appear to be flat amounts that are

11   somewhat consistent; 3,000, 6,000, 3,000.

12         Are they actual commissions, or are they flat

13   monthly payments for services rendered?

14   A    They are flat payments.  We did not pay commissions to

15   Mr. Vernikov.

16   Q    Is this in addition to the 1099 payments that you said

17   were made?

18   A    No, these are the amounts that were part of the 1099.

19         THE COURT:  All right, I don't have the exhibit in

20   front of me.

21         Are these payments to Interpage?

22         MR. DRANGEL:  These -- sorry.

23         THE COURT:  That's all right.

24         MR. DRANGEL:  Yes, these are actual payments made to

25   Interpage Co.

KERZHNER - CROSS - DRANGEL

1          THE COURT:  So this is a different Interpage Co.

2    than Interpage Co. Inc., correct?

3          MR. DRANGEL:  That's the question that we need

4    answered.

5          THE COURT:  Oh.

6    BY MR. DRANGEL:

7    Q    Is this Interpage Co. Gregory Vernikov's Interpage Co.?

8    A    2007 and '8, yes.

9    Q    So, in fact, Gregory Vernikov did run a business from

10   your warehouse between the years of 2006 and 2009 called

11   Interpage Co.; is that correct?

12   A    He did not run our warehouse business.

13         THE COURT:  The question is this:  This company

14   Interpage company, this was connected with Mr. Vernikov,

15   correct?

16         THE WITNESS:  Yes.

17         THE COURT:  And you knew about it, correct?

18         THE WITNESS:  Yes.

19         THE COURT:  And did he run it out of your warehouse?

20         THE WITNESS:  Well, maybe.  Maybe from his home.

21   Maybe from the warehouse.  I'm not sure.

22         THE COURT:  Next question.

23   BY MR. DRANGEL:

24   Q    Did Interpage Co. run its own business out of your

25   warehouse between the years 2006 and 2009?

KERZHNER - CROSS - DRANGEL

1    A    In my understanding, no.

2    Q    Did you give free rent to Mr. Vernikov to run his

3    Interpage business to Mr. Vernikov between the year 2006 and

4    2009?

5    A    He not have his own business and we did not rent out

6    anything to him free of charge.

7    Q    And you did not buy products from the Interpage Co.

8    company or Mr. Vernikov between 2006 and 2009; is that

9    correct?

10   A    We did not buy from him.

11          THE COURT:  So I am so confused.  You said different

12   things each time you're asked a question, and maybe I'm just

13   not understanding.

14          Did Mr. Vernikov have or not have a company called

15   Interpage in the time period that the lawyer is asking you

16   about?

17          THE WITNESS:  Yes.

18          THE COURT:  So the answer is "yes," correct?

19          THE WITNESS:  Yes, he did.

20          THE COURT:  Next question.

21   BY MR. DRANGEL:

22   Q    Okay, if you can take a look at Defendants' Exhibit C.

23          MR. WOLGANG:  Your Honor, can I give her a binder?

24          THE COURT:  Sure.

25   Q    Okay, just an initial question before we get into those

KERZHNER – CROSS – DRANGEL

1    documents.

2            Did Threeline have any distribution contracts with

3    any foreign manufacturers prior to the date that Gregory

4    Vernikov came to the Threeline warehouse in 2006?

5    A    Yes, of course, we did.

6    Q    Can you name those distribution agreements, who were the

7    distributors?

8    A    Kharvik Bisquit Company.

9            Factory Akkond in Russia.

10           Slavianka factory in Russia.

11           Red October.

12           Some other small ones we brought company Resource.

13   Q    Were these contracts with Threeline Imports or Trilini

14   International?

15   A    Some of them were Trilini International and some were

16   with Threeline Imports.

17   Q    Okay, which ones were with Threeline Imports?

18   A    I don't remember.

19   Q    Isn't it true that there are no Threeline Imports

20   distribution agreements before 2006 only with Trilini

21   International?

22           MR. FILOSA:  Objection.  Asked and answered.

23           THE COURT:  Overruled.

24   A    Trilini Import or Trilini International?

25   Q    Trilini International.

KERZHNER - CROSS - DRANGEL

1   A    Or Trilini Import.  We were Trilini Import.

2   Q    When Gregory Vernikov came to your warehouse in 2006, are

3   you aware that he had exclusive and nonexclusive distribution

4   rights that he brought with him?

5            MR. FILOSA:  Objection.  And to form, it assumes

6   facts not in evidence.

7            THE COURT:  Overruled.

8   A    I knew of two, yes.

9   Q    What were those?  Who were the distributors?

10  A    Brivais Vilnis canned fish, and Alex Water, mineral

11  water.

12  Q    Okay.  The first page of Exhibit C appears to be a

13  contract with Brivais Vilnis.  That's IPV00432 through IPV436;

14  is that correct?

15  A    Yes.

16  Q    Okay.  And who is party to this agreement?

17  A    Probably Interpage.

18  Q    Okay, and is this Interpage -- the Interpage -- I'm going

19  to refer to Interpage as my client, and the company that

20  you've designated as having an interest in Interpage Co. Inc.,

21  okay?

22            Is this agreement with Interpage Co.?

23            THE COURT:  Wait a second.  You have to give the

24  interpreter a chance to finish.

25  Q    Is this agreement with Interpage or Interpage Co. Inc.?

KERZHNER - CROSS - DRANGEL

1    A    Interpage Co., with Gregory Vernikov.

2    Q    And what's the year of this contract?

3    A    2002.

4    Q    If you look to the last page of this contract, who signed

5    it?  IPV436.

6    A    I don't know, there's no signature here.

7    Q    There actually is a signature there.

8            Do you recognize that signature?

9    A    Gregory.

10   Q    And the stamp, is that the same Interpage Co. stamp that

11   appears on the Franz Tress agreement and the ALB-GOLD

12   agreement?

13   A    Yes.

14   Q    Did Threeline purchase Brivais Vilnis products from

15   Interpage?

16   A    We purchased products from Brivais Vilnis and Alex Water,

17   but not through Interpage.  We had directly purchased from

18   Brivais Vilnis and we had their invoices.

19   Q    Well, doesn't this show that Brivais Vilnis agreement is

20   actually with the Interpage Co. company?

21            MR. FILOSA:  Object to the form.

22            THE COURT:  Overruled.

23   A    You know, I have never seen these contracts.  I placed

24   the orders and made the purchases, but I did not see these

25   contracts.

KERZHNER - CROSS - DRANGEL

1   Q    Did you place the orders through Gregory?

2   A    Leonid discussed the orders with Gregory and -- but

3   Gregory never placed orders on his own.

4   Q    So who would have placed the orders?

5   A    Leonid would make the order, give the paper to Gregory,

6   and Gregory would deliver it to Brivais Vilnis.

7   Q    Okay, and that is through Mr. Vernikov's Interpage Co.

8   company; is that correct?

9   A    It was through Gregory Vernikov as a person, he did not

10  do it trough a company.

11           THE COURT:  What time period did this happen in?

12           MR. FILOSA:  I believe 2002, Your Honor.

13           THE COURT:  All right, well I was asking the defense

14  counsel.

15           What, 2002?

16           MR. DRANGEL:  Well, we can ask the witness.

17  Q    How long did this -- these former transactions with

18  Brivais Vilnis take place?

19  A    Until he left from 2004 -- 2004 or '5.

20           THE COURT:  Through 2013?

21           THE WITNESS:  Yes.

22  BY MR. DRANGEL:

23  Q    I'm going to have you take a look at Defendants' Exhibit

24  P, if you would.

25  A    Okay.

KERZHNER – CROSS – DRANGEL

1    Q    Okay, are you familiar with -- can you describe to me

2    what these documents are?

3    A    It's a copy of a wire transfer.

4    Q    Okay, and who made these wire transfers?

5    A    I think I did, but I don't recognize it.

6    Q    Okay, let's specifically look at IPV248 to 249.

7         Can you tell me what these documents are?

8    A    It's a wire transfer of our company on behalf of

9    Interpage for Brivais Vilnis.

10        Well, I didn't transfer it to Interpage, I

11   transferred it to Brivais Vilnis.

12   Q    Okay, but it says "on behalf of Interpage," so when you

13   say "Interpage," you mean Gregory Vernikov's Interpage?

14   A    Yes.

15   Q    And that was 2009, correct?

16   A    Yes.

17   Q    And if you can look a few pages later, IPV255 to IPV256,

18   is that another payment a few years later, 2011, to Brivais

19   Vilnis on behalf of Interpage?

20   A    Yes.

21   Q    Okay, so isn't it clear that you have purchased products

22   that Interpage Co. owned by Gregory Vernikov during the time

23   period that he was an employee of Threeline?

24   A    You showed me a document that was dated 2009, the

25   Interpage, the previous document, and at that time, Gregory's

KERZHNER – CROSS – DRANGEL

1   Interpage did not exist.

2           THE COURT:  What about the 2011 one?

3           THE WITNESS:  Yes, and this Interpage was our

4   company.  I did not distinguish it with the other Interpage.

5   It was all our part of our company, he did not sell to anybody

6   else.

7   BY MR. DRANGEL:

8   Q    Did Interpage Co. Inc. have a contract with Brivais

9   Vilnis?

10  A    No.

11  Q    In 2009 or 2011; is that correct?

12  A    He did not.

13  Q    Isn't it clear that you actually did consistently

14  purchase products from Interpage Co., Gregory Vernikov's

15  Interpage Co., between the time period that he was in the

16  warehouse from 2006 to 2013?

17  A    Gregory Vernikov worked for our company, for Threeline

18  Imports.

19          THE COURT:  So the answer is "no," is that what

20  you're saying?

21          THE WITNESS:  No.

22  BY MR. DRANGEL:

23  Q    Okay, did you have a contract with Roshen at Threeline?

24  A    No, it was Gregory Vernikov's contract.

25  Q    And it was not Interpage Co. Inc.'s contract, correct?

KERZHNER - CROSS - DRANGEL

1  A    Maybe.

2  Q    Well, does Interpage Co. Inc. have a contract with

3  Roshen, as far as you know?

4  A    I don't know.

5  Q    If we look back two pages, IPV244 to 245, does that

6  represent a payment by you on behalf of Interpage Co. to

7  Roshen?  In 2009?

8  A    Yes.

9  Q    And that's -- the statement clearly says invoices 43, 44

10 and 45 with a contract Roshen from 10/4/08 on behalf of

11 Interpage, correct?

12 A    2009, yes.

13       THE COURT:  There's no question.  There's no

14 question to the witness right now.  Next question.

15 BY MR. DRANGEL:

16 Q    Do you dispute any of the other payments that are in this

17 Exhibit P were made on behalf of Interpage Co., Gregory

18 Vernikov's Interpage Co.?

19 A    Interpage Co. was our company, part of Threeline.  Why

20 was I not supposed to pay?  I don't understand.

21       THE COURT:  Are you saying that the Interpage Co.

22 that is on these invoices does not belong to Mr. Vernikov?  Is

23 that your testimony?

24       THE WITNESS:  No, I do not want to say that.

25       These are the documents that we used and the name

KERZHNER - CROSS - DRANGEL

1    Interpage was -- the name that we used alongside with

2    Threeline.

3            THE COURT:  But that's not my question.  My question

4    is:  These invoices indicate that this is Interpage Inc.,

5    correct?  Interpage Co.  Sorry, Interpage Co.  Correct?

6            THE WITNESS:  Yes.

7            THE COURT:  And that is not your company; is it?

8            That's a pretty simple answer.

9            Interpage Co., is that your company or not?

10           THE WITNESS:  Interpage Co.?

11           THE COURT:  Interpage Co., is that your company?

12           THE WITNESS:  Interpage Co. Inc. is our company.

13           THE COURT:  Correct.  And that is not the -- I'm

14   talking about the company that is referred to in these

15   documents, Interpage Co.

16           Is that or is that not your company?

17           It's either a "yes" or "no" answer.  Is it your

18   company or is it not?

19           THE WITNESS:  No.

20           THE COURT:  It is not.

21           All right, next question.

22   BY MR. DRANGEL:

23   Q    If you could take a look at Defendants' Exhibit R, and

24   tell me what these documents appear to be.

25           (Whereupon, the witness is reviewing the document.)

KERZHNER - CROSS - DRANGEL

1    A    Okay.

2    Q    Are these payments that were made by Threeline Imports to

3    Interpage Co., Gregory Vernikov's Interpage Co.?

4    A    Yes.

5    Q    Okay, and what were these payments made for?

6    A    It's hard to say from looking at this, but if he made

7    payments, then we reimbursed him as the course of business but

8    it doesn't say it here.

9    Q    Are these for the purchase of foods products from

10   Interpage Co.?

11   A    Maybe he paid for something and we reimbursed him for it.

12   I cannot say.

13          THE COURT:  All right, here's one.  Let's look at

14   page -- the page number ending in 275.

15          It says that in 2010, in July, you paid him -- you

16   paid Interpage Co., which is his company, correct?

17          THE WITNESS:  (In English.)  Uh-huh.

18          THE COURT:  You paid him $66,000 and some.

19          THE WITNESS:  (In English.)  Uh-huh.

20          THE COURT:  What's that for?

21          THE WITNESS:  Articom.  Articom.

22          What was Articom?

23          THE WITNESS:  (In English.)  Probably for sunflower

24   seeds.

25          THE COURT:  Through the interpreter.

KERZHNER - CROSS - DRANGEL

1   A     It's probably for sunflower seeds.  He paid for the

2   sunflower seeds and we reimbursed him.

3            THE COURT:  So $66,000 is for sunflower seeds?

4            THE WITNESS:  Yes.

5            THE COURT:  Okay.

6            THE WITNESS:  That's the price of a container, yes.

7            THE COURT:  Go ahead.

8   BY MR. DRANGEL:

9   Q     Is that your signature on all these checks?

10  A     Yes.

11  Q     And most of the checks seem to reference in the memo

12  section C-O-N-T.

13           Does that mean container?

14  A     Where is it, C-O-N-T?

15  Q     Now in the memo section of the check, on a number of

16  pages, 278, 276 says "payment for C-O-N-T".

17  A     Some say "PO," that's purchase order, some say "invoice

18  number".

19  Q     Okay.  And page 280 indicates "container for Roshen,"

20  check number 4076, signed by you.

21  A     Okay.

22  Q     And I believe we discussed earlier that Roshen was the

23  contract that Gregory Vernikov's Interpage had; is that

24  correct?

25  A     Yes.

KERZHNER - CROSS - DRANGEL

1   Q    And this check is dated when?

2   A    2010.

3   Q    And that's during the period of time that Gregory

4   Vernikov was an employee of Threeline; is that correct?

5   A    Yes.

6   Q    And is every single one of these checks made out to

7   Interpage Co.?

8   A    My QuickBooks on my computer had it set up that way.  I

9   don't know.

10  Q    Actually, if you look later on, 284 says direct payment

11  to Gregory Vernikov.

12  A    Yes.

13  Q    This is not the same Interpage Co. Inc. that you referred

14  to, correct?

15  A    Yes.

16  Q    I'm going to draw your attention to Defendants'

17  Exhibit MM, double M.

18       Do you know what this document is?

19  A    Yes.

20  Q    What is it?

21  A    It's an Interpage Company Co. Inc.

22  Q    Who maintained this record book?  Was it --

23  A    It's our partner, Norman Katsnelson, opened this company

24  in 2010.

25  Q    Do you know if this document was ever actually signed by

KERZHNER – CROSS – DRANGEL

1    anybody?

2    A    No, it was only a verbal contract.

3    Q    And have you ever seen the actual black book that it came

4    in?  Did it come in a black book?

5    A    Yes, it was a thick book.

6    Q    Okay.  And did a stamp come with that?

7    A    Probably.

8            THE COURT:  Do we have it?

9            MR. DRANGEL:  We have the stamp.

10           THE COURT:  No, do we have something that's signed?

11           MR. DRANGEL:  We do not, because we do not believe

12   it was ever signed.

13           THE COURT:  That's okay.  All right, next question.

14   BY MR. DRANGEL:

15   Q    Okay.  And we have referenced two contracts earlier, or

16   you did, Franz Tress and ALB-GOLD agreements.

17           Correct?  Are you familiar with those?

18   A    Yes.

19   Q    And those were Plaintiff's Exhibit 16 and Plaintiff's

20   Exhibit 18.

21   A    Okay.

22   Q    Can you just take a quick look at that?

23   A    I don't know.

24   Q    Okay.  If a stamp existed for Interpage Co. Inc., why was

25   it not used on those documents?

KERZHNER - CROSS - DRANGEL

1    A    Because Gregory used that stamp.

2    Q    But isn't --

3    A    We did not.

4    Q    -- it your testimony that Gregory signed those documents

5    on behalf of Interpage Co. Inc.?

6    A    Which documents?

7    Q    The agreement that I just referenced you to.

8    A    I don't understand.

9         THE COURT:  Plaintiff's Exhibit 16 and 18.

10   Q    You testified earlier that Gregory signed those documents

11   on behalf of Interpage Co. Inc.; is that correct?

12   A    Yes.

13   Q    And is there a stamp on those documents?

14   A    Yes.

15   Q    And is that the Interpage Co. stamp of Gregory Vernikov?

16   A    Yes.

17   Q    That we referenced earlier on the Brivais Vilnis

18   contract; is that correct?

19   A    Probably.

20   Q    So why would he not use an Interpage Co. Inc. stamp that

21   you said exists when executing this agreement --

22        MR. FILOSA:  Objection.

23   Q    -- of Interpage Co. Inc.?

24        MR. FILOSA:  Objection calls for speculation.

25        THE COURT:  Overruled.

KERZHNER - CROSS - DRANGEL

1          Do you know why?

2          THE WITNESS:  Because as a course of -- during the

3     course of business, we did not distinguish between the

4     Interpage Co. and Interpage Co. Inc. until the proceedings.

5          THE COURT:  Until what proceedings?  This lawsuit?

6          THE WITNESS:  Yes, until this here.

7     Q    Right, well, isn't it true that you actually understood

8     that this agreement was -- both of these agreements were

9     entered by Interpage Co. and not Interpage Co. Inc.?

10    A    No, I did not distinguish it because we did business as

11    Interpage and Threeline at the same time.

12    Q    I'm going to draw your attention to your testimony from

13    your deposition, which I'm going to put up on the screen so

14    you can see it.  It's page 70, line 12 through line 16.  Take

15    a look at that.

16         And I'm asking you questions about a Franz Tress

17    agreement, didn't you testify?

18         "QUESTION:  Who has the agreement with Franz Tress

19    as far as you know?  Threeline or Interpage?  And Interpage,

20    when we were talking about this, was Interpage Gregory

21    Vernikov's Interpage."

22         And you answered:

23         Interpage signed the contract with them, but with

24    them for us.

25         MR. FILOSA:  Again, Your Honor, I'm just going to

KERZHNER - CROSS - DRANGEL

1    object to the extent that the transcript will speak for

2    itself, for which entity is being referring to there, but

3    subject to that objection.

4              THE COURT:  All right.

5    Q    At the time of this deposition, wasn't it your position

6    that Gregory Vernikov's company signed the Franz Tress

7    agreement for your benefit, for Threeline's benefit?

8    A    Yes, for Threeline.

9    Q    But it was Interpage Co., Gregory Vernikov's company,

10   that signed.

11             Wasn't it your testimony that Interpage Co. signed

12   it?

13   A    Well, no, it said Interpage Co. Inc., but for me it was

14   not important.

15             THE COURT:  You might have exhausted this area.

16   BY MR. DRANGEL:

17   Q    Okay, with regard to Interpage Co. Inc. company, do you

18   know if that company ever conducted any business?

19   A    There was several transfers.  We had several contracts

20   with -- under Interpage name, and Gregory's account was

21   closed, so there was some transactions.

22   Q    So there were some transactions from the Interpage Co.

23   Inc. bank account, correct?

24   A    No, from us.

25             THE COURT:  The question is:  Did Interpage Co. Inc.

KERZHNER - CROSS - DRANGEL

1    do any business at all?

2             THE WITNESS:  That's us and, yes, we did business.

3             THE COURT:  As -- as --

4             MR. DRANGEL:  Interpage Co.

5             THE COURT:  Interpage Co. Inc.

6             You're saying that you did business as Interpage Co.

7    Inc. under that name?  Is that what you're saying?

8             THE WITNESS:  Yes.

9             THE COURT:  Name a transaction that you did under

10   Interpage Co. Inc.

11            THE WITNESS:  In our products, our private labels

12   had that name that said distributor is Interpage.

13            THE COURT:  But so did Interpage -- never mind.  Go

14   ahead.

15   BY MR. DRANGEL:

16   Q    Those same packaging that you referenced, didn't they

17   also identify Gregory Vernikov and his cell phone number on

18   them?

19   A    Not in all of them.

20   Q    And with regard to the transactions, wouldn't these

21   transactions have been processed through the Interpage Co.

22   Inc. bank account?

23   A    There was some transactions, I don't remember which ones

24   exactly, that went through Interpage Co. Inc. in 2009.

25            THE COURT:  Are there any records to that?

KERZHNER – CROSS – DRANGEL

1           MR. DRANGEL:  I would like you to look at

2    Defendants' Exhibit double N, as in Nancy.  In response to

3    discovery request, this is the bank accounts records that were

4    produced in connection with Interpage Co. Inc., and the

5    representation was made that these were the complete bank

6    account records for that company.

7    Q    Can you show me any transactions that occurred for this

8    company?

9    A    There are some transactions there, but I don't remember

10   what they were.

11          MR. DRANGEL:  We'll give you a minute to look

12   through it to see if you see any.

13          (Whereupon, the witness is reviewing the document.)

14          THE COURT:  Are these the complete records?

15          MR. DRANGEL:  These are the complete records that

16   were turned over.

17   A    All financial operations were going through Threeline

18   Imports, but I don't remember which.

19   Q    So there was no QuickBook accounts for Interpage Co.

20   Inc.?

21   A    No, there is no QuickBooks.

22          Interpage also doesn't have any QuickBooks at all.

23   Q    Do you know if there were ever any tax returns filed on

24   behalf of Interpage Co. Inc.?

25   A    I'm sure there were.

KERZHNER - CROSS - DRANGEL

1          MR. DRANGEL:  We would ask for the production of

2     those, and they were not produced.

3          THE COURT:  So no tax returns?

4          So were they filed?

5          THE WITNESS:  I think there were two years or

6     something that was filed, but I need to find out from

7     accounting if there were any.

8          THE COURT:  Well, shouldn't that have happened

9     already?

10         THE WITNESS:  No one asked me about it.  I did not

11    know.

12    BY MR. DRANGEL:

13    Q    As far as these bank statements, what's the address

14    identified on the bank statements?

15    A    41 Terrace Place.

16    Q    Is that Threeline's address?

17    A    This is the address for Trilini International, address of

18    our partners, Threeline's partners.

19    Q    Okay, earlier you testified that you believed that as of

20    2009, Gregory Vernikov did not have an Interpage Co. business.

21         Do you still stand by that statement?

22    A    There was a time when the bank account was closed.

23         THE COURT:  All right.  You can move on.

24         MR. DRANGEL:  Thank you.

25    Q    You had testified earlier that you're unaware that

KERZHNER – CROSS – DRANGEL

1  Delicious Wonders appeared on the packaging before you

2  actually opened the products when they arrived in

3  January 2013; is that correct?

4  A    Yes.

5  Q    Okay.  Were you aware of Delicious Wonders products

6  before January 2013?

7  A    Yes.

8  Q    Were you aware that Gregory Vernikov was somehow

9  associated with the company that owned the Delicious Wonders

10  trademark?

11  A    I knew that it was not his name, it was somebody else's

12  name.

13        And he was associated with only frozen cakes.

14  Q    Did you know that Delicious Wonders product was applied

15  to a cod liver product?

16  A    No.

17  Q    Threeline ever sell a cod liver, Delicious Wonders

18  product?

19  A    It was never brought to my attention, I don't know.

20  Q    I'm going to ask you to look at Defendants' Exhibit

21  double N.

22        Is there a number of sample labels that were sent to

23  you which correspond with Plaintiff's Exhibit 6 through 8.

24  A    Uh-huh.

25  Q    You're familiar with these?

KERZHNER - CROSS - DRANGEL

1    A    Yes, that's something I talked about earlier.

2    Q    Okay, and you had seen each of these products when

3    ordering the product, correct?

4    A    One more time?

5    Q    And you had seen each of these mockup invoices -- sorry,

6    mockup labels before ordering the Delicious Wonders ALB-GOLD

7    product; is that correct?

8    A    Honestly, I don't remember if there was the Delicious

9    Wonders logo there.  That's not something that bothered me.

10   What bothered me was the chicken logo.

11   Q    Okay.  Each and every one of these mockup labels does

12   identify Delicious Wonders, correct?

13   A    No.

14        If you look at page 382.

15   Q    Okay, the majority of them do; is that correct?

16        MR. FILOSA:  Object to form.

17        THE COURT:  Overruled.

18   Q    And you never expressed a concern to Mr. Vernikov that

19   you did not want to use Delicious Wonders on the products?

20   A    We did not even think about the Delicious Wonders' logo

21   about having it there or using it.  We were not discussing

22   Delicious Wonders.  We were just discussing the image.

23        THE COURT:  Which exhibit are you on?

24        MR. DRANGEL:  Defendants' Exhibit double A, Your

25   Honor.

KERZHNER - CROSS - DRANGEL

1    A    What we were looking at was the image.

2            THE COURT:  There's not a question for the witness

3    right now.

4    Q    If you can take a look at Defendants' Exhibit -- sorry,

5    Plaintiff's Exhibit 11, and Plaintiff's Exhibit 12.

6    A    Okay.

7    Q    Are you familiar with these invoices?

8    A    Yes, I said before that they look familiar to invoices I

9    had seen them.

10   Q    And you personally processed these invoices?

11   A    Yes.

12   Q    These are dated December 2012, correct?

13   A    Yes.

14   Q    And each of these products exclusively notes the product

15   as Delicious Wonders followed by what type of pasta product

16   that is; is that correct?

17   A    Yes.

18   Q    When you received these invoices, you made no mention to

19   Lenny or Gregory with an objection to the use of the Delicious

20   Wonders trademark; is that correct?

21   A    Yes, my objective was to check the price and the quantity

22   in the container.

23           THE COURT:  So you did complain?

24           THE WITNESS:  I not even paid attention that it was

25   Delicious Wonders.

KERZHNER - CROSS - DRANGEL

1    THE COURT:  Okay.

2    THE WITNESS:  The next bandnudeln, no, I did not

3  really understand what it was.

4    THE COURT:  Okay, next question.

5  BY MR. DRANGEL:

6  Q    Sorry, Your Honor.

7    Okay, if you can turn to Plaintiff's Exhibit 66,

8  which we discussed earlier.

9  A    Okay.

10  Q    Can you tell me what that is?

11  A    I mentioned before that it was a record of pasta 755 that

12  was in the container.

13  Q    Okay, and who printed out that document?

14  A    Maybe I did.

15  Q    Who else would have had access to be able to print out

16  that document?

17  A    Our accountant.

18  Q    And what did that show?  That document?

19  A    How the pasta was sold and to whom, the quantity.  And

20  boxes.

21  Q    Okay.  And in the memo section, is it clear that 755

22  product was referenced within your QuickBook database as

23  either DW or Delicious Wonders pasta products?

24  A    Yes.

25  Q    And is that the same for all the other pasta products

KERZHNER - CROSS - DRANGEL

1   that you purchased from ALB-GOLD?

2   A    The girl that was entering the data entered as it was

3   presented on the invoice.

4              THE COURT:  Is it time to take a break?

5              MR. DRANGEL:  That's fine.

6              THE COURT:  How much longer do you have with this

7   witness?

8              MR. DRANGEL:  Another half hour.

9              THE COURT:  Let's just take five or so minutes, all

10  right?

11             MR. DRANGEL:  Sure.

12             THE COURT:  Your witness is on cross-examination, so

13  I don't know how you all feel about that.

14             No, I just wanted to make sure if everybody was

15  aware.  All right.

16             (Whereupon, a recess was taken at 4:17 p.m.)

17             THE COURTROOM DEPUTY:  All rise.

18             THE COURT:  Everybody can sit down.

19             THE COURTROOM DEPUTY:  The witness, you are reminded

20  you are still under oath.

21             THE COURT:  All right.  Go ahead.

22  BY MR. DRANGEL:

23  Q    Before the break, we had taken a look at the document,

24  which is the sale of product GP30755.

25             THE COURT:  What exhibit are we on?

135
PROCEEDINGS

1          MR. DRANGEL:  Now, I'm going to bring us to the next

2    one.

3          That was.

4          MR. WOLGANG:  Sorry, what was that?

5          THE COURT:  Its okay.  Just go to the next one.

6    Q    I'm going to ask you to take a look at Defendants'

7    Exhibit BD; B as in boy, D as in dog.

8    A    Okay.

9          MR. DRANGEL:  Your Honor, this is a report for the

10   same number as the exhibit we just looked at, Plaintiff's

11   Exhibit 66.

12         THE COURT:  Okay.

13         MR. DRANGEL:  The only difference is that the memo

14   section, every single reference to Delicious Wonders was

15   removed.  As I discussed in my opening statement, there were

16   two QuickBook databases that were produced to us during the

17   course of discovery.

18         THE COURT:  So just do me a favor and show me an

19   example of what you're talking about.

20         MR. DRANGEL:  And so if you put side by side

21   defendants -- sorry, Plaintiff's Exhibit 66 --

22         THE COURT:  Right.

23         MR. DRANGEL:  -- and defendants, what I showed you

24   Defendants' BD --

25         THE COURT:  Right.

PROCEEDINGS

1          MR. DRANGEL:  -- you will see that these are the

2    same exact inventory reports, one produced -- actually it's

3    been produced in a paper version of it itself, and then I

4    printed out this from the QuickBook database, DB.

5          And every single reference where the memo section of

6    their document said "Delicious Wonders" but was removed in

7    this database that was produced to us.  They actually went

8    through the database and removed every single reference to

9    Delicious Wonders.

10         And if you want, you can go through the next couple

11   of pages, you can see what we did was we pulled out specific

12   invoices.

13         THE COURT:  So my question -- I'm not a

14   hundred percent, I can see that they are different.  Which --

15   are you saying that this document was altered?

16         MR. DRANGEL:  Yes.

17         THE COURT:  Which one?

18         MR. DRANGEL:  Well, that's what I'm showing you.

19         THE COURT:  Just tell me, is it yours or it is --

20         MR. DRANGEL:  Mine.  Mine.

21         THE COURT:  Yours.

22         So this is what was turned over to you?

23         MR. DRANGEL:  Well, initially, yes.  The one that

24   was turned over to us was -- in paper format was this without

25   Delicious Wonders.  But if you actually go through to IPV2063

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    within the document.

2              THE COURT:  What is that?

3              MR. DRANGEL:  Okay, that is a screen shot of what

4    happens when you click on the invoice number 37768, which is

5    shown in IPV2062.  And what that indicates in the note section

6    is that someone named Maya edited this document on March 20th,

7    2016.

8              THE COURT:  All right, so when did this one,

9    Plaintiff's 66, is that the original?  Is that the way it's

10   supposed to be?

11             MR. DRANGEL:  Correct.

12             THE COURT:  That's the unaltered one.

13             MR. DRANGEL:  Right.  The unaltered one was the one

14   that was produced, and they produced it in order to avoid

15   showing that this product was identified as Delicious Wonders.

16             THE COURT:  Wait, I'm confused, you're -- just so I

17   know.  The one that you were given is your exhibit, correct?

18             MR. DRANGEL:  We were actually given both of them.

19             THE COURT:  At the same time?

20             MR. DRANGEL:  Well, Threeline produced this

21   documented after in the course of litigation.

22             THE COURT:  Which document?

23             MR. DRANGEL:  Sorry.  66.

24             THE COURT:  All right.  So that the came off.

25             After what?

PROCEEDINGS

1          MR. DRANGEL:  After we had already been made aware

2    that they had removed Delicious Wonders from every single

3    reference in the QuickBook database.

4          THE COURT:  And when did you get the one without the

5    Delicious Wonders?  Was that before the injunction?

6          MR. DRANGEL:  No nothing happened before the

7    injunction.  This happened during the course of discovery in

8    March.

9          THE COURT:  How much time separates the two

10   disclosures?

11         MR. DRANGEL:  Two days.  They realized -- I'm not

12   exactly sure what happened, but they decided to replace the

13   tampered with one with the --

14         THE COURT:  The real one.  All right.

15         Do you want to say something?

16         MR. WOLGANG:  Yes, Your Honor, I do.

17         I'm going to object to any use of this document or

18   any questioning of the witness about this document.  And I

19   thank the Court for asking the questions they just asked,

20   because I want to lay out the chronology of what happened

21   here.

22         THE COURT:  Do you want me to compare it with the

23   witness here?  I mean there's no jury here.

24         If this was what was originally turned over, I mean

25   that's a thing.  That's what -- and I'll draw whatever

PROCEEDINGS

1    inference.

2          MR. ROSENBERG:  Well, the point is we don't want the

3    Court to draw an inference, which I think is both unfair and

4    very prejudicial.  I would like the Court to know exactly what

5    happened and the time it happened before you make that

6    inference.

7          THE COURT:  I haven't done anything yet.  I see them

8    both.

9          Does this witness have -- can this witness shed

10   light on it?  It seems to me like it's an appropriate subject

11   for cross-examination.

12         MR. ROSENBERG:  I think my office can shed light on

13   it.

14         THE COURT:  Well, let's finish with this witness and

15   then -- I mean, it's in evidence.  They're both in evidence.

16   And the way this generally works is you can both argue what

17   inference I should draw from it.

18         I don't think now is the time for you to be

19   describing what your role is, the witness is on the stand,

20   she's being cross-examined.

21         So let's finish the cross soon, and then you can

22   make whatever arguments you want to make about it.

23         MR. ROSENBERG:  Your Honor, just so we're all on

24   same ground rules here, I thought you said earlier that unless

25   we object, everything on the witness list would deemed to be

KERZHNER – CROSS – DRANGEL

1   admitted.

2                THE COURT:  You're objecting.

3                MR. ROSENBERG:  We are now objecting to this.

4                THE COURT:  And your objection is overruled.  Okay?

5                All right, go ahead.

6                MR. DRANGEL:  Thank you, Your Honor.

7   BY MR. DRANGEL:

8   Q    Ms. Kerzhner, the document that I was just discussing

9   with the Judge that says "edited by Maya," did you actually

10  make a change to this document?

11  A    Which one?  The disc.

12  Q    Sorry, BD.  And I'm talking about document number

13  IPV2063.

14               THE COURT:  2063.  And the question to the witness

15  is:  Did she make changes to the document; is that correct?

16               MR. DRANGEL:  Right.

17               THE COURT:  What's the answer to that question?

18  A    At some moment they demanded of us our QuickBook

19  documents and reports.  There was a lot of talk about DW.

20               THE COURT:  Okay, that means Delicious Wonders,

21  right?

22               THE WITNESS:  Yes.

23               We never wanted to use Delicious Wonders, and it

24  happened so that the Delicious Wonders was entered into the

25  computer system.

KERZHNER - CROSS - DRANGEL

1          THE COURT:  Okay, here's the question:

2          Who entered Delicious Wonders into the computer

3   system?

4          THE WITNESS:  A female that works at data entry.

5          THE COURT:  Under your direction?

6          THE WITNESS:  Yes.

7          THE COURT:  And who took Delicious Wonders out?

8          THE WITNESS:  I did.

9          THE COURT:  Okay.  And when did you do that?

10         THE WITNESS:  When Gregory raised the big issue that

11  we are using Delicious Wonders.

12         THE COURT:  So what date was that?

13         THE WITNESS:  I don't remember the exact -- I don't

14  remember --

15  BY MR. DRANGEL:

16  Q    Well, would it refresh your recollection if you look at

17  this document, it says "last edited on March 20th, 2016 by

18  Maya"?

19  A    Yes, March 2016.

20         THE COURT:  So you changed it on that date, right.

21         THE WITNESS:  Yes.

22         THE COURT:  All right.  Next question.

23         Okay, let the lawyer asks you questions.

24  BY MR. DRANGEL:

25  Q    Okay.  And why did you make that change to the database?

142

KERZHNER - CROSS - DRANGEL

1   A    Well I was so stressed because of all that DW, DW

2   bothering me, and I decided let's just get rid of the DW.

3        And that same day I told my son that I did this, and

4   then he told me that I should not have done that.

5        THE COURT:  So what did you do?

6        THE WITNESS:  He then called the lawyer and the

7   lawyer called the judge or the assistant of the judge and

8   informed that they would provide the database so that they

9   don't have to look at that other document.

10       It was not done intentionally, it was just done

11  because of the stress.  Because the attorney was stressing us

12  a lot.

13       THE COURT:  Okay.  Go ahead.

14  BY MR. DRANGEL:

15  Q    I'm going to refer you to the declaration of your

16  husband, Leonid Kerzhner, which is Exhibit double R.

17  A    Okay.

18  Q    Are you familiar with the declaration?

19  A    Okay.

20  Q    You are aware that in support of his declaration there

21  was a check that was referenced as representative of a payment

22  for the development of the chicken and egg logo; is that

23  correct?

24  A    Yes.

25  Q    Okay.  And can you point out that check to me in

KERZHNER - CROSS - DRANGEL

1    Plaintiff's Exhibit -- sorry, Defendants' Exhibit double R?

2                THE COURT:  Do you just want to tell me what you're

3    talking about so we can move this along?

4                Why don't you reask the question.

5    Q    Can you point out the check -- I'm also going to

6    reference --

7                THE COURT:  Where's the check?

8                MR. DRANGEL:  To speed it up.  Defendants'

9    Exhibit SS and Defendants' Exhibit TT.

10   Q    Okay, and there's a check referenced, it says "circle the

11   check" in that exhibit.

12               Is that the check that was supposedly paid to Pravda

13   for selling the chicken and egg logo?

14               THE COURT:  So that's the question, it's really

15   quite simple.

16               Is this the check that was written to Pravda for the

17   logo.

18               So the answer is "no".

19               THE WITNESS:  No.

20               THE COURT:  Okay, next question.

21   BY MR. DRANGEL:

22   Q    At the preliminary injunction hearing, it was your

23   testimony that a check was paid to Pravda Media for the

24   development of the chicken and egg logo; is that correct?

25   A    Yes, I didn't realize --

KERZHNER - CROSS - DRANGEL

1          THE COURT:  Let him --

2   A    Yes, I didn't realize it, and I knew that we were in

3   contact with Pravda Media to develop the logo, that I was in

4   contact with Pravda's Media, and I wrote out the check but

5   I -- and the time frame of the check matched that time frame,

6   so I thought this was the check for it.

7          But when we investigated it further, we found out

8   that this was, in fact, for canned meat that also Gregory

9   handled.

10          THE COURT:  Canned meat, is that what you said?

11          THE WITNESS:  Canned meat, yes.

12   Q    And I believe you testified in January of 2016, that you

13   discovered this after ALB-GOLD visited you, in the summer of

14   2015?

15          THE COURT:  You have to let the interpreter

16   interpret.

17          THE WITNESS:  Okay.

18   A    I don't remember when I realize it, but as we looked

19   through documents, I realized that this check was not to

20   Pravda Media -- it was to Pravda Media but for another item.

21   Q    But you did have this realization before the date of the

22   deposition where you told me that your testimony was false,

23   correct?

24          THE COURT:  Let him finish the question.

25          Go ahead.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

KERZHNER - CROSS - DRANGEL

```
1    Q      You were aware that this payment was not made for

2    development of the chicken and egg trademark before

3    January 21st, 2016, the date of your deposition; is that

4    correct?

5    A      When I found out about it, I spoke before the judge or at

6    a deposition that this check I identified by mistake that it

7    was for another item to Pravda Media.  I never take this back.

8    Q      But in your testimony that day, you indicated that you

9    had known about this since the previous summer; is that

10   correct?

11   A      I did not say.  I do not remember.

12   Q      With regard to the check itself, did you -- actually, it

13   indicates that the check or this whole slew of checks have

14   been redacted; is that correct?

15   A      Yes.

16   Q      Okay.  And did you actually do the redactions on this

17   page?

18   A      No.

19   Q      Do you know who did the redactions?

20          THE COURT:  Wait, wait, wait you have to wait for

21   the interpreter.

22   A      No.

23   Q      Do you know who did the redactions on this page?

24   A      No.  I don't know.

25   Q      You see the handwriting in the upper right-hand corner
```

KERZHNER - CROSS - DRANGEL

1    says "redacted".

2            Do you know whose handwriting that is?

3    A    I do not know.

4    Q    Is that your son, Alex Kerzhner's, handwriting?

5    A    Maybe.

6    Q    And as far as redactions, the redactions would be the --

7    the lines through all the designations in black, correct?

8    A    Yes.

9            MR. DRANGEL:  Okay.  Your Honor, after seeing this,

10   we would ask for the production of the actual check and were

11   produced Exhibits SS and TT direct from HSBC bank.

12           And if you'll take a look at those references,

13   you'll see that the redactions --

14           THE COURT:  Which you can see through, by the way.

15           MR. DRANGEL:  -- are black.

16           THE COURT:  Yes.

17           MR. DRANGEL:  But if you look at the memo section

18   for the check that was allegedly redacted, you can see that

19   it's whited out.  So we can see that there were -- it wasn't

20   blacked out, it was actually whited out.

21           THE COURT:  Okay.

22           MR. DRANGEL:  So it didn't follow the format of all

23   the other redactions here, so it seems curious to us, so we

24   requested that the other documents be produced through the

25   magistrate.

KERZHNER - CROSS - DRANGEL

1          And what we received were the form of documents

2     tabbed as SS and TT.  And what those documents show is that

3     the memo section actually says "for Interpage Co."  So

4     somebody whited these out prior to the preliminarily

5     injunction hearing.

6     Q    Was that done for the purpose of concern over that the --

7     it was clear that the chicken and egg logo was actually

8     created for Interpage Co. and not Interpage Co. Inc., or

9     anybody else?

10    A    I had no intention of doing that.  The check is signed by

11    me and it was issued by me, but I don't know who wrote that

12    memo for Interpage.

13         THE COURT:  The question is:  Do you know who

14    crossed it out?

15         THE WITNESS:  I do not know.  I do not even know who

16    wrote this here for Interpage.

17         And it doesn't say Interpage Inc., it just said

18    Interpage only, and it wouldn't have bothered me anyways.

19         THE COURT:  Is it the case that the crossing out was

20    done before the hearing in front of Judge Cogan?

21         THE WITNESS:  I do not know.

22         THE COURT:  Does Judge Cogan know about this?

23         MR. FILOSA:  He does, Your Honor.

24         MR. DRANGEL:  How does Judge Cogan know about this?

25         MR. FILOSA:  May I.

KERZHNER - CROSS - DRANGEL

1                THE COURT:  Sure.

2                MR. FILOSA:  This was raised in support of

3    defendants' second motion to vacate the preliminary

4    injunction.  It was extensively briefed.  Judge Cogan denied

5    that motion.  It was also raised as part of the plaintiff's

6    proposed third motion for reconsideration over which Your

7    Honor presided over a pretrial conference.

8                THE COURT:  I think the issue there was whether

9    there was a trademark at the time.  I think that was what the

10   issue was.

11               MR. FILOSA:  But again, with respect -- certainly on

12   the second motion for reconsideration, it was -- the check was

13   submitted as an exhibit.  That issue was considered.  It was

14   rejected by Judge Cogan.

15               THE COURT:  How much more?  Can you wrap it up?

16               MR. DRANGEL:  Yes, I'm trying.  Sorry.

17               THE COURT:  That's fine.

18   BY MR. DRANGEL:

19   Q    Okay, I'm going to ask to you take a look at Defendants'

20   Exhibit double zero, double O.

21   A    Okay.

22   Q    Okay, are you familiar with this email?  Generally?

23   A    Okay, yes, I'm familiar.

24   Q    Can you tell me what it's about?

25               THE WITNESS:  (In English.)  It's about --

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

KERZHNER – CROSS – DRANGEL

1              THE COURT:  Let the interpreter speak.

2              Can you translate that for me, the email?

3              THE INTERPRETER:  Yes.

4              MR. DRANGEL:  I was going to get to that.

5              THE COURT:  Let's get there right now.  What does it

6    say?

7              THE INTERPRETER:  Leonid, this is the final version

8    of labels for bullheads.  Let me know if there are any

9    comments.

10             THE COURT:  Okay.

11   BY MR. DRANGEL:

12   Q    Okay, is this a product that was for Interpage Co. or

13   Threeline?

14   A    All products are for Threeline.

15   Q    Okay, but you didn't register a trademark for this; did

16   you?

17   A    No.

18   Q    And the time period of this is nearly the exact time

19   period of the discussions about the ALB-GOLD label,

20   October 2012; is that correct?

21   A    Yes.

22   Q    And the label says "Interpage International, imported

23   by," correct?

24   A    Yes.

25   Q    Okay.  And this actually says the same exact thing that

KERZHNER - CROSS - DRANGEL

1   was said in the email to Leonid at Plaintiff's 52 regarding

2   the ALB-GOLD agreement; is that correct?

3   A    Yes.

4   Q    Did you purchase Bullhead products from Interpage Co,

5   Gregory's Interpage Co.?

6   A    I repeat, I -- we did not purchase from Interpage.  He

7   worked for us as a buyer and he did negotiations on our

8   behalf.

9   Q    Do you know if he sold this product, this Bullhead

10  product?

11  A    I don't remember if it was the Bullhead.  I remember that

12  it issue or not, I'm not sure, but me and Leonid will speak

13  more about it.

14  Q    Well, actually, let's ask you about it, since you seem to

15  know more about it than he would.

16           THE COURT:  Don't argue with the lawyer.

17           Next question.

18  Q    Why don't we take a look at the following exhibit,

19  Defendants' Exhibit double P.

20  A    Okay.

21  Q    Can you tell me what this is?

22  A    I know what it is.

23  Q    Can you let me know what that?

24  A    FDA paperwork.

25  Q    Okay.  Can you describe what happened here in this

KERZHNER - CROSS - DRANGEL

1   situation?

2   A    We bought products that were goods for consumption,

3   canned fish.  And Gregory had many problems with the FDA.

4         One day several people from the FDA came regarding

5   these products.  He was not in the office and I showed this to

6   him.

7   Q    Okay.  And whose products were those?  Were those

8   Threeline's or Interpage's?

9   A    We had no differentiation between Threeline or

10  Interpage --

11         THE COURT:  First of all, you have got to stop

12  interrupting --

13         THE WITNESS:  (In English.)  Okay.

14         THE COURT:  -- the interpreter.

15         What was your answer to that question?  There's no

16  difference between you and Interpage?

17         THE WITNESS:  Yes.

18         THE COURT:  I take it you're going to get to that

19  page 38, right?

20         MR. DRANGEL:  Yes.

21         THE COURT:  Let's go there now.

22  BY MR. DRANGEL:

23  Q    Okay, if you can take a look at page 38.

24         Was this document signed by you, if you look at

25  page 39?

KERZHNER - CROSS - DRANGEL

1   A    Yes.

2   Q    Okay.  And identified on this -- in this batch of

3   products is Bullhead tomato sauce products, correct?

4   A    Yes.

5   Q    And as part of this declaration I'm going to read to you

6   in the middle of the paragraph of 2038, it says:

7           "Mr. Gregory Vernikov of Interpage is responsible

8   for this shipment, and I am only renting him an office and

9   goods space in the warehouse."

10          Is that a correct statement?

11  A    It was an incorrect translation.  There were a lot of

12  them, I was nervous, I saw it later on.  I just wanted to have

13  it signed so that they would leave me alone.

14          THE COURT:  Did you ever call them to correct it?

15          THE WITNESS:  No, we had tried to reexport it to

16  Canada, these goods.

17  BY MR. DRANGEL:

18  Q    What would you have corrected about this statement?

19  A    That he was renting a space, that he just -- that he was

20  renting a space there, I would change it to that he was

21  keeping his goods there that had the name Interpage on it.

22  Q    And the date of this declaration is actually October 8th,

23  2009.  Is that the time period when Mr. Vernikov was actually

24  an employee of Threeline?

25  A    Yes.

KERZHNER – CROSS – DRANGEL

1    Q    Thank you.

2              You indicated that you -- the transactions that were

3    taking place for payments in euros that were made by Trilini

4    International.

5    A    Yes.

6    Q    In connection with those payments, you actually made a

7    3 percent service fee to Trilini International; is that

8    correct?

9    A    Yes.

10   Q    Do you know what that 3 percent service fee covered?

11   A    Yes, they had better rates, and they made payments for us

12   wherever we needed to immediately.

13             I did not have to work on it, because transactions

14   overseas is complicated, and they would provide that service

15   for me with better rates.

16   Q    Do you know if that 3 percent was the actual fee paid by

17   Trilini International for the actual transaction from U.S.

18   dollars to euros?

19   A    I just know that I paid 3 percent to Trilini

20   International for transactions.

21   Q    And you never questioned what the amount was applied to?

22   A    No, we just had an oral agreement that they would do the

23   transfers, and I paid the 3 percent.

24   Q    I'm just going to draw your attention to Plaintiff's

25   Exhibit 27, again.

KERZHNER - CROSS - DRANGEL

1          Okay, are you familiar with this?

2          (Whereupon, the witness is reviewing the document.)

3    Q    Is a warning letter that you had discussed earlier in

4    your testimony.

5          What's the date of that letter?

6    A    I don't see a date.

7    Q    Do you know the date that the warning letters were sent

8    out by your son?

9    A    It's better to ask him those questions.  I don't

10   remember.  And this doesn't have dates on it.

11         MR. DRANGEL:  Your Honor, we actually have

12   stipulated to that.  Specifically in the stipulation, we have

13   paragraph 24 indicates March 20th, 2015, a cease and desist

14   letter was sent.

15   Q    You had testified earlier, though, that in the summer of

16   2013, following Gregory leaving, customers had complained

17   about Gregory Vernikov continuing to sell; is that correct?

18   A    The clients, they did not complain about the products,

19   they said that our products were priced too high and Gregory's

20   products -- our clients said that our products with our logo

21   was being sold by Gregory for a lower price under the name of

22   Threeline, the same as Trilini before.

23   Q    And again, that was -- that took place in the summer of

24   2013; is that correct?

25   A    Yes.

KERZHNER – CROSS – DRANGEL

1  Q    Okay, and that's almost two years before you sent a

2  warning letter; is that correct?

3            THE COURT:  That's either a "yes" or "no" answer.

4            Two years before you sent the warning letter,

5  correct?

6            THE WITNESS:  Maybe.

7  BY MR. DRANGEL:

8  Q    Why did you wait so long to send a warning letter?

9  A    We did not wait, we were working.

10 Q    An injunction was issued against my client a year and a

11 half after or, actually, almost two years after you knew about

12 it; is that correct?

13 A    Yes, we had many issues after he left.  And that was

14 the -- this wasn't the first issue that we needed to handle.

15 Q    ALB-GOLD products, do you know if they're all kosher?

16 A    They have kosher products, if they are produced in their

17 plant.

18 Q    All products that you sold to them are all kosher?

19 A    Except for nests.

20 Q    When did Threeline first obtain a UPC code?

21 A    A month after Gregory left, I purchased 1500 UPC codes

22 for $125.

23            MR. DRANGEL:  I have no further questions, Your

24 Honor.

25            THE COURT:  All right, any redirect?

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

KERZHNER – REDIRECT – FILOSA

1        MR. FILOSA:  Very brief, Your Honor.

2        THE COURT:  Okay.

3   REDIRECT EXAMINATION

4   BY MR. FILOSA:

5   Q    Ms. Kerzhner, what is Brivais Vilnis?

6   A    It's a company that produces canned fish.

7   Q    All right.  Does Brivais Vilnis manufacture pasta

8   products?

9   A    No.

10  Q    Did Threeline ever purchase any product from Brivais

11  Vilnis bearing a chicken and egg label?

12  A    No.

13  Q    Did Threeline ever sell any product from Brivais Vilnis

14  bearing a chicken and egg label?

15  A    No.

16  Q    What are bullheads?

17  A    Also a canned fish.

18  Q    Did the Bullhead product that was exhibited on

19  Defendants' Exhibit 00, did that ever have a chicken and egg

20  logo on it?

21  A    No.

22  Q    At any time did Threeline ever express any interest in

23  selling a Bullhead under a chicken and egg logo?

24  A    No.

25  Q    In 2013 when -- in the summer of 2013 when you testified

KERZHNER - REDIRECT - FILOSA

1    that Threeline discovered that Mr. Vernikov was selling pasta

2    product under the chicken and egg label, do you know who the

3    manufacturer of that pasta product was?

4    A    ALB-GOLD.

5            MR. FILOSA:  No further questions, Your Honor.

6            THE COURT:  Anything else?

7            All right, you can step down.

8            (Whereupon, the witness was excused.)

9            THE COURT:  Can I see the lawyers at sidebar for a

10   second.

11           (Continued on the next page.)

12           (Sidebar conference.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1         THE COURT:  All right, so what's tomorrow?

2         THE COURT REPORTER:  Not tomorrow, the day after.

3         THE COURT:  Oh, that's right, we're off tomorrow.

4         MR. FILOSA:  So we're Thursday, I believe.

5         THE COURT:  I thought we were off tomorrow?

6     You asked me for Wednesday off.

7         MR. DRANGEL:  No, we asked for Thursday.

8         THE COURT:  No, absolutely you did not.  You asked

9     me for Wednesday off.  I think you might have been confused

10    about the days, maybe.  It was Wednesday, right?  There's --

11    I --

12        MR. DRANGEL:  Yes, we knew that we were supposed

13    correct it.

14        MR. FILOSA:  We discussed this.

15        THE COURT:  It doesn't matter.  So you are here

16    tomorrow?

17        MR. FILOSA:  Yes, if the Court's available tomorrow.

18        THE COURT:  Did we schedule something else?

19        THE LAW CLERK:  Can I talk to you for a moment?

20        THE COURT:  Yes.

21        (Discussion was had off the record.)

22        THE COURT:  We knew this because my clerk

23    rescheduled a doctor's appointment for tomorrow, so...

24        MR. DRANGEL:  Sorry about that.

25        THE COURT:  All right, what do we have tomorrow

SIDEBAR CONFERENCE

1    then?

2              MR. FILOSA:  Mr. Kerzhner, Leonid and Alex, and the

3    remainder of our plaintiff's witnesses are appearing.

4              THE COURT:  So it's the husband and the son?

5              MR. FILOSA:  Yes.

6              THE COURT:  And who else?

7              MR. FILOSA:  And Roman Katsnelson.  And then one

8    other gentleman, a nonparty from the --

9              THE COURT:  I have to tell you, that wasn't good,

10   that testimony.  Is the rest going to be like that?  I mean --

11   and I'm not telling you anything that is big secret.

12             On line 1 a question is asked where the answer is

13   "yes," and the exact same question, the answer becomes "no"

14   within a space of two minutes.

15             So you need to really have a conversation with them.

16   I mean, maybe I'm missing something and maybe I don't

17   understand but, you know, there's also a lot of stuff in here

18   that is wildly improper, if it's true.

19             And if one of the witnesses is a lawyer is going to

20   be testifying about blotting things out, it's really, really

21   inappropriate behavior.  And I'm sure you've discussed all of

22   this with them.

23             But if there are witnesses that are going to come in

24   here and say that they got phone calls, you know, in a lot of

25   parts of this town, that's a crime, both a federal one and a

SIDEBAR CONFERENCE

1  state one.

2         So as I say, I'm not trying to, you know, go all

3  drama on your here, but, you know, this is a pretty serious

4  allegation about playing fast and loose with some of the

5  evidence.

6         Maybe there's an explanation for it, and maybe it's

7  not true.  But it's rather astonishing, I have to say.  And as

8  I say, there could be a completely innocent explanation for

9  all of it, and I'm not being sarcastic when I say that.  It

10  just has a very bad sound, and it's not directed at you, by

11  the way.

12         MR. FILOSA:  I appreciate that.

13         Let's take it in turn.  The Pravda Media check,

14  again, that issue was raised before Judge Cogan.

15         THE COURT:  Slow down just a little bit.

16         MR. FILOSA:  It was raised before Judge Cogan and

17  was rejected.

18         THE COURT:  It was rejected, but I'm not

19  Judge Cogan.  It affects people's credibility if they are

20  tampering with evidence, and it seems to be pretty clear that

21  that's exactly what she did, and maybe the son, who's a

22  lawyer.

23         There are letters that are going out on their

24  different letterheads.  There are all the kind of things that

25  are happening here that, as I say, there may be a perfectly

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1    innocent explanation for them.  I mean, but I'm just kind of

2    perusing some of the stuff here, some of it doesn't look so

3    good.

4                MR. FILOSA:  On the issue of the chicken and egg,

5    Your Honor, though, again, here the testimony is fairly

6    consistent, again, with respect to the creation of the chicken

7    and egg.

8                THE COURT:  But it's -- but all I'm suggesting to

9    you is that if there were a jury here, a jury would be

10   instructed that in evaluating the credibility of a witness,

11   they could consider the entire witness' testimony and choose

12   whether to reject all of the testimony, or just a portion of

13   the testimony, if they found any of it incredible.

14               I mean, that's also just a simple fact of life of

15   common sense; if someone hears somebody being less than

16   truthful about subject A, the person may question their

17   credibility on subject B.

18               I'm not telling you anything you don't know, I'm

19   simply suggesting that you have a conversation with your

20   witnesses -- with your clients about what they're going to

21   with this case.

22               So, again, none of it is directed at you at all.

23   I'm just telling you the -- as I say, it's not -- like I'm not

24   telling you anything that all of us didn't hear in the

25   courtroom, so just something to think about.  Okay?

SIDEBAR CONFERENCE

1          MR. DRANGEL:  Your Honor, sorry, also just to add to

2    something, you're supposed to let two of my witnesses go

3    tomorrow because one of them flew in from Europe.

4          MR. FILOSA:  I don't have a problem with taking a

5    witness out of turn.

6          MR. DRANGEL:  And then I guess we'll go --

7          THE COURT:  And let's just do them efficiently, all

8    right?  Because a lot of things you don't have to prove to me,

9    because I'm not a jury.  So if things are in evidence, you

10   argue from them, that's also fine.

11         So we're going to take some people out of turn

12   tomorrow?

13         MR. DRANGEL:  Yes.

14         THE COURT:  All right.

15         MR. FILOSA:  So, wait, these are nonparties, are

16   they going to be here at 9:30 a.m.?

17         MR. ROSENBERG:  I will have them here.

18         MR. DRANGEL:  They're quick witnesses on a discrete

19   issue and that's it.  So then you'll open the record tomorrow,

20   so you can release your witness.  Okay.

21         THE COURT:  All right.  So you tomorrow.

22         MR. DRANGEL:  Thank you, Your Honor.

23         MR. FILOSA:  Thank you, Your Honor.

24         (End of sidebar conference.)

25         (Continued on the next page.)

PROCEEDINGS

1              (In open court.)

2              THE COURT:  So we'll start at 9:30 or 10 tomorrow?

3              MR. FILOSA:  9:30.

4              MR. ROSENBERG:  9:30.

5              THE COURT:  I forgot you were coming from far away.

6    All right.

7              Thank you to the interpreter for your services.

8              THE INTERPRETER:  My pleasure.

9              THE COURT REPORTER:  Your Honor, may I close the

10   record?

11             THE COURT:  You may.

12             (Proceedings adjourned at 5:03 p.m. to resume on

13   January 18, 2017 at 9:30 a.m.)

14

15                           I N D E X

16   WITNESS                                   PAGE

17

     MALVINA KERZHNER
18
     DIRECT EXAMINATION    BY MR. FILOSA        31
19   CROSS-EXAMINATION     BY MR. DRANGEL      102
     REDIRECT EXAMINATION  BY MR. FILOSA       156
20

21

22

23

24

25